MARK M. SHARF, ESQ. (SBN 140390)
SHARF LAW FIRM
15821 Ventura Blvd, Suite 245
Encino, CA 91436
Telephone: (818) 788-4800
Facsimile: (818) 905-6100

Attorneys for William S. Patrick

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In Re | ) | BK No. 1:07-bk-10312GM |
| | ) | |
| WILLIAM S. PATRICK, | ) | Chapter 7 |
| | ) | |
| Debtor | ) | **BRIEF RE LEGISLATIVE HISTORY; DECLARATION OF WILLIAM PATRICK** |
| | ) | |
| | ) | |
| | ) | Date: November 5, 2008 |
| | ) | Time: 10:00 a.m. |
| | ) | Ctrm: 303 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

26 USC §408 was passed into law as Public Law 93-406 in 1974.  As initially enacted it limited 60-day rollovers to one every three years.  Specifically, it read in pertinent part:

> "(B) Limitations – this paragraph does not apply to any amount described in subparagraph (A)(i) received by an individual from an individual retirement account or individual retirement annuity if at any time during the 3-year period ending on the day of such receipt such individual receiving any other amount described in that subparagraph from an individual retirement account, individual retirement annuity, or a retirement bond which was not includable in his gross income because of the application of this paragraph."

1   Public Law 95-600 changed the 3-year limitation to 1-year.

2   Both the Senate Report and the House Report which accompanied the Employee

3   Retirement Social Security Act in 1974 (i.e. P.L. 93-406) explain the purpose of the 3-

4   year limitation in the same manner.  Senate Report No. 93-383 (Aug. 21, 1973) at pp

5   5017-5018:

6
7   "Taxation of beneficiaries.-- Generally, the proceeds of an individual retire-
ment account are to be taxable to the individual when distributed. Since the
contributions to the account will be made with tax free dollars, the employee's
basis in the account will be zero.

8   The amounts distributed to the individual are not to be eligible for capital
gains treatment, and the special averaging rules applicable to lump sum distribu-

9   tions (under sec. 72) are not to be available. This should encourage the individual
to take down the amounts ratably over the period of his retirement. However, the

10   individual would be permitted to use the general averaging rules (sec. 1301).

11   If any individual borrows money, pledging his interest in the retirement
account as security, the portion pledged as security is to be treated as a distribu-

12   tion from the retirement account to the individual. This treatment also is consis-
tent with the committee's intention to encourage retirement savings, since in this

13   case if the employee had already pledged his retirement account as security for a
loan, he has no funds left for retirement. For the same reasons, any contribution to

14   an individual retirement account, or any income of the account, applied to the
purchase of life insurance protection under any retirement income, endowment, or

15   other life insurance contract also will constitute income to the individual.

16   For purposes of the estate and gift taxes the amounts in individual retirement
accounts are not to be excluded from tax (secs. 2039(c) and 2517). This too is
consistent with the committee's intent that the funds be spent during the individ-

17   ual's period of retirement.

   Rollovers.-- To permit flexibility with respect to the investment of an individ-

18   ual retirement account, the bill provides that money or property may be distributed
from an individual retirement account, without payment of tax, provided this same

19   money or property is reinvested by the individual within 60 days in another
qualifying individual retirement account. The transfer may be desired because the

20   individual desires to shift his investments, for example, from, or to, an annuity
contract, a mutual fund, a savings account or perhaps to a Government bond

21   (described below). To prevent too much shifting of investments under this
provision, the committee bill provides that this rollover can only be used once

22   every three years. Also, before releasing the account, the committee anticipates
that the custodian will be required by the Internal Revenue Service to receive a

23   declaration of intention from the individual as to the proposed reinvestment
(except in the case of an individual who was entitled to receive a distribution

24   because of his retirement at age 59 1/2, or because of disability). The custodian is
also to be required to notify the Service that a distribution of assets from the

25   account had been made.

   Qualified retirement bonds.-- In addition to the various types of investment

26   described above in which an individual retirement account can be placed, the bill
also provides that these amounts may be invested annually in a retirement bond, to

27   be issued by the government. The bonds are to be issued under the Second Liberty
Bond Act and provide for the accumulation of interest until the time of redemp-

28   tion. In conformity with the general provisions for individual retirement accounts,
the bill provides that the bonds generally can only be cashed after the individual

has reached the age of 59 1/2 years, or if he becomes disabled. If he dies, the bonds could be redeemed by his estate."

[Underline added]

On the one hand the Legislative History indicates that a rollover may be beneficial because it allows an individual the flexibility of shifting his investments.  On the other hand the Congressional History both in the Senate Report and the virtually identical House Report (H.R. 93-807, pp 4804-4805) indicates there a need to limit too much shifting of investments.

The exact legislative purpose behind limiting the shifting of investments too often is not immediately apparent from the Legislative History.  However, there are several different possible explanations and inferences that can be made.   For example, the two sentences which follow this legislative intent indicate that the custodian is required to notify the Internal Revenue Service regarding the distribution.  So, one possible inference is that the administrative task of keeping track of the location of investments would be burdened by a large number of transfers.

On the other hand, there is strong evidence that many IRA regulations are designed to encourage long-term investing - - paticularly the penalty upon early withdrawals (before the age of 59 ½).   See the historical discussion contained in The Roots of Broad Stock Ownership issued by the Joint Economic Committee of the United States Congress in April 2000 attached Exhibit F hereto, p. 10 wherein it indicates"

 "By having punitive penalties for early withdrawal, IRAs and 401K plans made investors focus on the long-term."

Encouraging long-term investing appears to be the more likely Congressional purpose since the wording in the Senate Report indicates that shifting investments e.g., from a bond to a mutual fund may be "desirable" but that too much shifting is not.

The text in the Senate Report is worthy of consideration for other reasons. It specifically states that there would be no payment of tax "provided the same money or property is re-invested by the individual within 60 days in another qualifying individual retirement account." The contemplation of Congress was that funds would be shifted from one individual retirement account to "another" or a different one.

In considering the Legislative History, it is important to also consider the Legislative History surrounding an amendment to 28 U.S.C. § 408, which occurred in 2001. In 2001 26 U.S.C. § 408(d)(I) was passed, which allows the Secretary to waive the sixty-day requirement "where the failure to waive such requirement will be against equity or good conscience…." The Conference Report which led to this addition to the Internal Revenue Code specifically indicates:

> "The conference agreement provides that the Secretary may waive the 60-day rollover period if the failure to waive such requirement would be against equity or good conscience, including cases of casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement. For example, the Secretary may issue guidance that includes objective standards for a waiver of the 60-day rollover period, such as waiving the rule to do military service in a combat zone or during a Presidentially declared disaster (both of which are provided for under present law, or for a period during which the participant has received payment in the form of a check, but has not cashed the check, or for errors committed by financial institutions, or in cases of inability to complete a rollover due to a death, disability, hospitalization, incarceration, restrictions imposed by a foreign country, or postal error."

See Legislative History regarding 28 U.S.C. 408(d)(I) attached as Exhibit G hereto, specifically the very bottom of page 35778 and the top of page 35779 which are the last two pages of Exhibit G.

## I.

## ARGUMENT

None of the public policy reasons contemplated above are implicated in this case. The administrative difficulty in following investments from account to account are not implicated because the uncashed Cashier's Checks were returned to exactly the same account each time in this case. The public policy in favor of long-term investing is not

implicated when a 70-year-old who has invested the funds in one form of investment only

– certificates of deposit – for a period of over 30 years takes those funds in the form of a

check and re-deposits those funds into the exact same account at the same financial

institution.   This is the type of circumstance where the Secretary of the Internal Revenue

Service would have discretion to waive the 60-day requirement and the one-year rule

which is a limitation upon the 60-day restriction.

## II.

### IMPORTANT DOCUMENTS ON FILE IN THIS CASE

Since the record in this matter is long, it is critical that the Court know that expert

witness declarations have already been submitted by both sides as to the reasonable

necessity of the retirement funds.  Specifically, the Declarations of Donald Fife are part of

Docket Nos. 87 filed on March 25, 2008 (this includes 25 Exhibits), and a supplemental

Declaration is part of Docket No. 98 filed on June 11, 2008.   On the other side, the

Objecting party has submitted the Declarations of Vijay Ahuja as part of Docket Nos. 96

filed on 6/4/08 and Docket No. 100 filed on 6/25/08.

## III.

### CONCLUSION

Wherefore, Debtor prays that the full amount of his IRA be deemed to be exempt,

with the exception of the funds attributable to $2000 contributed during 1998 and $4000

contributed during 2006.

DATED:   September 26, 2008                    Sharf Law Firm


_____/s/_____
Mark M. Sharf, Esq., Counsel for
William S. Patrick

# <u>DECLARATION OF WILLIAM S. PATRICK</u>

I, William S. Patrick, declare:

1.   I am over 18 years of age.  I am the debtor in the within bankruptcy case.  I have personal knowledge of the facts set forth herein and, if called as a witness, I would and could testify completely with respect thereto.

2.   On June 18, 2008 I submitted a Request for Copy of Tax Return to the Internal Revenue Service, seeking a copy of my tax returns for years 1975 through 1981, along with a check for $273.  A true and correct copy of that Request is attached as Exhibit A hereto.

3.   On June 19, 2008, believing that I filed my tax returns using my middle initial and not my middle name, I submitted another Request for Copy of Tax Return to the Internal Revenue Service ("IRS"), along with another $273 check.  A true and correct copy of that second Request is   attached as Exhibit B hereto.

4.   This Tuesday I received the Internal Revenue Service's responses to my two requests. Attached as Exhibit C hereto is a true and correct copy of the IRS' response to my first request, which includes tax transcripts.  Unfortunately, the transcripts do not include any detail from my tax return.   Attached as Exhibit D hereto is a true and correct copy of the IRS' response to my second request, in which the IRS indicates that they do not have information for tax years 1975 through 1981 (at least not under the name "William S. Patrick").

5.   Attached as Exhibit E hereto are true and correct copies of the "Photocopy Refund" checks I received back from the IRS in mid-September, 2008.  Apparently they return your money if there is nothing to photocopy.

///

///

6.  I have called all of the telephone numbers with the Internal Revenue Service at the telephone numbers indicated in their responses (559-456-5894, 800-829-0922, and 559-456-5888), seeking copies of any transcript or any document that might show what my IRA contributions were from 1975 to 1981.  I have been informed that the IRS does not keep tax returns for more than 10 years, and that more detailed tax transcripts are not available.

7.  This has been an incredibly frustrating experience for me.  Fisserv Investment Support Services, the IRA administrator for First Private Bank & Trust, does not have any records relating to me pre-dating 2003 (which is when the account was moved to First Private Bank & Truste).  Citibank, whom my counsel already deposed, does not have my IRA records either.   Walter Prince and I worked together full time in the mid-1970's and we were good friends (he was in my estate planning documents as my trustee even when this bankruptcy case was filed).  He  knows that I started my IRA account in the mid 1970's, and that is why his pleadings on file with this Court originally took that position.  See Exhibit B to Motion Objection To Debtor's Claim Of Exemption filed with this Court on 6/18/07.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this ___ day of September, 2008 at Encino, California.

William S. Patrick

## DECLARATION OF MARK M. SHARF

I, Mark M. Sharf, do hereby declare:

1. I am an attorney at law, duly licensed as such by the State of California. The facts stated herein are from my own personal knowledge. If called upon as a witness I could and would competently testify to the facts stated herein.

2. Attached as Exhibit F hereto is a true and correct copy of The Roots of Broadened Stock Ownership, a publication of the Joint Economic Committee of the United States Congress, published in April 2000.

3. Attached as Exhibit G hereto is a true and correct copy of pages from Volume 7 of Standard Federal Tax Reporter pages 35751 and 35777-35779 (Commerce Clearing House, Inc. 2008), which detail the legislative history surrounding the enactment of 26 U.S.C. §408(d)(I).

4. The quotations in the attached brief from Public Law 93-406 and from Senate Report No. 93-383 are true and correct. The relevant section from S.R. 93-383 is an attachment to this brief.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 26th day of September, 2008 at Encino, California.

_____/s/_____
Mark M. Sharf

**EXHIBIT A**

Form **4506**

(Rev. January 2008)

Department of the Treasury
Internal Revenue Service

## Request for Copy of Tax Return

▶ Do not sign this form unless all applicable lines have been completed.
Read the instructions on page 2.

▶ Request may be rejected if the form is incomplete, illegible, or any required
line was blank at the time of signature.

OMB No. 1545-0429

**Tip:** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a **Tax Return Transcript** for many returns free of charge. The transcript provides most of the line entries from the tax return and usually contains the information that a third party (such as a mortgage company) requires. See Form 4506-T, Request for Transcript of Tax Return, or you can call 1-800-829-1040 to order a transcript.

| | | |
|---|---|---|
| **1a** Name shown on tax return. If a joint return, enter the name shown first.<br><br>William Stark Patrick | **1b** First social security number on tax return or employer identification number (see instructions)<br><br>█████93111 | |
| **2a** If a joint return, enter spouse's name shown on tax return.<br><br>Carol G. Patrick | **2b** Second social security number if joint tax return<br><br>██ ██ | 1134 |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code

William Stark Patrick, 10543 Lubao, Chatsworth, CA 91311

**4** Previous address shown on the last return filed if different from line 3

**5** If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax return.

**Caution:** *DO NOT SIGN* this form if a third party requires you to complete Form 4506, and lines 6 and 7 are blank.

**6** Tax return requested. (Form 1040, 1120, 941, etc.) and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____1040_____

**Note.** *If the copies must be certified for court or administrative proceedings, check here.* . . . . . . . . . . . . . . . ☐

**7** Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than eight years or periods, you must attach another Form 4506.

| 12 / 31 / 1975 | 12 / 31 / 1976 | 12 / 31 / 1977 | 12 / 31 / 1978 |
|---|---|---|---|
| 12 / 31 / 1979 | 12 / 31 / 1980 | 12 / 31 / 1981 | / / |

**8** Fee. There is a $39 fee for each return requested. Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN or EIN and "Form 4506 request" on your check or money order.

**a** Cost for each return . . . . . . . . . . . . . . . . . . . . . $ **39.00**

**b** Number of returns requested on line 7 . . . . . . . . . . . . . . . . . 7

**c** Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . . . $ **273.00**

**9** If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . ☐

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer.

Telephone number of taxpayer on line 1a or 2a ( 818 ) 363-6556

**Sign Here**

*William Stark Patrick* — Signature (see instructions)    Date 6-18-08

*Deceased* — Title (if line 1a above is a corporation, partnership, estate, or trust)

Spouse's signature    Date

For Privacy Act and Paperwork Reduction Act Notice, see page 2.    Cat. No. 41721E    Form **4506** (Rev. 1-2008)

**EXHIBIT B**

Form **4506**

(Rev. January 2008)

Department of the Treasury
Internal Revenue Service

# Request for Copy of Tax Return

▶ Do not sign this form unless all applicable lines have been completed.
Read the instructions on page 2.

▶ Request may be rejected if the form is incomplete, illegible, or any required line was blank at the time of signature.

OMB No. 1545-0429

**Tip:** You may be able to get your tax return or return information from other sources. If you had your tax return completed by a paid preparer, they should be able to provide you a copy of the return. The IRS can provide a Tax Return Transcript for many returns free of charge. The transcript provides most of the line entries from the tax return and usually contains the information that a third party (such as a mortgage company) requires. See Form 4506-T, Request for Transcript of Tax Return, or you can call 1-800-829-1040 to order a transcript.

| | |
|---|---|
| **1a** Name shown on tax return. If a joint return, enter the name shown first. <br><br> William S. Patrick | **1b** First social security number on tax return or employer identification number (see instructions) <br><br> ▦-8111 |
| **2a** If a joint return, enter spouse's name shown on tax return. <br><br> Carol G. Patrick | **2b** Second social security number if joint tax return <br><br> ▦ ▦ \| 1134 |

**3** Current name, address (including apt., room, or suite no.), city, state, and ZIP code

   William S. Patrick,10543 Lubao, Chatsworth, CA 91311

**4** Previous address shown on the last return filed if different from line 3

**5** If the tax return is to be mailed to a third party (such as a mortgage company), enter the third party's name, address, and telephone number. The IRS has no control over what the third party does with the tax return.

**Caution:** *DO NOT SIGN this form if a third party requires you to complete Form 4506, and lines 6 and 7 are blank.*

**6** Tax return requested. (Form 1040, 1120, 941, etc.) and all attachments as originally submitted to the IRS, including Form(s) W-2, schedules, or amended returns. Copies of Forms 1040, 1040A, and 1040EZ are generally available for 7 years from filing before they are destroyed by law. Other returns may be available for a longer period of time. Enter only one return number. If you need more than one type of return, you must complete another Form 4506. ▶ _____ 1040 _____

   Note. *If the copies must be certified for court or administrative proceedings, check here.* . . . . . . . . . □

**7** Year or period requested. Enter the ending date of the year or period, using the mm/dd/yyyy format. If you are requesting more than eight years or periods, you must attach another Form 4506.

| | | | |
|---|---|---|---|
| '2 / 31 / 1975 | 12 / 31 / 1976 | 12 / 31 / 1977 | 12 / 31 / 1978 |
| 12 / 31 / 1979 | 12 / 31 / 1980 | 12 / 31 / 1981 | / / |

**8** Fee. There is a $39 fee for each return requested. Full payment must be included with your request or it will be rejected. Make your check or money order payable to "United States Treasury." Enter your SSN or EIN and "Form 4506 request" on your check or money order.

| | | |
|---|---|---|
| **a** Cost for each return . . . . . . . . . . . . . . . . . . . . . . . | $ | 39.00 |
| **b** Number of returns requested on line 7 . . . . . . . . . . . . . . . | | 7 |
| **c** Total cost. Multiply line 8a by line 8b . . . . . . . . . . . . . . . | $ | 273.00 |

**9** If we cannot find the tax return, we will refund the fee. If the refund should go to the third party listed on line 5, check here . . . □

**Signature of taxpayer(s).** I declare that I am either the taxpayer whose name is shown on line 1a or 2a, or a person authorized to obtain the tax return requested. If the request applies to a joint return, either husband or wife must sign. If signed by a corporate officer, partner, guardian, tax matters partner, executor, receiver, administrator, trustee, or party other than the taxpayer, I certify that I have the authority to execute Form 4506 on behalf of the taxpayer.

|  | | Telephone number of taxpayer on line 1a or 2a |
|---|---|---|
| **Sign Here** | *William S Patrick*     6-19-08 <br> Signature (see instructions)     Date | ( 818 )  363-6556 |
|  | Title (if line 1a above is a corporation, partnership, estate, or trust) | |
|  | *Deceased* <br> Spouse's signature     Date | |

For Privacy Act and Paperwork Reduction Act Notice, see page 2.     Cat. No. 41721E     Form **4506** (Rev. 1-2008)

**EXHIBIT C**



**Department of the Treasury**
**Internal Revenue Service**
Form 13873-I

**Please refer to all marked boxes regarding your request for taxpayer**
WILLIAM STARK PATRICK ●●●●-8111                    :

☒ 1. We have enclosed your request for a:

☐ Return Transcript(s)          ☒ Account Transcript(s)
☐ Record of Account(s)          ☐ Verification of Non-filing
☐ Return Photocopy              ☐ Audit Report or CP2000
☐ Form W-2 Form 1099 series, Form 1098 series, Form 5498 series, transcript(s) or miscellaneous form.

☐ 2. The remainder of your requested information will be submitted within 2-4 weeks.

☐ 3. Your requests must be signed and dated. If the information you requested is to be sent to a third party, disclosure laws require that the signature and date be within 60 days of the IRS received date. To ensure the authenticity of the authorization, the taxpayer must sign and date the Form 4506, *Request for copy of Tax Return* or Form 4506-T, *Request for Transcript of Tax Return.*

☐ 4. We are unable to accept altered Forms 4506 or 4506-T. Please complete and return a new Form 4506 or 4506-T.

☐ 5. Form 4506-T is specifically designed to provide tax return transcripts pertaining only to Form(s) 1040, 1065, 1120, or 1120S for purposes of the Small Business Administration agreements and Photocopy requests. Form 4506 is to request an actual photocopy of the tax return and requires a $39.00 fee for each tax period requested.

☐ 6. Line 1 through 9 of Form 4506 or 4506-T must be complete. Please refer to the highlighted area on your request and provide missing information.

☐ 7. This request is being rejected for one of the following reasons:

   ☐ A fee was not included with the request or it was not sufficient.

   ☐ An authorized signature and/or date were not present on the request.

   ☐ A tax form number was not present on the request and/or the tax year(s) were not listed.

☐ 8. You submitted Form 4506 or 4506T with a payment. There is no fee for a transcript of your tax return. We sent your request to Returns and Income Verification Services (RAIVS) for processing.

☐ 9. We are returning the payment to you or the designated third party.

☐ 10. The taxpayer's name, address and/or Social Security/ Employer Identification Number does not match our records, or was incomplete or missing. Please correct this information:
   ☐ Address ☐ Social Security/Employer ID Number ☐ Name

☐ 11. The taxpayer's address does not match our records. Please provide one of the following: a photocopy of two pieces of identification bearing the taxpayer's signature, preferably a driver's license and social security card; (*Note: A credit card is not an acceptable form of identification); an original notarized statement affirming the taxpayer's identity; or a signed and dated statement by the taxpayer worded as follows: "I certify under penalty of perjury under the laws of the United States of America, that I am the taxpayer who filed the tax return(s) for tax year(s) _____.

☐ 12. We are unable to provide the information you requested. Please contact the taxpayer for specific details on the rejected request.

☐ 13. You have not submitted authorization that meets our guidelines to receive the information you requested. To request information about another taxpayer, we must have a valid authorization. (See chart shown under box 16). All forms submitted should be current and dated within 60 days.

☐ 14. You requested information for more than one third party. You need to submit a separate request form for each third party recipient (Line 5 of Form 4506, *Request for Copy of Tax Return*, or Form 4506-T, *Request for Transcript of Tax Return).*

☐ 15. If you entered a third party on line 5 of your Form 4506 or Form 4506-T, we notified the third party we could not fill the request. Because of disclosure laws, we did not disclose to the third party why we rejected the request. The third party may contact you to get this information and resubmit your request. If you are the third party listed on line 5, we are sending you this letter because we were unable to locate a current address for the taxpayer. Please contact the taxpayer to resubmit the request.

☐ 16. When requesting tax account information, we must have the appropriate signature, title, current date, and proper authorization meeting IRS guidelines. See the chart below for the appropriate signature.

| Form | Title | Authorization |
|------|-------|---------------|
| Form 1040 Series | U.S. Individual Income Tax Return | Power of Attorney (Form 2848), Tax Information Authorization (Form 8821), or Letters of Testamentary, Administration, or Guardianship (court papers) with current date. |

☐ 17. The request you submitted is not valid. A Form 8821, *Tax Information Authorization*, or a Form 2848, *Power of Attorney and Declaration of Representative*, must accompany a Form 4506, *Request for Copy of Tax Return*, or Form 4506-T, *Request for Transcript of Tax Return*, to request copies or transcripts of tax forms or other products.

---

Form **13873-I**          Catalog Number 51126X          Department of the Treasury – **Internal Revenue Service**

☐ 18. The required information needed to release taxpayer information to a third party was incomplete. Please complete line 5 on the Form 4506 or 4506-T.

☐ 19. We no longer have tax account or record of account information for tax year(s)

_____

Tax account information is kept on file for a limited number of years.

☐ 20. We have enclosed your request for tax year(s)

_____

☐ 21. We are unable to provide tax account information for tax year(s)

_____

☐ 22. We are currently unable to obtain a copy of your Audit Report for tax period(s)

_____

☐ 23. Forms or tax information for tax year

_____

is not available until _____ .

☐ 24. Individual tax information and business tax information must be requested on separate Forms 4506 or 4506-T.

☐ 25. The signature on your Form 4506/4506-T submitted is illegible. Please complete and resubmit a new Form 4506/4506-T.

☐ 26. You are only authorized to receive the enclosed documents. To obtain the information you requested for tax year(s)

on Form(s) _____ .
you must provide proof of authorization.

☐ 27. This request is being rejected because we are unable to provide state tax documents. Please contact your local state office.

☐ 28. We are unable to provide information for Forms

_____

for tax years _____ .
We find no record of these Forms being filed.

☒ 29. Unless, an adjustment was made to the account, income tax returns prior to 1975
_____ have been destroyed by authorization from the U.S. Congress.

☐ 30. Your request was received without payment or insufficient payment. A fee of $39.00 is required for each tax year requested.

☐ 31. We do not have a record of receiving a

_____

tax return. However, we prepared a substitute return for you. You can request information about the substitute return under the Freedom of Information Act (FOIA). We have enclosed an information sheet on how to submit these requests. For more information please visit www.irs.gov.

☐ 32. The tax returns you requested for tax year(s)

_____

are unavailable. We are providing you with a transcript of the account free of charge for those tax years.

☐ 33. The tax return(s) and/or the tax account information requested for the year(s)

_____

are unavailable at this time. If your return has been filed, please resubmit the request in 60 days.

☐ 34. Our records show that an extension has been filed. Please resubmit your request 3-6 weeks after you have filed a return.

☐ 35. We have no record of a return being filed for tax year

_____

If you have filed your return, please resubmit your request in 3-6 weeks.

☐ 36. In order for us to service your request, please provide copies of your appointment as the executor of the estate to our office.

☒ 37. A refund will be issued within 4 to 6 weeks for any account information that has not been provided.

☐ 38. A refund will be issued to the taxpayer in 4-6 weeks. The box on line 9 of the Form 4506 has no designation for refunding to another party.

☐ 39. If payment was sent with the original request, and a refund is being issued, please wait to receive your refund before resubmitting your request, or you may resubmit a newly signed request with payment, and your refund will be sent in 4 to 6 weeks.

☐ 40. In recent correspondence we indicated that the tax return for tax year(s) _____
were unavailable. We have obtained these returns and enclosed photocopies. We will cancel or adjust the refund of your photocopy fee.

☐ 41. A verification of non-filing cannot be issued for the current processing year until after June 15th. Please resubmit your request after this date.

☐ 42. This serves as your verification of non filing for tax year(s)

_____

for taxpayer _____ .

☐ 43. The requested tax return transcripts are available only for the Form(s) 1040 series, 1120 series, and 1065. Tax return transcripts are available only for the current tax year and three years prior.

---

Form **13873(I)**        Catalog Number 51126X        Department of the Treasury – **Internal Revenue Service**

☐ 44. We are unable to provide the tax information to the designated third party. Please contact the third party and provide them with this information.

☐ 45. We are unable to provide tax information for tax year(s) _____

because your spouse did not sign the request.

☐ 46. We are unable to provide Form 1096 information.

☐ 47. We are unable to provide W-3 information. If you would like copies of the Forms W-2, please complete and resubmit a new Form 4506-T in 30 days. (See checkbox 50 for SSA contact information).

☐ 48. We have no record of Form(s) W-2/W-3, 1099, 1098, and/or Form(s) 5498 for tax year(s) _____

☐ 49. We have enclosed printout(s) of Form(s) W-2/W-3, 1099, 1098 and/or 5498 for tax year(s) _____

State or local information will not be included with the printout(s).

☐ 50. We do not have Form(s) W-2/W-3, as submitted by the employer, for tax years prior to _____.
The Social Security Administration (SSA) can provide social security earnings information for older tax years. Written requests can be mailed, along with a fee (a fee is charged for non-retirement requests) for each tax year. **You may contact the SSA at 1-800-772-1213 or submit a written request to:**

Social Security Administration
Division of Earnings Records Operations
P.O. Box 33003
Baltimore, MD 21290-3003

Or, you may request this information from the employer who issued your Form(s) W-2.

☐ 51. The wage documents for the year(s) _____

are temporarily unavailable. Please complete and return a new Form 4506-T in 30 days.

☐ 52. The wage documents for the year(s) _____

are temporarily unavailable. If we receive this information within the next _____
days we will send the information to you.

☐ 53. Your request is being rejected for the following Social Security/Employer Identification Numbers.

| | |
|---|---|
| | |

☐ 54. The Record of Account transcripts that were requested for tax year(s) _____
are currently unavailable at this time. If your return has been filed, please resubmit the request in 30 days.

☐ 55. Your request has been referred to the _____ function.
Please contact the Customer Service Area at the number listed below for additional information.

If you have any questions about the information in **this letter ONLY**, please call the Return and Income Verification Services Team at

( 559 ) 456-5894 _____ , or fax to ( 559 ) 456-5877
Please refer to # 1012507097 _____

**All other inquires should be directed to our Customer Service Area.**

- For questions concerning your individual return, please call 1-800-829-0922.
- For questions concerning your individual return with Schedule C, E, F or Form 2106, *Employee Business Expenses*, please call 1-800-829-8374.
- For questions concerning business returns, please call 1-800-829-0115.

Enclosures:
Original Request or Copy of Original Request
☐ Envelope         ☐ Blank Forms

---

Form **13873(I)**         Catalog Number 51126X         Department of the Treasury – **Internal Revenue Service**

**Internal Revenue Service**
RAIVS Unit, MS 38101
5045 East Butler Ave.
Fresno, CA 93888

IRS EMPLOYEE: MS. ZUNIGA
IRS EMPLOYEE: 1012507097
TELEPHONE:559-456-5888

| TAXPAYER IDENTIFICATION NUMBER: | TAX PERIOD: | FORM NUMBER: |
|---|---|---|
| ████-8111 | 1978 | 1040 |

TAXPAYER NAME:
WILLIAM S AND CAROL G PATRICK

| FILING STATUS: | MARRIED FILING JOINT |
|---|---|
| EXEMPTIONS: | 4 |
| ADJUSTED GROSS INCOME: | $1,393.00 |
| TAXABLE INCOME: | $12,975.00 |
| SELF EMPLOYMENT TAX: | $0.00 |

## TRANSACTIONS

| CODE AND EXPLANATION | DATE | MONEY AMOUNT |
|---|---|---|
| 150 - RETURN FILED & TAX ASSESSED | 05/21/79 | $1,393.00 |
| 806 - CREDIT FOR WITHHELD TAXES | 04/15/79 | ($5,321.00) |
| 846 - REFUND OF OVERPAYMENT | 05/21/79 | $3,928.10 |

 **Internal Revenue Service**
RAIVS Unit, MS 38101
5045 East Butler Ave.
Fresno, CA  93888

IRS EMPLOYEE: MS. ZUNIGA
IRS EMPLOYEE: 1012507097
TELEPHONE:559-456-5888

**TAXPAYER IDENTIFICATION NUMBER:**
███-8111

**TAX PERIOD:**
1979

**FORM NUMBER:**
1040

**TAXPAYER NAME:**
**WILLIAM S AND CAROL G PATRICK**

| FILING STATUS: | MARRIED FILING JOINT |
|---|---|
| EXEMPTIONS: | 4 |
| ADJUSTED GROSS INCOME: | $18,588.00 |
| TAXABLE INCOME: | $5,325.00 |
| SELF EMPLOYMENT TAX: | $0.00 |

## TRANSACTIONS

| CODE AND EXPLANATION | DATE | MONEY AMOUNT |
|---|---|---|
| 150 - RETURN FILED & TAX ASSESSED | 05/12/80 | $173.00 |
| 806 - CREDIT FOR WITHHELD TAXES | 04/15/80 | ($5,907.56) |
| 846 - REFUND OF OVERPAYMENT | 05/12/80 | $5,734.56 |

**Internal Revenue Service**
RAIVS Unit, MS 38101
5045 East Butler Ave.
Fresno, CA 93888

IRS EMPLOYEE: MS. ZUNIGA
IRS EMPLOYEE: 1012507097
TELEPHONE:559-456-5888

| TAXPAYER IDENTIFICATION NUMBER: | TAX PERIOD: | FORM NUMBER: |
|---|---|---|
| ████-8111 | 1980 | 1040 |

**TAXPAYER NAME:**
**WILLIAM S AND CAROL G PATRICK**

| | |
|---|---|
| FILING STATUS: | MARRIED FILING JOINT |
| EXEMPTIONS: | 4 |
| ADJUSTED GROSS INCOME: | $54,459.00 |
| TAXABLE INCOME: | $9,925.00 |
| SELF EMPLOYMENT TAX: | $0.00 |

## TRANSACTIONS

| CODE AND EXPLANATION | DATE | MONEY AMOUNT |
|---|---|---|
| 150 - RETURN FILED & TAX ASSESSED | 05/11/81 | $1,049.00 |
| 806 - CREDIT FOR WITHHELD TAXES | 04/15/81 | ($6,188.73) |
| 846 - REFUND OF OVERPAYMENT | 05/11/81 | $5,139.73 |
| 290 - ADDITIONAL TAX ASSESSMENT | 04/12/82 | $7,637.00 |
| 196 - INTEREST ASSESSED | NO DATA | $18.00 |
| 196 - INTEREST ASSESSED | NO DATA | $597.14 |
| 670 - SUBSEQUENT PAYMENT | 04/23/82 | ($597.14) |

**Internal Revenue Service**
RAIVS Unit, MS 38101
5045 East Butler Ave.
Fresno, CA 93888

IRS EMPLOYEE: MS. ZUNIGA
IRS EMPLOYEE: 1012507097
TELEPHONE:559-456-5888

TAXPAYER IDENTIFICATION NUMBER:
~~-9111

TAX PERIOD:
1981

FORM NUMBER:
1040

TAXPAYER NAME:
WILLIAM S AND CAROL G PATRICK

| FILING STATUS: | MARRIED FILING JOINT |
|---|---|
| EXEMPTIONS: | 4 |
| ADJUSTED GROSS INCOME: | $62,170.00 |
| TAXABLE INCOME: | $43,641.00 |
| SELF EMPLOYMENT TAX: | $0.00 |

### TRANSACTIONS

| CODE AND EXPLANATION | DATE | MONEY AMOUNT |
|---|---|---|
| 150 - RETURN FILED & TAX ASSESSED | 07/12/82 | $9,305.00 |
| 610 - REMITTANCE WITH RETURN | 04/13/82 | ($2,489.00) |
| 666 - ESTIMATED TAX CREDIT TRANSFER IN | 04/15/82 | $0.00 |
| 176 - ESTIMATED TAX PENALTY | 07/12/82 | $712.10 |
| 276 - FAILURE TO PAY TAX PENALTY | NO DATA | $102.24 |
| 196 - INTEREST ASSESSED | NO DATA | $328.66 |
| 171 - ABATEMENT OF ESTIMATED TAX PENALTY | NO DATA | ($651.58) |
| 806 - CREDIT FOR WITHHELD TAXES | 04/15/82 | ($6,816.00) |
| 290 - ADDITIONAL TAX ASSESSMENT | 09/27/82 | $0.00 |
| 277 - ABATEMENT OF FAILURE TO PAY TAX PENALTY | NO DATA | ($102.24) |
| 197 - ABATEMENT OF INTEREST ASSESSED | NO DATA | ($326.11) |
| 670 - SUBSEQUENT PAYMENT | 10/28/82 | ($64.00) |
| 196 - INTEREST ASSESSED | 11/22/82 | $0.93 |

**EXHIBIT D**



**Department of the Treasury**
**Internal Revenue Service**
Form 13873-I

**Please refer to all marked boxes regarding your request for taxpayer**

WILLIAM S PATRICK                              :

☐ 1. We have enclosed your request for a:
    ☐ Return Transcript(s)       ☐ Account Transcript(s)
    ☐ Record of Account(s)       ☐ Verification of Non-filing
    ☐ Return Photocopy           ☐ Audit Report or CP2000
    ☐ Form W-2 Form 1099 series, Form 1098 series,
      Form 5498 series, transcript(s) or miscellaneous form.

☐ 2. The remainder of your requested information will be submitted within 2-4 weeks.

☐ 3. Your requests must be signed and dated. If the information you requested is to be sent to a third party, disclosure laws require that the signature and date be within 60 days of the IRS received date. To ensure the authenticity of the authorization, the taxpayer must sign and date the Form 4506, *Request for copy of Tax Return* or Form 4506-T, *Request for Transcript of Tax Return.*

☐ 4. We are unable to accept altered Forms 4506 or 4506-T. Please complete and return a new Form 4506 or 4506-T.

☐ 5. Form 4506-T is specifically designed to provide tax return transcripts pertaining only to Form(s) 1040, 1065, 1120, or 1120S for purposes of the Small Business Administration agreements and Photocopy requests. Form 4506 is to request an actual photocopy of the tax return and requires a $39.00 fee for each tax period requested.

☐ 6. Line 1 through 9 of Form 4506 or 4506-T must be complete. Please refer to the highlighted area on your request and provide missing information.

☐ 7. This request is being rejected for one of the following reasons:
    ☐ A fee was not included with the request or it was not sufficient.
    ☐ An authorized signature and/or date were not present on the request.
    ☐ A tax form number was not present on the request and/or the tax year(s) were not listed.

☐ 8. You submitted Form 4506 or 4506T with a payment. There is no fee for a transcript of your tax return. We sent your request to Returns and Income Verification Services (RAIVS) for processing.

☐ 9. We are returning the payment to you or the designated third party.

☐ 10. The taxpayer's name, address and/or Social Security/Employer Identification Number does not match our records, or was incomplete or missing. Please correct this information:
    ☐ Address   ☐ Social Security/Employer ID Number   ☐ Name

☐ 11. The taxpayer's address does not match our records. Please provide one of the following: a photocopy of two pieces of identification bearing the taxpayer's signature, preferably a driver's license and social security card; (*Note: A credit card is not an acceptable form of identification); an original notarized statement affirming the taxpayer's identity; or a signed and dated statement by the taxpayer worded as follows: "I certify under penalty of perjury under the laws of the United States of America, that I am the taxpayer who filed the tax return(s) for tax year(s) _____ .

☐ 12. We are unable to provide the information you requested. Please contact the taxpayer for specific details on the rejected request.

☐ 13. You have not submitted authorization that meets our guidelines to receive the information you requested. To request information about another taxpayer, we must have a valid authorization. (See chart shown under box 16). All forms submitted should be current and dated within 60 days.

☐ 14. You requested information for more than one third party. You need to submit a separate request form for each third party recipient (Line 5 of Form 4506, *Request for Copy of Tax Return*, or Form 4506-T, *Request for Transcript for Tax Return).*

☐ 15. If you entered a third party on line 5 of your Form 4506 or Form 4506-T, we notified the third party we could not fill the request. Because of disclosure laws, we did not disclose to the third party why we rejected the request. The third party may contact you to get this information and resubmit your request. If you are the third party listed on line 5, we are sending you this letter because we were unable to locate a current address for the taxpayer. Please contact the taxpayer to resubmit the request.

☐ 16. When requesting tax account information, we must have the appropriate signature, title, current date, and proper authorization meeting IRS guidelines. See the chart below for the appropriate signature.

| Form | Title | Authorization |
|------|-------|---------------|
| Form 1040 Series | U.S. Individual Income Tax Return | Power of Attorney (Form 2848), Tax Information Authorization (Form 8821), or Letters of Testamentary, Administration, or Guardianship (court papers) with current date. |

☐ 17. The request you submitted is not valid. A Form 8821, *Tax Information Authorization*, or a Form 2848, *Power of Attorney and Declaration of Representative*, must accompany a Form 4506, *Request for Copy of Tax Return*, or Form 4506-T, *Request for Transcript of Tax Return*, to request copies or transcripts of tax forms or other products.

---

Form **13873-I**          Catalog Number 51126X          Department of the Treasury – **Internal Revenue Service**

☐ 18. The required information needed to release taxpayer information to a third party was incomplete. Please complete line 5 on the Form 4506 or 4506-T.

☒ 19. We no longer have tax account or record of account information for tax year(s)
1975 through 1981                                        .
Tax account information is kept on file for a limited number of years.

☐ 20. We have enclosed your request for tax year(s)

_____ .

☐ 21. We are unable to provide tax account information for tax year(s)

☐ 22. We are currently unable to obtain a copy of your Audit Report for tax period(s)

_____ .

☐ 23. Forms or tax information for tax year

is not available until _____

☐ 24. Individual tax information and business tax information must be requested on separate Forms 4506 or 4506-T.

☐ 25. The signature on your Form 4506/4506-T submitted is illegible. Please complete and resubmit a new Form 4506/4506-T.

☐ 26. You are only authorized to receive the enclosed documents. To obtain the information you requested for tax year(s)

_____

on Form(s) _____ ,
you must provide proof of authorization.

☐ 27. This request is being rejected because we are unable to provide state tax documents. Please contact your local state office.

☐ 28. We are unable to provide information for Forms

for tax years _____ .
We find no record of these Forms being filed.

☐ 29. Unless, an adjustment was made to the account, income tax returns prior to _____
_____ have been destroyed by authorization from the U.S. Congress.

☐ 30. Your request was received without payment or insufficient payment. A fee of $39.00 is required for each tax year requested.

☐ 31. We do not have a record of receiving a

_____
tax return. However, we prepared a substitute return for you. You can request information about the substitute return under the Freedom of Information Act (FOIA). We have enclosed an information sheet on how to submit these requests. For more information please visit www.irs.gov.

☐ 32. The tax returns you requested for tax year(s)

_____
are unavailable. We are providing you with a transcript of the account free of charge for those tax years.

☐ 33. The tax return(s) and/or the tax account information requested for the year(s)

_____
are unavailable at this time. If your return has been filed, please resubmit the request in 60 days.

☐ 34. Our records show that an extension has been filed. Please resubmit your request 3-6 weeks after you have filed a return.

☐ 35. We have no record of a return being filed for tax year

If you have filed your return, please resubmit your request in 3-6 weeks.

☐ 36. In order for us to service your request, please provide copies of your appointment as the executor of the estate to our office.

☒ 37. A refund will be issued within 4 to 6 weeks for any account information that has not been provided.

☐ 38. A refund will be issued to the taxpayer in 4-6 weeks. The box on line 9 of the Form 4506 has no designation for refunding to another party.

☐ 39. If payment was sent with the original request, and a refund is being issued, please wait to receive your refund before resubmitting your request, or you may resubmit a newly signed request with payment, and your refund will be sent in 4 to 6 weeks.

☐ 40. In recent correspondence we indicated that the tax return for tax year(s) _____
were unavailable. We have obtained these returns and enclosed photocopies. We will cancel or adjust the refund of your photocopy fee.

☐ 41. A verification of non-filing cannot be issued for the current processing year until after June 15th. Please resubmit your request after this date.

☐ 42. This serves as your verification of non filing for tax year(s)

_____

for taxpayer _____ .

☐ 43. The requested tax return transcripts are available only for the Form(s) 1040 series, 1120 series, and 1065. Tax return transcripts are available only for the current tax year and three years prior.

Form **13873(I)**        Catalog Number 51126X        Department of the Treasury – **Internal Revenue Service**

☐ 44. We are unable to provide the tax information to the designated third party. Please contact the third party and provide them with this information.

☐ 45. We are unable to provide tax information for tax year(s)

_____

because your spouse did not sign the request.

☐ 46. We are unable to provide Form 1096 information.

☐ 47. We are unable to provide W-3 information. If you would like copies of the Forms W-2, please complete and resubmit a new Form 4506-T in 30 days. (See checkbox 50 for SSA contact information).

☐ 48. We have no record of Form(s) W-2/W-3, 1099, 1098, and/or Form(s) 5498 for tax year(s)

_____ .

☐ 49. We have enclosed printout(s) of Form(s) W-2/W-3, 1099, 1098 and/or 5498 for tax year(s)

_____ .

State or local information will not be included with the printout(s).

☐ 50. We do not have Form(s) W-2/W-3, as submitted by the employer, for tax years prior to _____ .
The Social Security Administration (SSA) can provide social security earnings information for older tax years. Written requests can be mailed, along with a fee (a fee is charged for non-retirement requests) for each tax year. **You may contact the SSA at 1-800-772-1213 or submit a written request to:**

Social Security Administration
Division of Earnings Records Operations
P.O. Box 33003
Baltimore, MD 21290-3003

Or, you may request this information from the employer who issued your Form(s) W-2.

☐ 51. The wage documents for the year(s)

_____

are temporarily unavailable. Please complete and return a new Form 4506-T in 30 days.

☐ 52. The wage documents for the year(s)

_____

are temporarily unavailable. If we receive this information within the next _____
days we will send the information to you.

☐ 53. Your request is being rejected for the following Social Security/Employer Identification Numbers.

| | |
|---|---|
| | |

☐ 54. The Record of Account transcripts that were requested for tax year(s) _____
are currently unavailable at this time. If your return has been filed, please resubmit the request in 30 days.

☐ 55. Your request has been referred to the

_____ function.
Please contact the Customer Service Area at the number listed below for additional information.

If you have any questions about the information in **this letter ONLY**, please call the Return and Income Verification Services Team at

( 559 ) 456-5894 _____ , or fax to ( 559 ) 456-5878 ____

Please refer to # 1012620407 _____ .

**All other inquires should be directed to our Customer Service Area.**

- For questions concerning your individual return, please call 1-800-829-0922.
- For questions concerning your individual return with Schedule C, E, F or Form 2106, *Employee Business Expenses*, please call 1-800-829-8374.
- For questions concerning business returns, please call 1-800-829-0115.

Enclosures:

Original Request or Copy of Original Request
☐ Envelope          ☐ Blank Forms

**EXHIBIT E**

 **United States Treasury** $\frac{15-51}{000}$    A 555,622,311



Check No.

09 02 08   59     AUSTIN, TEXAS          2221 34901464
2221 34901464 20098900 M1   IRS FSC    08893241PC

Pay to
the order of   **WILLIAM STARK PATRICK**
**10543 LUBAO**
**CHATSWORTH CA   91311**                $****273*00

34901464

000343

REGIONAL DISBURSING OFFICER    **VOID AFTER ONE YEAR**
001
Robert C. Nonge

PHOTOCOPY REFUND RE: 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
F 4506 REF NMF  FSC

⑈2221⑈    ⑆000000518⑆: 3490146⑆4⑈ 010908

---

 **United States Treasury** $\frac{15-51}{000}$    A 555,622,312



Check No.

09 02 08   49     AUSTIN, TEXAS          2221 34901465
2221 34901465 20098900 M1   IRS FSC    08893241PC

Pay to
the order of   **WILLIAM S PATRICK**
**10543 LUBAO**
**CHATSWORTH CA   91311**                $****273*00

34901465

000344

REGIONAL DISBURSING OFFICER    **VOID AFTER ONE YEAR**
001
Robert C. Nonge

PHOTOCOPY REFUND RE: 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
F 4506 REF NMF  FSC

⑈2221⑈    ⑆000000518⑆: 34901465⑈ 010908

**EXHIBIT F**

# THE ROOTS OF BROADENED STOCK OWNERSHIP



## Vice Chairman Jim Saxton (R-NJ)

### Joint Economic Committee
### United States Congress

### April 2000

This analysis examines recent trends in stock ownership and explains the reasons for the dramatic increase in stock ownership among a broader and increasingly diverse number of Americans. The key reasons for this democratization of the stock market include:

- The popularization of the mutual fund.
- The general reduction in the multiple taxation of saving and investment that resulted from the genesis of the IRA and 401(k) plan.
- The emphasis of the Federal Reserve on price stability that has lowered interest rates, stabilized financial markets, and acted as a *de facto* tax cut.

Joint Economic Committee
1537 Longworth House Office Building
Washington, DC 20515
Phone:   202-226-3234
Fax:      202-226-3950
Internet Address:
  http://www.house.gov/jec/

# THE ROOTS OF BROADENED STOCK OWNERSHIP

## I. INTRODUCTION

Recent data released by the Federal Reserve shows that nearly half of all U.S. households are stockholders. In the last decade alone, the number of stockholders has jumped by over fifty percent. According to one observer, this explosion in stock ownership has been "one of the great social movements of the 1990s."[1] The shift of many individuals from wage earners to worker capitalists has stimulated discussion on the implications of this economic shift. On the surface, it might seem that broadened stock ownership is of little importance. There are many positive benefits, however, to the expansion of stock ownership. Not the least of these benefits is the ability, over the long-term, for families to accumulate wealth to provide for their needs including retirement, education, medical care, and potential unemployment.

In addition to this effect on household wealth, saving and investment contribute to the capital needed for sustainable economic growth. According to one market strategist, financial market liquidity has been one of the main drivers of the bull market:

> You can have no inflation and earnings up 25 percent, but if you don't have money [from investors] forget it...The liquidity has come from you and me and our neighbors, who have been putting money into mutual funds to the tune of $20 billion to $25 billion a month.[2]

In addition to providing a basis for investment needed for economic growth, the increase in stock ownership appears to be cultivating a deeper appreciation and understanding of private enterprise. The involvement of new stockholders in the capitalization of the companies that create wealth allows these new investors to have a better understanding of financial matters. Furthermore, it is suggested that broadened stock ownership can erode class conflict, for "as capitalism expands, a lot of 'them' can become 'us.' It [stock ownership] brings us all together as stakeholders-in-common."[3]

---

[1] Robert J. Samuelson, "Stocks Without Risks?" *Newsweek*, November 11, 1999.

[2] Alfred Goldman, chief market strategist at A.G. Edwards, a St. Louis based brokerage firm, cited in: Albert B. Crenshaw, "401(k) Plans Provide Benefits for the Wall Street as Well as the Workers," *Washington Post*, March 20, 1999.

[3] Ben J. Wattenberg, "Capitalism for the Masses," *Baltimore Sun*, January 9, 1997.

Richard Nadler, executive director of the American Shareholders Association and author of "The Rise of Worker Capitalism," has written:

> The active involvement of tens of millions of Americans in capital markets has affected their retirement planning, productivity, and attitudes toward capital and free markets. The growth of investment has rewarded, and appears to have thus encouraged, an orientation towards the future – the investor's own and his family's.[4]

The purpose of this analysis is not to restate the benefits of worker capitalism. Rather this report analyzes the reasons behind the increase in stock ownership. Given the private and public benefits of stock ownership, it is appropriate to analyze the dynamics of stock market democratization and its policy implications.

The rise in stock ownership over the past twenty years can be mainly attributed to three factors, all of which made stock ownership more attractive relative to consumption or other methods of saving. First, the increasing use of mutual funds as an investment vehicle allowed small investors to diversify and receive professional management at a fraction of its previous cost. Second, the creation and proliferation of the Individual Retirement Arrangement (IRA) and the 401(k) plan led to a general reduction in the multiple taxation on saving and investment, increasing its after-tax return. Finally, the emphasis of the Federal Reserve on price stability has lowered inflation, brought interest rates down and stabilized financial markets, creating a stable macroeconomic climate.

This remainder of this paper is organized into four sections. Section II provides an overview of the mechanics of stock ownership, while Section III outlines prominent features of the current expansion in stock ownership. Section IV addresses the reasons behind the broadening of stock ownership, and Section V concludes the study with an articulation of some lessons to be learned from the broadening of stock ownership.

## II.    THE MECHANICS OF STOCK OWNERSHIP & SUPPLEMENTAL RETIREMENT ACCOUNTS

Shares of stock represent ownership shares in a corporation. Investors purchase these shares because they expect to share in the corporation's profits. It is these expectations of profit and loss that drive the demand for stocks. Owners of common stock hope to make money in two ways – through dividends and/or price appreciation. Dividends are a division of income among the firm's owners (i.e., shareholders) and stock appreciation arises from an increase in the market value of the stock relative to its purchase price. The profit on a sale of an appreciated stock is called a capital gain.

---

[4] Richard Nadler, "The Rise of Worker Capitalism," Cato Policy Analysis No. 359, November 1, 1999.

Direct purchase of common stock is one way to invest, although not the only method. Many investors choose to combine the advantages of many different types of stock (diversification) by purchasing shares in a mutual fund. A mutual fund is a financial institution that pools investor money to buy and sell stocks on their behalf. The advantage of mutual funds over individual investment is that they offer small investors diversification and professional management for a small fee. Mutual funds are usually organized around a specific objective such as long-term growth or income security. Ownership of mutual funds can result in the realization of dividends and capital gains.

The tax treatment of capital gains and dividends present an unfortunate aspect of the tax code, namely, the multiple taxation of saving and investment. Imagine a family wishing to save out of current income to invest for a large purchase in the future. The family pays all applicable federal, state, and local taxes on their earnings. They then decide to invest a portion of what remains. However, on the return of the investment's dividends and capital gains, the taxpayer is taxed again. The result is that the portion of income that is saved is being taxed twice. In contrast, the consumption component of the income stream is only being taxed once. Multiple taxation of the returns to saving and investment increases the cost of saving and investment relative to consumption, thus encouraging consumption.

Mutual fund shares and stock holdings can be held in a retirement saving account such as an Individual Retirement Arrangement (IRA), 401(k) plan, 403(b) plan, or Keogh plan. These plans were created to promote retirement saving and are subject to limitations and restrictions. All of these plans defer taxation of contributions, either by allowing contributions to come from pre-tax dollars or by allowing the deduction of contributions from taxable income.

IRAs were established by the Employee Retirement Income Security Act of 1974 (P.L. 94-406), and were strictly limited to those workers who lacked employer pension coverage. Expansion of eligibility to all workers occurred with the Economic Recovery Act of 1981 (P.L. 97-34), but restrictive income limits were then applied in the Tax Reform Act of 1986 (P.L. 99-514). As of 1998, a worker and a worker's nonworking spouse may both make annual tax-deductible contributions to IRAs of $2,000, subject to certain restrictions such as income tests. Assets of IRAs are required to be held at a financial institution and can only be invested in interest-bearing accounts, certain precious metals, and financial securities including common stock. Income from IRAs is taxed as ordinary income as long as funds are not withdrawn before age 59½ ; otherwise, a 10% tax penalty applies.

Named after the section of the Internal Revenue Code that created them, 401(k) plans allow workers to contribute pre-tax dollars to retirement saving accounts. The Revenue Act of 1978 (P.L. 95-600) formally authorized the 401(k) plan for use, although some 401(k) plans had already existed under earlier Internal Revenue Service rulings. 401(k) plans permit employees to contribute a portion of their wages into a retirement plan on a tax-deferred basis, up to a certain threshold. In 1998, the contribution limit was $10,000.

401(k) plans are similar to IRAs in that the worker decides how contributions should be allocated among various investment options. These options vary from plan to plan, with the worker having discretion over allocation of funds. 401(k) plans have a higher contribution threshold and generally allow employers to "match" employee contributions. Withdrawals of accrued 401(k) plan funds are taxed as ordinary income, with withdrawals before age 59½ incurring an additional 10% tax penalty.

The 401(k) plan and the IRA are supplemented by two other retirement saving plans that are available to specific groups. One plan is the Keogh plan for self-employed persons. The second type of group specific retirement saving plan is the 403(b) tax-sheltered annuity plan for employees of education and various non-profit institutions. Due to the specific nature of the individuals eligible for these plans, they are not as prevalent as 401(k) plans and IRAs.

## III. CHARACTERISTICS OF STOCK OWNERSHIP

The most widely used data source in research on financial behavior is the *Survey of Consumer Finances (SCF)*, a survey conducted on behalf of the Federal Reserve Board by the Survey Research Center at the University of Michigan. The *SCF* occurs every three years and data from the survey is usually released two years after the survey date. Data from the *SCF* are used whenever possible due to its generally accepted status as the most accurate source on stock ownership. Table 1 presents data compiled in the Federal Reserve Bulletin from the *1989, 1992, 1995,* and *1998 SCF.*

**Table 1. Percentage of Families Directly and Indirectly Holding Stocks,\***
**by Selected Characteristics - 1989, 1992, 1995, and 1998**

| Characteristic | 1989 | 1992 | 1995 | 1998 |
|---|---|---|---|---|
| **All Families** | **31.6** | **36.7** | **40.4** | **48.8** |
| **Cash Income (1998 dollars)** | | | | |
| Less than 10,000 | ** | 6.8 | 5.4 | 7.7 |
| 10,000 - 24,999 | 12.7 | 17.8 | 22.2 | 24.7 |
| 25,000 - 49,999 | 31.5 | 40.2 | 45.4 | 52.7 |
| 50,000 - 99,999 | 51.5 | 62.5 | 65.4 | 74.3 |
| 100,000 or more | 81.8 | 78.3 | 81.6 | 91.0 |
| **Age of Household Head** | | | | |
| Less than 35 | 22.4 | 28.3 | 36.6 | 40.7 |
| 35 - 44 | 38.9 | 42.4 | 46.4 | 56.5 |
| 45 - 54 | 41.8 | 46.4 | 48.9 | 58.6 |
| 55 - 64 | 36.2 | 45.3 | 40.0 | 55.9 |
| 65 - 74 | 26.7 | 30.2 | 34.4 | 42.6 |
| 75 or more | 25.9 | 25.7 | 27.9 | 29.4 |

Source: Kenickell, et al.

\* Indirect Holdings are those in mutual funds, retirement accounts, and other managed assets.

\*\* Ten or fewer observations.

The data presented in Table 1 show that 48.8 percent of households were stockholders in 1998, an increase of over 17 percentage points since 1989. In addition, the ownership rates for all income groups and all age groups increased over the last nine years. A significant portion of the increase in the incidence of stock ownership has come through indirect ownership, as a majority of stockholders no longer directly own stock.[5] The majority of the new growth in stock ownership is not in the form of "direct" ownership, but has come from retirement saving accounts such as IRAs and 401(k) plans. In addition, the percentage of young Americans (households where the head is below age 35) investing has nearly doubled since 1989.

## IV.  REASONS BEHIND BROADENED STOCK OWNERSHIP

This section of the paper analyzes the reasons behind the broadening of stock ownership in recent years. This section argues that stock ownership expanded mainly due to three factors that made stock ownership an increasingly attractive option compared to alternatives. The rise of mutual funds, creation and proliferation of IRAs and 401(k) plans, and a declining risk premium due to lower and less variable inflation have all contributed to broadened stock ownership.

### A.  THE MUTUAL FUND REVOLUTION

A mutual fund is an investment company that pools money from individual shareholders and invests those funds into a diverse pool of securities. Mutual fund investors purchase shares of the fund, with each share representing proportionate ownership in all of the securities held by the investment company. Although data from previous years is not directly comparable due to different methodologies, it is clear that mutual fund ownership has increased exponentially. By one measure 44 million American households owned mutual fund shares in 1998, an increase of 39 million from the 4.6 million mutual fund-owning households in 1980.[6] In addition, the percentage of U.S. households owning mutual funds has increased sevenfold since 1980 (Chart 1).

Although mutual funds have been in existence since the Great Depression, they first gained real popularity in the late 1970s due to the conjunction of two unrelated factors – inflation and outdated banking regulations. A Depression-era banking regulation known as Regulation Q limited banks to offering a maximum of 5¼ percent return on passbook savings accounts. As long as inflation remained low, Regulation Q was of little concern. Starting in 1973, however, inflation began averaging over 5 percent annually. This meant that the assets held in passbook accounts were declining in value at the same time that inflation was pushing interest rates on money market funds higher.

---

[5] Poterba, James, *Shareownership 1998: Based on the 1995 Survey of Consumer Finances,* (New York, NY: New York Stock Exchange, 1998), 9.

[6] Investment Company Institute, *1999 Mutual Fund Factbook*, (Washington, DC: Investment Company Institute, 1999), 11, and Investment Company Institute, *Mutual Fund Shareholders: The People Behind the Growth*, (Washington, DC: Investment Company Institute, Spring 1996), 1.



**Chart 1. Percent of U.S. Households Owning Mutual Funds, 1980-1998\***

Source:  Investment Company Institute, *1999 Mutual Fund Factbook*, Washington, DC:  Investment Company Institute, 1999, p. 40.
\* 1998 data includes ownership through variable annuties and uses an improved method to calculate ownership through employer-sponsored retirement plans.  Consequently, the 1998 number is not directly comparable with previous years.

In 1974 the spread between the regulated interest rates of passbook accounts and the unregulated interest rates of money market funds was about 4 percent.  By 1981, the difference between the rates reached as high as 12 percent.[7]  The locus of risk had shifted. It was now riskier to wait in a passbook account for inflation to decline than it was to place one's money in an investment vehicle.  Money market funds and mutual funds soon began to compete for ex-passbook account money.  Mimicking passbook accounts by allowing accountholders to write checks gave money market funds the initial edge.  The advantage held by money market funds dissipated over time as interest rates came down and accountholders shifted assets into the stock market through mutual funds.

Consider the example of a hypothetical family, the Joneses, placing $1,000 into a passbook savings account at the beginning of 1975 and earning the maximum interest rate allowable (5¼ percent).  According to the *1999 Economic Report of the President*, the Consumer Price Index rose by 6.9 percent in 1975.  Although the Jones family would have ended 1975 with $1,052.50 [1000+(1000\*0.0525)] in their account, after adjusting for inflation they would have lost money, the real value of their assets declining to $983.50 [1000+(1000(0.0525-0.0690))].

A few years of meager earnings or asset devaluation forced individuals to look for a way to protect their assets from inflation in a way that passbook accounts could not. Hard, or illiquid, assets such as housing were purchased as a hedge against inflation.

---

[7] Joseph Nocera, *A Piece of the Action: How the Middle Class Joined the Money Class* (New York, NY: Simon & Schuster, 1994), 197.

However, many individuals shifted assets into money market funds and the stock market. Stocks were not exactly a hedge against inflation; however, return was not restricted as in Regulation Q deposits. Joseph Nocera, editor-at-large of *Fortune* and author of *A Piece of the Action: How the Middle Class Joined the Money Class*, states that the inflation of the seventies destroyed some of the trust that households had in government bonds and savings accounts as safe places for their savings.[8]

The two main problems facing these reluctant investors were inadequate information regarding stock selection and insufficient funds to minimize risk through portfolio diversification. Mutual funds solved both of these problems. The assets in mutual funds are selected by a professional investment adviser to meet a specific objective. Rather than having to choose among various stocks to suit their financial goals (i.e., retirement income, current income stream), all families had to do was choose from among the variety of mutual funds, all with varying objectives. In addition, fund managers invest in a variety of securities, seeking portfolio diversification. The benefit of portfolio diversification is that it helps to reduce risk. In the eyes of these former savers, mutual funds were a good way to increase the return on their savings without increasing their effort or risk much over what it had been previously.

Mutual funds gave small investors the ability to adequately diversify with minimal outlay, and to receive professional management at a fraction of the cost of a stockbroker. Joseph Nocera noted in *A Piece of the Action*:

> Part of the original appeal of mutual funds was that they seemed to offer a path into the stock market that was both simpler and safer than the old call-a-broker-and-buy-a-stock route.[9]

Katherine Wilson, a certified financial planner for Financial Network Investment Corporation in Houston, agreed that before the advent of mutual funds it was difficult for the small investor to get started:

> This [investing in the stock market] was kind of a rich person's discipline because, in order to be cost-effective, you had to buy round lots (100-share increments of stock) or an individual bond. It was a very restricted market for this in many ways.[10]

Mutual funds companies played a large role in expanding stock ownership to the middle class. There exists a fund for just about any objective an investor could desire: growth funds, income funds, environmental funds, children funds, etc. By enabling investors to overcome their information and diversification problems the mutual fund helped to make the stock market a financial tool of the middle class.

---

[8] *Ibid.*, 178.

[9] *Ibid.*, 333.

[10] Pamela Yip, "Spreading the Wealth: Changes Paved Way to 10K; Retirement Funds, High Tech, Strong Economy Fuel Climb," *The Houston Chronicle*, March 30, 1999.

## B.    INDIVIDUAL RETIREMENT ARRANGEMENTS AND 401(K) PLANS

In 1974, Individual Retirement Arrangements (IRAs) were created to encourage individuals to save for retirement if they were not covered by employer sponsored retirement plans.    Assets in IRAs have grown steadily, rising from $200 billion in 1985 to $1,347 billion in 1996.[11]    While assets in IRAs have been rising, however, annual contributions to IRAs precipitously declined and then have leveled off since the Tax Reform Act of 1986.    Annual IRA contributions, which had risen from $5 billion in 1981 to nearly $38 billion in 1986, have declined to just over 8.6 billion by 1997 (Chart 2).[12] Not only have contributions fallen, but also IRA participation has declined in proportion with the decline in contributions (Chart 3).    In 1986, there were over 15.5 million IRA participants.    By 1997, there were only 4 million.    The income and contribution limits established by the Tax Reform Act of 1986 appear to have had a "chilling" effect on IRA participation.

**Chart 2.  Contributions to Individual Retirement Arrangements (IRAs):
1975-1997**



Source:  Internal Revenue Service, *Statistics of Income Bulletin*, various years.

---

[11] U.S. Bureau of the Census, *Statistical Abstract of the United States 1998* (118th edition), (Washington, DC: Government Printing Office, 1998), Table 845.

[12] M. Poterba, Steven F. Venti and David A. Wise, "How Retirement Savings Programs Increase Savings," *Journal of Economic Perspectives* 10, no. 4 (Fall 1996), 91-92.  Also, Internal Revenue Service, *Statistics of Income Bulletin*, Fall 1999, Washington, D.C., 1999



**Chart 3. Participation in Individual Retirement Arrangements (IRAs): 1975-1997**



Source: Internal Revenue Service, *Statistics of Income Bulletin,* various years.

   401(k) plans, which allow employees to contribute a tax-deferred portion of their wages to a retirement plan, have grown steadily since the Internal Revenue Service issued rules regarding them in 1982 (Table 2).

**Table 2.  401(k) Plan Trends, 1984-1993**

| Year | Number of Plans (thousands) | Participants (millions) | Contributions ($billions) | Plan Assets ($billions) | Distributions ($billions) |
|------|------|------|------|------|------|
| 1984 | 17.3 | 7.5 | 16.3 | 91.8 | 10.6 |
| 1985 | 29.9 | 10.3 | 24.3 | 143.9 | 16.4 |
| 1986 | 37.4 | 11.6 | 29.2 | 182.8 | 22.1 |
| 1987 | 45.1 | 13.1 | 33.2 | 215.5 | 22.2 |
| 1988 | 68.1 | 15.2 | 39.4 | 277.0 | 25.2 |
| 1989 | 83.3 | 17.3 | 46.1 | 357.0 | 30.9 |
| 1990 | 97.6 | 19.5 | 49.0 | 384.9 | 32.0 |
| 1991 | 111.4 | 19.1 | 51.5 | 440.3 | 32.7 |
| 1992 | 139.7 | 22.4 | 64.3 | 553.0 | 43.2 |
| 1993 | 154.5 | 23.1 | 69.3 | 616.3 | 44.2 |

Source: James R. Storey, "Section 401(k) Retirement Plans: A Fact Sheet."

By eliminating some of the multiple taxation that exists on saving and investment, IRAs and 401(k) plans became attractive relative to other retirement saving options. Americans looking for a way to protect their savings from the ravages of inflation began to look towards investing in stocks and mutual funds. The creation of the IRA and the 401(k) account allowed their participants to maximize the return on their retirement savings by allowing contributions and earnings to accumulate on a tax-deferred basis. The new saving vehicles proved to be popular with onetime passbook account holders.

More importantly, the people brought into the stock market by IRAs and 401(k) plans were a new type of investor. A survey of money fund customers by the Investment Company Institute found that the investment purpose of 53 percent of money fund customers was "general savings."[13] Alternatively, "These new customers were still not *investors* – or rather they didn't think of themselves as investors. They still thought of themselves as savers."[14]

For many individuals, the IRA and 401(k) rules on early withdrawal made it quite clear that these were *retirement* accounts. Penalties for early withdrawal, combined with the ability to move assets from one investment to another, created the perfect haven for reluctant investors to get their feet wet. Being unable to touch the funds placed into their 401(k) plans or IRAs until age 59½ encouraged many to look long-term.

By having punitive penalties for early withdrawal, IRAs and 401(k) plans made investors focus on the long-term. The existence of these penalties helped IRA and 401(k) investors to consider the benefits that stock investment had over long periods. Being unable to remove the money in their 401(k) plan without penalty encouraged savers to take a long-term view of investment. In a manner of speaking, IRAs and 401(k) plans gave people a way to try the stock market on for size. A consultant to the financial services industry at the time was convinced that the IRA was the beginning of Americans taking responsibility for their financial future:

> It [the IRA] was the first real incentive for a great number of Americans to put money away for the long term. And these were generally people who up until then hadn't seen themselves as having any control over the long-term.[15]

Thus, the IRA and the 401(k) plan helped to transform savers into investors. Relief from the multiple taxation of saving and investment increased the attractiveness of saving and investment relative to consumption. Withdrawal rules and penalties assisted new investors in feeling comfortable assuming risk and planning for a longer term. Although few visualized the interaction between supplemental retirement accounts and the stock market, they have proved to be an immensely popular and efficacious retirement saving vehicle. Now that so many Americans have taken advantage of these

---

[13] Joseph Nocera, *A Piece of the Action*, 286.

[14] *Ibid.*

[15] *Ibid.*, 288.

accounts, support has increased for some liberalization of withdrawals without stiff penalties.

## C. INFLATION

The past eighteen years have seen the stock market experience one of the greatest bull markets in U.S. history. An often overlooked contributor to this current economic expansion is the role of monetary policy. The distortionary effect of inflation on saving and investment decisions is well known among economists, with recent research documenting a strongly negative relationship between inflation and economic growth.[16]

Changing inflation rates have effected change in stock ownership by initially pushing - and later pulling - individuals into the stock market as inflation declined. As stated earlier, high inflation in the 1970's, combined with outdated banking regulations, pushed savers into the stock market. For many savers, there was little choice between getting into the stock market or remaining in a passbook savings account and allowing inflation to eat away at their retirement.

However, an important ingredient of post-1970's monetary policy has been price stabilization as Federal Reserve officials have repeatedly endorsed the goal of price stability. This emphasis on price stability has resulted in the steady decline in the inflation rate (Chart 4), leading to lower interest rates, stable financial markets, and an enhanced working of the price system. Lower interest rates, stable financial markets, and increased economic efficiency have increased the returns to investment, attracting more individuals toward the stock market.

Alan Greenspan, Chairman of the Board of Governors of the Federal Reserve System, while expressing some reservations about rising stock prices, has acknowledged the importance of price stability in economic growth:

> Importantly, the evidence has become increasingly persuasive that relatively stable prices – neither persistently rising nor falling – are more predictable hence result in a lower risk premium for investment. Because the nation's level of investment, to a large extent, determines our prosperity over time, stability in the general level of prices for goods and services is clearly a necessary condition for maximum sustainable growth.[17]

[16] See, for example, Robert Barro, "Inflation and Economic Growth," National Bureau of Economic Research, Working Paper 5326 (October 1995); and Stanley Fischer, "The Role of Macroeconomic Factors in Growth," National Bureau of Economic Research, Working Paper 4565 (December 1993). For more information on the economic and financial market effects of a credible anti-inflationary monetary policy and the effect it has on economic growth, see Robert Keleher, "The Roots of the Current Expansion," Joint Economic Committee Study, April 1997.

[17] Alan Greenspan, Testimony before the Joint Economic Committee, *The Economic Outlook and U.S. Monetary Policy*, U.S. Congress, June 17,1999, 9.

Low levels of inflation have played a large role in creating an environment where new investors feel comfortable. Many new investors viewed themselves as savers and stable financial markets allowed these savers to feel comfortable investing. Low levels of inflation helped to make individuals feel comfortable using mutual funds instead of banks to increase the return on their investment.

Chart 4. Annual Percent Change in Consumer Price Indexes (CPI-U): 1970-1998



Sources: *Statistical Abstract of the United States 1998*, Table 772 and *Montly Labor Review* 122, no. 6.

The harmful impact of high inflation is highlighted by the degree to which inflation has a negative marginal effect on equity valuations. Nobel Prize winner Franco Modigliani, along with Richard Cohn, documented a negative relationship between inflation and equity valuation in a 1981 paper. Using both time series and cross-sectional analyses, they found that stocks were presently undervalued due to the effect of inflation on nominal interest rates.[18] The effect of this undervaluation is not small. One study estimated that a one-percentage point increase in expected inflation would cause a 20 percent decline in stock prices.[19]

The magnitude of the inverse relationship between the price level and stock prices is also influenced by the tax code. Taxation of nominal capital gains, estate taxation, some forms of corporate taxation, and historic cost depreciation are all portions of the tax

[18] Franco Modigliani and Richard A. Cohn, "Inflation and the Stock Market," *Review of Economic Conditions in Italy*, (October 1981): 415-431.

[19] Steven A. Sharpe, "Stock Prices, Expected Returns, and Inflation," Board of Governors of the Federal Reserve System, Finance and Economics Discussion Series, no. 1999-02 (April 1999).

code that are not indexed for inflation. Inflation raises the effective tax rate on corporate source income, lowering the after-tax return on investment and leading to a reduction in the price-earnings ratio.[20]

The individuals who may be most affected by the interaction between inflation and capital gains taxation are risk-averse individuals. Risk-averse individuals place their investments in assets with low variability and low rates of return. Taxation of inflationary capital gains imposes higher capital gains rates on individuals who are risk averse by reducing or eliminating the after-tax return on safe investments. Even relatively modest rates of inflation, when combined with burdensome capital gains tax rates, can turn real capital gains into after-tax losses, discouraging a safe and steady stream of equity from entering capital markets.

# V.    LESSONS FROM BROADENED STOCK OWNERSHIP

The first lesson to be taken from the broadening of stock ownership is that Americans want access, control, and choice over their retirement and other saving options. Prior to the introduction of the IRA and 401(k) plan, there was little to no choice in retirement saving. Firms promised a specific pension benefit based on salary and years of service. Accumulating retirement savings using stocks, bonds, or savings accounts was possible, but was unlikely due to burdensome taxes, low rates of return, and the large amount of money needed to invest adequately. The introduction of the 401(k) plan, the IRA, and the proliferation of the mutual fund industry changed retirement planning by allowing the middle class to control their financial future.

The second lesson is the importance of a tax policy that minimizes the multiple taxation of saving and investment while shifting attention towards longer-term planning. IRAs and 401(k) plans remove some of the excess burden that the income tax places on saving and investment and some recent changes in the tax laws have made important progress in expanding IRAs.

However, current tax policy continues to discriminate against saving and investment, an issue frequently addressed in recent legislation. For example, the $2,000 annual IRA contribution limit introduced in 1981 has not been adjusted for inflation. Several proposals have been introduced that would increase the IRA contribution limit to a level that reflects the eroding effects of inflation and the need for expanded saving incentives.[21] Increasing the contribution limits would enhance the tax benefits of IRAs, allowing middle class Americans to shield a larger portion of their saving and investment from multiple taxation.

---

[20] For a broad discussion of the interaction between inflation, taxes, and the stock market, see Martin Feldstein, "Inflation and the Stock Market," *American Economic Review* 70, (December 1980): 839-847.

[21] For a legislative history of IRAs and a summary of legislative issues regarding IRAs in the 106th Congress, see James R. Storey, "Individual Retirement Accounts (IRAs): Legislative Issues in the 106th Congress," CRS Report for Congress 96-20EPW, Washington, DC: Congressional Research Service, 02/08/00.

Recent U.S. tax policy towards saving and investment contains an underlying trade-off – a general reduction in the multiple taxation of saving and investment in exchange for planning for long-term financial needs.    This policy has been very successful in getting Americans to take a more active role in their future, a role that many have embraced.

However, an unfortunate aspect of the tax code works against this policy. According to current tax law, senior citizens are required to begin withdrawals from IRAs by April 1 the year after they reach age 70½ . Withdrawals must be of an amount sufficient to empty their account according to an actuarial schedule, or a 50 percent excise tax is applied to the deficiency.  This unfortunate aspect of the current tax code seems to be at odds with prevailing views regarding the proper role of federal tax policy, since it directly promotes the erosion of personal saving.

Another example of federal tax policy promoting the erosion of personal saving is in the tax treatment of capital gains attributed to mutual fund shareholders.  Mutual funds are required by the tax law to distribute capital gains to shareholders on an annual basis – a taxable event for the taxpayer over which they have little control.  These realizations are involuntary and capital gains taxes are due on the forced realizations.    This tax treatment of gains that would otherwise be unrealized has been estimated to reduce the annual return of the average mutual fund shareholder by 2.3 percentage points a year, at least 10 percent of their annual return.[22]

The final lesson to be learned from the past two decades is the recognition of the role that price stability plays in creating the long-term certainty that is a necessary but not a sufficient condition for long-term planning and capital formation.  The emphasis of the Federal Reserve on price stability lowered interest rates, stabilized financial markets, and created an environment where citizens and companies felt comfortable planning for the long-term.  Given the importance of price stability, not only to stock ownership and retirement planning, but also to general economic growth, it seems appropriate to institute price-stability as the primary goal of monetary policy.

This paper has detailed the roots of the increase in stock ownership to the middle class over the past two decades.  Mutual funds, IRAs, and 401(k) plans have made the retirement tools of the upper class available to all.

Joshua Hall
Economist

---

[22] Jeffery Laderman and Amy Barnett, "Mutual Funds: What's Wrong," *Business Week*, January 24, 2000.

# BIBLIOGRAPHY

Barro, Robert J. "Inflation and Economic Growth." National Bureau of Economic Research, Working Paper 5326, October 1995.

Crenshaw, Albert B. "401(k) Plans Provide Benefits for Wall Street as Well as Workers." *Washington Post*, March 20, 1999.

Feldstein, Martin. "Inflation and the Stock Market." *American Economic Review* 70, (December 1980): 839-847.

Fischer, Stanley. "The Role of Macroeconomic Factors in Growth," National Bureau of Economic Research, Working Paper 4565, December 1993.

Greenspan, Alan. Testimony to the Joint Economic Committee, *The Economic Outlook and Monetary Policy*, U.S. Congress, June 17, 1999.

Internal Revenue Service. *Statistics of Income Bulletin.* Washington, D.C., various years.

Investment Company Institute. *Mutual Fund Shareholders: The People Behind the Growth.* Washington, DC: Investment Company Institute, Spring 1996.

———. *1999 Mutual Fund Factbook.* Washington, DC: Investment Company Institute, 1999.

Katzeff, Paul. "Soaring Savings: Ted Benna, 401(k) Creator, Urges All Workers To Join Up," *Investor's Business Daily*, April 30, 1999.

Keleher, Robert. "The Roots of the Current Expansion." Joint Economic Study. Washington, DC: Joint Economic Committee, April 1997.

Kennickell, Arthur B., Martha Starr-McCluer, and Brian J. Surette, "Recent Changes in U.S. Family Finances: Results from the Survey of Consumer Finances," *Federal Reserve Bulletin*, vol. 87 (January 2000): 1-29.

Laderman, Jeff and Andy Barnett. "Mutual Funds: What's Wrong." *Business Week.* January 24, 2000.

Modigliani, Franco and Richard A. Cohn. "Inflation and The Stock Market." *Review of Economic Conditions in Italy* (October 1981): 415-431.

Nadler, Richard. "The Rise of Worker Capitalism." Cato Policy Analysis No. 359, November 1, 1999.

Nocera, Joseph. *A Piece of the Action: How the Middle Class Joined the Money Class.* New York, NY: Simon & Schuster, 1994.

Poterba, James M. *Shareownership 1998: Based on the 1995 Survey of Consumer Finances.* New York, NY: New York Stock Exchange, 1998.

Poterba, James M., Steven F. Venti and David A. Wise. "How Retirement Savings Programs Increase Savings." *Journal of Economic Perspectives* 10, no. 4 (Fall 1996): 91-112.

Roberts, Lee Harris. "The 401(k) Boom." *Weekly Standard,* March/April 1999.

Samuelson, Robert J. "Stocks Without Risks?" *Newsweek,* November 11, 1999.

———. "Capitalism for the Multitude." *Newsweek*, November 15, 1999.

Sharpe, Steven A. "Stock Prices, Expected Returns, and Inflation." Board of Governors of the Federal Reserve System, Finance and Economics Discussion Series no. 1999-2, April 1999.

Storey, James. "Individual Retirement Accounts: A Fact Sheet." CRS Report for Congress 94-83. Washington, DC: Congressional Research Service, 10/22/97.

————. "Section 401(k) Retirement Plans: A Fact Sheet." CRS Report for Congress 95-180. Washington, DC: Congressional Research Service, 1/6/98.

————. "Individual Retirement Accounts (IRAs): Legislative Issues in the 106th Congress." CRS Report for Congress 96-20 EPW. Washington, DC: Congressional Research Service, 02/08/00.

U.S. Bureau of the Census. *Statistical Abstract of the United States 1998*. 118th edition. Washington, DC: 1998.

U.S. Department of Labor, Bureau of Labor Statistics. *Monthly Labor Review* 122, no. 6 (June 1999).

Wattenberg, Ben. "Capitalism for the Masses." *Baltimore Sun*, January 9, 1997.

Yip, Pamela. "Spreading the Wealth; Changes Paved Way To 10K; Retirement Funds, High Tech, Strong Economy Fueling Climb." *Houston Chronicle*, March 30, 1999.

**EXHIBIT G**

# CCH

# Standard Federal Tax Reporter

## VOL. 7

EMPLOYEE BENEFIT PLANS
CONTRIBUTIONS • FUNDING
IRA • VESTING

CODE SEC. 400—440

¶18,200—¶300

KB81
A1C73b

COMMERCE CLEARING HOUSE, INC

# Employee Benefit Plans

## IRA • ESOP

... Code Secs. 408–409A ... IRAs/SEPs ... Roth IRAs ...
ESOPs... Nonqualified deferred compensation plans

## Table of Contents

| '86 Code Sec. | Reg. § CCH Expl'n | | Paragraph |
|---|---|---|---|
| | | Overview . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,901 |
| 408 | | Individual retirement accounts . . . . . . . . . . . . . | 18,902 |
| | §1.408-1 | General rules . . . . . . . . . . . . . . . . . . . . . | 18,903 |
| | §1.408-2 | Individual retirement accounts . . . . . . . . . . . | 18,904 |
| | §1.408-3 | Individual retirement annuities . . . . . . . . . . . | 18,907 |
| | §1.408-4 | Treatment of distributions from individual retirement arrangements . . . . . . . . . . . . . . | 18,910 |
| | §1.408-5 | Annual reports by trustees or issuers . . . . . . . | 18,912 |
| | §1.408-6 | Disclosure statements for individual retirement arrangements . . . . . . . . . . . . . . . . . . . . . | 18,914 |
| | §1.408-7 | Reports on distributions from individual retirement plans . . . . . . . . . . . . . . . . . . . | 18,916 |
| | §1.408-7 | Simplified employee pension (proposed) . . . . . | 18,917 |
| | §1.408-8 | Distribution requirements for individual retirement plans . . . . . . . . . . . . . . . . . . . | 18,917A |
| | §1.408-8 | Nondiscrimination requirements for simplified employee pensions (proposed) . . . . . . . . | 18,919 |
| | §1.408-9 | Reports for simplified employee pensions (proposed) . . . . . . . . . . . . . . . . . . . . . | 18,920 |
| | §1.408-10 | Investment in collectibles (proposed) . . . . . . . | 18,921 |
| | §1.408-11 | Net income calculation for returned or recharacterized IRA contributions . . . . . . . | 18,921C |
| | §1.408(q)-1 | Deemed IRAs in qualified employer plans . . . | 18,921F |
| | (CCH) | Individual retirement accounts . . . . . . . . | 18,922 |
| 408A | | Roth IRAs . . . . . . . . . . . . . . . . . . . . . . . . . . | 18,925 |
| | §1.408A-0 | Roth IRAs; Table of contents . . . . . . . . . . . . | 18,926 |
| | §1.408A-1 | Roth IRAs in general . . . . . . . . . . . . . . . . . . | 18,926B |
| | §1.408A-2 | Establishing Roth IRAs . . . . . . . . . . . . . . . . | 18,926D |
| | §1.408A-3 | Contributions to Roth IRAs . . . . . . . . . . . . . | 18,927 |
| | §1.408A-4 | Converting amounts to Roth IRAs . . . . . . . . . | 18,927B |

IRAs—§408 [¶ 18,902]        **35,777**

### Effective Date

The provision is effective on the date of enactment.

**Act Sec. 104. Provisions Relating to Plan Amendments in Connection with Hurricane Katrina.**— The provision permits certain plan amendments made pursuant to the changes made by the provisions of Title I of the bill, or regulations issued thereunder, to be retroactively effective. If the plan amendment meets the requirements of the provision, then the plan will be treated as being operated in accordance with its terms. In order for this treatment to apply, the plan amendment is required to be made on or before the last day of the first plan year beginning on or after January 1, 2007, or such later date as provided by the Secretary of the Treasury. Governmental plans are given an additional two years in which to make required plan amendments. If the amendment is required to be made to retain qualified status as a result of the changes made by Title I of the bill (or regulations), the amendment is required to be made retroactively effective as of the date on which the change became effective with respect to the plan, and the plan is required to be operated in compliance until the amendment is made. Amendments that are not required to retain qualified status but that are made pursuant to the changes made by Title I of the bill (or regulations) may be made retroactively effective as of the first day the plan is operated in accordance with the amendment. A plan amendment will not be considered to be pursuant to changes made by Title I of the bill (or regulations) if it has an effective date before the effective date of the provision under the bill (or regulations) to which it relates.

### Effective Date

The provision is effective on the date of enactment.—**Technical Explanation of the "Katrina Emergency Tax Relief Act of 2005,"** September 23, 2005 (JCX-69-05).

### Committee Reports on P.L. 108-311 (Working Families Tax Relief Act of 2004)

.928 Amendments Related to the Economic Growth and Tax Relief Reconciliation Act of 2001.—

#### House Bill

No provision.

#### Senate Amendment

No provision.

#### Conference Agreement

*SIMPLE plan contributions for domestic or similar workers.*—Section 637 of EGTRRA provides an exception to the application of the excise tax on non-deductible retirement plan contributions in the case of contributions to a SIMPLE IRA or SIMPLE section 401(k) plan that are nondeductible solely because they are not made in connection with a trade or business of the employer (e.g., contributions on behalf of a domestic worker). Section 637 of EGTRRA did not specifically modify the present-law requirement that compensation for purposes of determining contributions to a SIMPLE plan must be wages subject to income tax withholding, even though wages paid to domestic workers are not subject to income tax withholding. The provision

revises the definition of compensation for purposes of determining contributions to a SIMPLE plan to include wages paid to domestic workers, even though such amounts are not subject to income tax withholding.—**Conference Committee Report** (H.R. Conf. Rep. No. 108-696).

### Joint Committee Summary of P.L. 107-147 (Job Creation and Worker Assistance Act of 2002)

.930 Pension-Related Amendments to the Economic Growth and Tax Relief Reconciliation Act of 2001.—

**Individual Retirement Arrangements** ("IRAs").—Under the Act, a qualified employer plan may provide for voluntary employee contributions to a separate account that is deemed to be an IRA. The provision clarifies that, for purposes of deemed IRAs, the term "qualified employer plan" includes the following types of plans maintained by a governmental employer: a qualified retirement plan under section 401(a), a qualified annuity plan under section 403(a), a tax-sheltered annuity plan under section 403(b), and an eligible deferred compensation plan under section 457(b). The provision also clarifies that the Employee Retirement Income Security Act ("ERISA") is intended to apply to a deemed IRA in a manner similar to a simplified employee pension ("SEP"). ***

**Increase in benefit and contribution limits.**— Under the Act, the benefit and contribution limits that apply to qualified retirement plans are increased. These increases are generally effective for years beginning after December 31, 2001, but the increase in the limit on benefits under a defined benefit plan is effective for years ending after December 31, 2001. In the case of some plans that incorporate the benefit limits by reference and that use a plan year other than the calendar year, the increased benefit limits became effective under the plan automatically, causing unintended benefit increases. The provision permits an employer to amend such a plan by June 30, 2002, to reduce benefits to the level that applied before enactment of the Act without violating the anticutback rules that generally apply to plan amendments.

In connection with the increases in the benefit and contribution limits under the Act, a new base period applies in indexing the 2002 dollar amounts for future cost-of-living adjustments. The same indexing method applies to the dollar amounts used to determine eligibility to participate in a SEP and to determine the proper period for distributions from an employee stock ownership plan ("ESOP"). The provision changes these dollar amounts to the 2002 indexed amounts so that future indexing will operate properly.—**Technical Explanation of the "Job Creation and Worker Assistance Act of 2002,"** March 6, 2002 (JCX-12-02).

### Committee Reports on P.L. 107-16 (Economic Growth and Tax Relief Reconciliation Act of 2001)

.932 Increase in annual contribution limits.—

*Reasons for change.*—The Committee is concerned about the low national savings rate, and that individuals may not be saving adequately for retirement. The present-law IRA contribution limits have

**Code § 408(r)(2)   ¶ 18,902**

not been increased since 1981. The Committee believes that the limits should be raised in order to allow greater savings opportunities. * * *

*Explanation of provision.*—The provision increases the maximum annual dollar contribution limit for IRA contributions from $2,000 to $2,500 for 2002 through 2005, $3,000 for 2006 and 2007, $3,500 for 2008 and 2009, $4,000 for 2010, and $5,000 for 2011. After 2011, the limit is adjusted annually for inflation in $500 increments.

*Effective Date.*—The provision is generally effective for taxable years beginning after December 31, 2001. * * *.—**Senate Committee Report (S. Rep. No. 107-30).**

*Conference Agreement.*—The conference agreement increases the maximum annual dollar contribution limit for IRA contributions from $2,000 to $3,000 for 2002 through 2004, $4,000 for 2005 through 2007, and $5,000 for 2008. After 2008, the limit is adjusted annually for inflation in $500 increments.

*Effective Date.*—The conference agreement is generally effective for taxable years beginning after December 31, 2001.* * * **Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**Additional catch-up contributions.—**

*Reasons for change.*—The Committee understands that, for a variety of reasons, older individuals may not have been saving sufficiently for retirement. For example, some individuals, especially women, may have left the workforce temporarily in order to care for children. Such individuals may have missed retirement savings options that would have been available had they remained in the workforce. Thus, the Committee believes it appropriate to accelerate the increase in the IRA contribution limits for such individuals.* * *

*Explanation of provision.*—The bill provides that individuals who have attained age 50 may make additional catch-up IRA contributions. The otherwise maximum contribution limit (before application of the AGI phase-out limits) for an individual who has attained age 50 before the end of the taxable year is increased by $500 for 2002 through 2005, $1000 for 2006 through 2009, $1,500 for 2010, and $2,000 for 2011 and thereafter.* * *

*Effective Date.*—The provision is generally effective for taxable years beginning after December 31, 2001. * * *.—**Senate Committee Report (S. Rep. No. 107-30).**

*Conference Agreement.* The conference agreement provides that individuals who have attained age 50 may make additional catch-up IRA contributions. The otherwise maximum contribution limit (before application of the AGI phase-out limits) for an individual who has attained age 50 before the end of the taxable year is increased by $500 for 2002 through 2005, and $1,000 for 2006 and thereafter.

*Effective Date.*—The conference agreement is generally effective for taxable years beginning after December 31, 2001.* * * **Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**.934 Rollovers of IRA distributions.—**

*Reasons for change.*—Present law encourages individuals who receive distributions from qualified

plans and similar arrangements to save those distributions for retirement by facilitating tax-free rollovers to an IRA or another qualified plan. The Committee believes that expanding the rollover options for individuals in employer-sponsored retirement plans and owners of IRAs will provide further incentives for individuals to continue to accumulate funds for retirement.[* * *]

*Explanation of provision.*—The provision provides that * * * distributions from an IRA generally are permitted to be rolled over into a qualified plan, section 403(b) annuity, or governmental section 457 plan. [* * *]

*Rollover of after-tax contributions.*—The provision provides that employee after-tax contributions may be rolled over into another qualified plan or a traditional IRA. In the case of a rollover from a qualified plan to another qualified plan, the rollover is permitted to be accomplished only through a direct rollover. In addition, a qualified plan would not be permitted to accept rollovers of after-tax contributions unless the plan provides separate accounting for such contributions (and earnings thereon). After-tax contributions (including nondeductible contributions to an IRA) would not be permitted to be rolled over from an IRA into a qualified plan, tax-sheltered annuity, or section 457 plan.

In the case of a distribution from a traditional IRA that is rolled over into an eligible rollover plan that is not an IRA, the distribution is attributed first to amounts other than after-tax contributions. [* * *]

*Treasury regulations.*—The Secretary is directed to prescribe rules necessary to carry out the provision. Such rules may include, for example, reporting requirements and mechanisms to address mistakes relating to rollovers. It is anticipated that the IRS would develop forms to assist individuals who roll over after-tax contributions to an IRA in keeping track of such contributions. Such forms could, for example, expand Form 8606—Nondeductible IRAs, to include information regarding after-tax contributions.

*Effective Date.*—The provision is effective for distributions made after December 31, 2001.[* * *]— **House Committee Report (H.R. Rep. No. 107-51, pt. 1).**

*Conference Agreement.*—The conference agreement follows the House bill, with the following modification. Hardship distributions from governmental section 457 plans are not considered eligible rollover distributions.—**Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**.936 IRS discretion to waive 60-day rollover period.—**

*House Bill.*—The House bill provides that the Secretary may waive the 60-day rollover period if the failure to waive such requirement would be against equity or good conscience, including cases of casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement. For example, the Secretary may issue guidance that includes objective standards for a waiver of the 60-day rollover period, such as waiving the rule due to military service in a combat zone or

**¶ 18,902   Code § 408(r)(2)**

©2008 CCH. All Rights Reserved.

during a Presidentially declared disaster (both of which are provided for under present law), or for a period during which the participant has received payment in the form of a check, but has not cashed the check, or for errors committed by a financial institution.

*Senate Amendment.*—The Senate amendment is the same as the House bill.

*Conference Agreement.*—The conference agreement provides that the Secretary may waive the 60-day rollover period if the failure to waive such requirement would be against equity or good conscience, including cases of casualty, disaster, or other events beyond the reasonable control of the individual subject to such requirement. For example, the Secretary may issue guidance that includes objective standards for a waiver of the 60-day rollover period, such as waiving the rule due to military service in a combat zone or during a Presidentially declared disaster (both of which are provided for under present law), or for a period during which the participant has received payment in the form of a check, but has not cashed the check, or for errors committed by a financial institution, or in cases of inability to complete a rollover due to death, disability, hospitalization, incarceration, restrictions imposed by a foreign country, or postal error.

*Effective Date.*—The conference agreement applies to distributions made after December 31, 2001.—**Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**.937 Modifications to minimum distribution rules—**

*House Bill.*—The House bill applies the present-law rules applicable if the participant dies before distribution of minimum benefits has begun to all post-death distributions. Thus, in general, if the employee dies before his or her entire interest has been distributed, distribution of the remaining interest is required to be made within five years of the date of death, or begin within one year of the date of death and paid over the life or life expectancy of a designated beneficiary. In the case of a surviving spouse, distributions are not required to begin until April 1 of the calendar year following the calendar year in which the surviving spouse attains age 70-1/2. The House bill includes a transition rule with respect to the provision providing that the required beginning date in the case of a surviving spouse is no earlier than the April 1 of the calendar year following the calendar year in which the surviving spouse attains age 70-1/2. In the case of an individual who died before the date of enactment and prior to his or her required beginning date and whose beneficiary is the surviving spouse, minimum distributions to the surviving spouse are not required to begin earlier than the date distributions would have been required to begin under present law.

*Reduction in excise tax.*—The House bill reduces the excise tax on failures to satisfy the minimum distribution rules to 10 percent of the amount that was required to be distributed but was not distributed.

*Treasury regulations.*—The Treasury is directed to revise the life expectancy tables under the applicable regulations to reflect current life expectancy.

*Effective Date.*—In general, the House bill is effective for years beginning after December 31, 2001.

*Senate Amendment.*—The Senate amendment is the same as the House bill, with the following modification. The Senate amendment does not modify the excise tax on failures to satisfy the minimum distribution rules.

*Conference Agreement.*—The conference agreement directs the Treasury to revise the life expectancy tables under the applicable regulations to reflect current life expectancy.

*Effective Date.*—The conference agreement is effective on the date of enactment.—**Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**.938 Deemed IRAs under employer plans.**—The bill provides that, if an eligible retirement plan permits employees to make voluntary employee contributions to a separate account or annuity that (1) is established under the plan, and (2) meets the requirements applicable to either traditional IRAs or Roth IRAs, then the separate account or annuity is deemed a traditional IRA or a Roth IRA, as applicable, for all purposes of the Code. For example, the reporting requirements applicable to IRAs apply. The deemed IRA, and contributions thereto, are not subject to the Code rules pertaining to the eligible retirement plan. In addition, the deemed IRA, and contributions thereto, are not taken into account in applying such rules to any other contributions under the plan. The deemed IRA, and contributions thereto, are subject to the exclusive benefit and fiduciary rules of ERISA to the extent otherwise applicable to the plan, and are not subject to the ERISA reporting and disclosure, participation, vesting, funding, and enforcement requirements applicable to the eligible retirement plan.[47] An eligible retirement plan is a qualified plan (Sec. 401(a)), tax-sheltered annuity (Sec. 403(b)), or a governmental section 457 plan.

*Effective Date.*—* * * The provision relating to deemed IRAs under employer plans is effective for plan years beginning after December 31, 2002. * * *.—**Senate Committee Report (S. Rep. No. 107-30).**

*Conference Agreement.*—The conference agreement follows the Senate amendment.

*Effective Date.*—* * * The provision relating to deemed IRAs under employer plans is effective for years beginning after December 31, 2002.—**Conference Committee Report (H.R. Conf. Rep. No. 107-84).**

**.940 Increase in compensation taken into account under SIMPLE plan.—**

*Reasons for change.*—The tax benefits provided under qualified plans are a departure from the normally applicable income tax rules. The special tax benefits for qualified plans are generally justified on the ground that they serve an important social pol-

---

[47] The provision does not specify the treatment of deemed IRAs for purposes other than the Code and ERISA.

## PROOF OF SERVICE BY MAIL

I am self employed in the State of California.  I am over the age of 18 years and not a party to the within action; my business address is 15821 Ventura Boulevard, Suite 245, Encino, California 91436.

On the 26th day of September,  2008, I served the foregoing document described as **BRIEF RE LEGISLATIVE HISTORY; DECLARATION OF WILLIAM PATRICK** on parties in this action by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States mail at Encino, California, addressed as follows:

SEE ATTACHED SERVICE LIST

I sealed and placed such envelope for collection and mailing to be deposited in the mail on the same day in the ordinary course of business at Encino, California.  The envelope was mailed with postage thereon fully prepaid.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed this 26th day of September, 2008, at Encino, California.


_____/s/_____
Mark M. Sharf

1

2

<u>Service List</u>

3

<u>Attorney for Creditor Walter Prince</u>
Allan D. Sarver

4

16633 Ventura Blvd.
Suite 800

5

Encino, CA 91436

6

<u>Office of the US Trustee</u>
U.S. Trustee

7

21051 Warner Center Lane, Ste. 115
Woodland Hills, CA 91367

8

9

<u>Counsel for Chapter 7 Trustee</u>
Daniel Gill
Law Offices of Ezra/Brutzkus/Gubner LLP

10

21650 Oxnard St., Ste 500
Woodland Hills, CA 91367

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28