Save on Westlaw

**S. REP. 93-383**

P.L. 93-406, EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974
SENATE REPORT NO. 93-383
Aug. 21, 1973

S. REP. 93-383

Case 1:07-bk-10312-GM    Doc 102-1    Filed 09/26/08    Entered 09/26/08 12:54:41    Page 1 of 29    Desc
Supplement Senate Report Excerpts    Page 2 of 30

First Part | <<Previous Part | Next Part>>

persons without receipt of adequate security and a reasonable rate of interest. Other prohibited transactions with disqualified persons include payment of excessive salaries, providing the trust's services on a preferential basis, substantial purchases or sales of property for other than adequate consideration, and engaging in any other transaction which results in a substantial diversion of trust assets. [FN139] If the trust engages in any prohibited transaction, it will lose its tax-exempt status for at least one year.

### General reasons for change

Under present law, a trust forming part of a qualified retirement plan loses its exemption from taxation if it engages in a prohibited transaction. With loss of exemption, special tax benefits relating to qualified plans also may be denied, including deferral of taxation by employees and loss of deductions by employers contributing to the trust. In practice these sanctions have not been satisfactory in discouraging prohibited transactions. An employer, needing working capital or in bad financial condition, may forego a deduction in order to divert trust assets to his own use, and the trust fiduciary may acquiesce in his demand.

In addition, the present law's sanctions for engaging in prohibited transactions tend to fall upon innocent employees. For example, if a trust is disqualified because of an act of the trustee and the employer, the income tax imposed upon a disqualified plan may be paid out of funds otherwise available to provide employees' retirement benefits. Furthermore, because of the prohibited act of an employer and trustee, an employee may have to pay tax on contributions made on his behalf before he actually receives the amounts attributable to the contributions. This possible loss to innocent employees has caused the Service to be reluctant to impose the sanctions.

To resolve these problems, the committee bill changes the method of enforcing the prohibited transaction rules. It imposes sanctions for prohibited transactions upon the parties in interest and fiduciaries who engage in these transactions in place of the sanctions now imposed on the employee benefit trusts. [FN140] Under the bill the parties in interest and fiduciaries who engage in a prohibited transaction are to be subject to a two-level excise tax on the amount involved in the prohibited transaction. The first-level tax on parties in interest is to be 5 percent of the amount involved (2 1/2 percent on certain fiduciaries) for each year. If the transaction is not corrected to make the trust whole, a second-level tax of 100 percent is to be imposed on the parties in interest (50 percent on fiduciaries who do not agree to correct the transaction). In accord with current law regarding similar taxes respecting private foundations, neither of these taxes is to be **\*4979** deductible. Since payment of the 100-percent tax would be more expensive than restoring the amount involved to the trust (and since payment of the tax would in no event remove the obligation to make the trust whole), it is expected that the trust will be the ultimate beneficiary of the possible imposition of these sanctions.

In some cases an additional remedy may be needed. For example, sometimes it is difficult to quantify the amount involved in a prohibited transaction and therefore difficult to impose a tax. Also, equitable remedies are sometimes necessary. To resolve these problems, the bill provides that the Secretary of Labor and plan participants and beneficiaries may sue to remedy a breach or anticipated breach of fiduciary obligations. This provision is analogous to the provisions in the Tax Reform Act of 1969 that strengthen the ability of State attorneys general to restore or correct acts of self-dealing involving private foundations.

An additional problem exists because of the present definition of prohibited transactions. Currently, transactions generally are prohibited when the dealings involved are on other than an arm's-length basis. However, arm's-length standards require substantial enforcement efforts, resulting in sporadic and uncertain effectiveness of these provisions. This is the same problem which was faced by the Congress in 1969 when it acted with respect to prohibited transactions and private foundations. At that time the Congress concluded that in most cases arm's-length standards did not preserve the integrity of private foundations, and amended these definitions of prohibited transactions for the most part to prohibit outright questionable transactions between the trust and interested parties. The committee's bill generally follows the approach that was developed in 1969, establishing definitions for prohibited transactions that will make it more practical to enforce the law. The committee's

definitions of prohibited transactions, and the exceptions from these definitions, however, are designed to take account of the unique situation of employee benefit trusts.

## Explanation of provisions

Excise tax on prohibited transactions, in general.-- For the reasons indicated above the committee bill establishes an excise tax on parties in interest and fiduciaries who participate in certain specified prohibited transactions respecting an employee benefit trust. The new provisions apply to a trust which after August 20, 1973, has qualified (or has been determined to qualify by the Secretary of the Treasury) under section 401 of the Code (and a plan described in section 404(a)(2), and a qualified individual retirement account under section 408(a)). The prohibited transaction rules and excise tax sanctions are to continue to apply even if the trust, etc., should later lose its tax qualification. Under the bill, a trust is not to lose its exempt status because it engages in a prohibited transaction, but the parties in interest and fiduciaries who engage in the transaction are to be subject to tax. These provisions (including the civil action provisions to be administered by the Labor Department, discussed below) are not to apply to church plans unless there has been an election with respect to these plans to obtain insurance coverage (See F. Plan Termination Insurance, above).

This excise tax generally follows the same procedures as the tax on self-dealing enacted in the 1969 Tax Reform Act with respect to private **\*4980** foundations. The tax is at two levels; initially, parties in interest who participate in a prohibited transaction are to be subject to a tax of 5 percent of the amount involved in the transaction per year. A second tax of 100 percent is imposed if the transaction is not corrected after notice from the Internal Revenue Service that the 5-percent tax is due.

The committee believes that where the party in interest and not the fiduciary benefits from the prohibited transaction, primary responsibility under the excise tax provisions should be on the party in interest and not on the fiduciary. Therefore, in these cases the tax rates generally are to be lower on fiduciaries than the party in interest. However, where the fiduciary benefits from the prohibited transaction, he is to be treated as a party in interest. Where the fiduciary is subject to tax as an interested party for a given transaction, he is not to be also subject to the fiduciary tax at that level for that same transaction.

The tax on a fiduciary who participates in a prohibited transaction, but does not benefit from it, is initially to be 2 1/2 percent of the amount involved per year. To be liable, the fiduciary must have known (or would have known if he had exercised reasonable diligence), it was a prohibited transaction, and if his participation was not willful, and was due to reasonable cause, he would not be subject to tax. The second level of tax on a fiduciary who does not benefit from the transaction is to be 50 percent of the amount involved, where the fiduciary refuses to agree to part, or all, of the correction required to make the trust whole. Both the first- and second-level taxes on a fiduciary who does not benefit from the transaction are limited to $10,000 (for each tax) with respect to cash transactions.

The first-level tax is owed for each taxable year (or part of a year) in the period that begins with the date when the prohibited transaction occurs and ends on the earlier of the date of correction or the date of mailing of a deficiency notice for the first level tax (under section 6212 of the Code). The first-level tax (except in the case of a fiduciary who does not benefit from the transaction) is imposed automatically without regard to whether the violation was inadvertent.

If more than one person is liable for the prohibited transaction tax on parties in interest (or the tax on fiduciaries), they all are to be jointly and severally liable. For example, if the prohibited transaction involves $100,000, all parties in interest who participated in the transaction will be jointly and severally liable for the first-level tax of $5,000 (per year in the taxable period) and also jointly and severally liable for the second-level tax of $100,000.

The excise tax on a prohibited transaction is a function of the amount involved in the transaction. The bill provides that the amount involved is the greater of the fair market value of the property (including money) given or received in the transaction. However, with regard to services which are necessary to the operation of the plan and which generally may be paid for if the compensation is not excessive, the amount involved is the excess compensation. For the first-level tax, the amount involved in a prohibited transaction is valued as of the date of the transaction. However, for the second-level tax the amount involved is valued at the highest fair market value during the correction period. The higher valuation is used for the second-level tax so the person subject to tax will not delay returning the amount involved to the trust in order to earn income with this amount.

**\*4981** A prohibited transaction may be corrected to avoid the second-level tax at any time before the

90th day after the Internal Revenue Service mails a notice of deficiency with respect to the first-level tax. However, the 90-day period may be extended by any period within which a deficiency cannot be assessed (because of petitions to the Tax Court), and may also be extended for a period which the Internal Revenue Service determines is both reasonable and necessary to correct the prohibited transaction. To correct a prohibited transaction, the transaction must be undone to the extent possible, but in any case the final position of the trust must be no worse than it would have been if the prohibited transaction had not occurred. The higher valuation to be used in computing any second-level tax that might be applicable, is also the valuation to be used in correcting the transaction. In other words, correction requires that the trust receive the benefit of whatever bargain turns out to have been involved in the transaction.

Prohibited transactions and exceptions, in general.-- The bill removes qualified trusts from the present arm's-length prohibited transaction rules, and in place of these limitations establishes a set of comprehensive definitions of the prohibited transactions that apply to qualified trusts. Generally, the committee bill defines as prohibited transactions the same type of transactions that constitute prohibited self-dealings with regard to private foundations, with modifications that are appropriate in the employee benefit trust area. As with private foundations, the bill prohibits both direct and indirect dealings of the types specified.

Sale, exchange, or leasing of property.-- Under the bill, the sale, exchange, or leasing of any property between the trust and a party in interest (with the exceptions noted subsequently) is a prohibited transaction. Under this rule, the transaction is prohibited whether or not the property involved is owned by the trust or the party in interest, and the prohibited transaction includes sales, etc., from the party in interest to the trust and also from the trust to the party in interest. Additionally, following the private foundation rules, a transfer of property by a party in interest to a trust is treated as a sale or exchange if the property is subject to a mortgage or similar lien which the party in interest placed on the property within 10 years of the transfer to the trust, or if the trust assumes a mortgage or similar lien placed on the property prior to transfer. This rule prevents circumvention of the prohibition on sale by mortgaging the property before a transfer to the trust.

Loans.-- The bill also prohibits all lending of money or other extension of credit between the trust and a party in interest but with the exceptions noted below. The committee recognizes that at times a trust may need financial aid and a party in interest may be the only person willing, or able, to provide that aid. The committee believes that the problem of need and the problem of practical administration in this case can be reconciled where an independent third party makes the loan and the interested party guarantees the loan. Therefore, the bill provides that an interested party may guarantee a loan to a qualified trust if a reasonable rate of interest is charged. In this way, there will be an independent lender to keep the interest rate from being too low (which would avoid the contribution limits), and the trust will have an interest in keeping the interest rate from being too high *4982 (which could drain money from the trust to the detriment of the employees). The committee contemplates that a party in interest may guarantee a loan to the trust only where the loan is made by a person who is independent of and not related to the party in interest (or fiduciary), and that the party in interest (or fiduciary) must not provide the lender any direct or indirect consideration for making the loan other than the guarantee.

Following current practice, the bill also allows a loan by the trust to a participant or beneficiary to the extent of the vested accrued benefit of the borrower. To be permitted, such loans must be available to all participants and beneficiaries on a nondiscriminatory basis, and must be made in accord with specific provisions in the plan governing such loans. In addition, a reasonable interest rate must be charged and the loan must be adequately secured. However, it is intended that loans to persons who have been, at any time within 3 years before the loan is made, or while the loan is outstanding, owner-employees or proprietary employees under the plan are not available under this exception; otherwise, the prohibition of premature distributions to such persons could be circumvented.

It is intended that prohibited loans include the acquisition by the trust of a debt instrument (such as a bond or note) which is an obligation of a party in interest. (However, the transition rules, described below, establish special rules regarding certain debt instruments held by the trust on August 21, 1973.) Similarly, the committee intends that it would be a prohibited transaction (in effect, a loan by the trust to the employer) if the employer funds his contributions to the trust with his own debt obligations.

Furnishing goods, services, and facilities.-- The committee bill also prohibits the furnishing of goods, services, and facilities between the trust and parties in interest. However, a party in interest may furnish goods, services, and facilities to a trust if this is necessary for the operation of the plan and

the compensation paid is not excessive.

However, since a substantial portion of a trust's activity is usually investment of assets, the committee intends that 'personal service' not include the activities of a broker, for this activity can give rise to substantial conflicts of interest (e.g., 'churning' of assets).

Also, a trust may furnish goods, services, or facilities to a party in interest if the terms on which the goods, etc., are offered are no more favorable than the terms on which they are made available to the general public.

Transfer or use of trust income or assets.-- The bill prohibits the transfer of any trust income or assets to, or for the benefit of, a party in interest. It also prohibits the use of trust income or assets by or for the benefit of any party in interest. As in other situations, this prohibited transaction may occur even though there has been no transfer of money or property between the trust and any party in interest. For example, securities purchases or sales by the trust in order to manipulate the prices of the securities to the advantage of a party in interest constitute 'a use by, or for the benefit of, a party in interest of any income or assets of the trust.'

To prevent discrimination against fiduciaries and parties in interest, the bill permits these persons to receive any benefits to which they are entitled as participants or beneficiaries in the plan.

**\*4983** Payment of compensation.-- The bill also generally prohibits payment of compensation, or payment or reimbursement of expenses, by a trust to any party in interest. However, this prohibition does not apply to the payment of compensation, or payment or reimbursement of expenses, by the plan to a fiduciary or other party in interest for personal services which are reasonable and necessary to the plan, if the compensation for payment or reimbursement is not excessive. To prevent double payment, this exception does not apply with regard to a fiduciary who is receiving full-time pay from a party in interest whose employees or members participate in the qualified plan. Also, in accord with present law, it is intended this exception will not apply to payments to owner-employees (or proprietary employees) or to certain of their relatives or to corporations controlled by them.

Transactions primarily involving conflicts of interest and fiduciaries.-- The committee bill generally prohibits a fiduciary from dealing with the income or assets of a trust in his own interest or for his own account. However, this does not prohibit the fiduciary from dealings where he has an account in the employee benefit trust and the dealings apply to all trust accounts without discrimination.

The bill also prohibits fiduciaries from receiving consideration in connection with a transaction involving the trust from any party who deals with the trust. This prevents, e.g., kickbacks to a fiduciary.

Transfer of assets outside the United States.-- In order to prevent 'run-away assets', the bill prohibits any assets of the trust from being held, deposited, or invested outside the United States unless the assets remain within the jurisdiction of a United States district court, except as authorized by the Internal Revenue Service under regulations. Any such exceptions should be made only where, as to categories of circumstances, it is clear that neither the interests of the trust participants and beneficiaries, nor the interests of the United States in protecting the integrity of its taxing and regulatory and pension guaranty systems would be likely to be jeopardized by the trust assets being outside the United States.

Acquisition of securities of the employer.-- The committee bill generally prohibits employee benefit plans from acquiring stock or other securities of the employer. This is provided because generally investment in an employer's securities subjects plan participants to a double risk of loss. If an employer has severe financial reverses, his employees may not only lose their jobs (and the employer's contributions for their retirement may substantially decrease), but also they may suffer a loss from decreases in the securities' value and dividends. Also, if the trust is permitted to invest in securities of the employer, the fiduciary may well be subject to great pressure to time the purchases and sales so as to improve the market in those securities, whether or not the interests of protecting retirement benefits of plan participants may be adversely affected.

However, the bill provides a special rule for profit-sharing plans because the concept of these plans is that employees should share in profits through dividends and appreciation as well as through employer contributions out of profits. As a result it is not to be a violation of this securities-of-the-employer rule for a profit-sharing plan to invest all or any part of its assets in securities of the employer if the securities are readily tradable in an established securities market. **\*4984** However, where the securities are not tradable on an established market, then no more than 10 percent of the profit-sharing trust's assets is to consist of the employer's securities. This limit is needed because of the greater difficulty in selling such securities and therefore the greater risk involved in this situation. Moreover, the bill does not limit acquisition of employer's stock by stock bonus plans, since limitations

in these cases would be inconsistent with the nature of these plans.

An employer's securities includes the securities of any controlled group of corporations (as defined in section 1563(a) of the Code) of which the employer is a member. The prohibition applies not only to the purchase of securities, but also to acquisition in other ways, such as acquisition on default of a loan where stock was security for the loan (this latter example is to apply only where the stock was made security for the loan after August 21, 1973).

The 10-percent test, applicable in the case of profit-sharing plans where the securities are not tradable on an established securities market, is to be applied at the time the securities are acquired. Consequently, if the 10- percent test is met at the time of acquisition, ownership of employer securities is not to be prohibited at a later time when the securities may represent more than 10 percent of the trust assets (e.g., because of a change in the values of the assets of the trust).

The committee bill does not change present law which provides, for qualified trusts, that trust funds may not be used for any purpose other than for the exclusive benefit of the employees or their beneficiaries. Under administrative rulings, an investment generally meets the 'exclusive benefit ' requirement if its cost does not exceed fair market value, a fair return is received, sufficient liquidity is maintained, and the safeguards and diversity adhered to by a prudent investor are present. The exclusive benefit rule currently applies to investment in an employer's securities and it is intended that the rule continues to so apply.

The committee bill also does not prohibit a plan from acquiring shares in a regulated investment company (defined under section 851 of the code) which holds or acquires securities of the employer as a regular part of its investment program. However, where the mutual fund acquires securities of the employer as part of the arrangement under which the employer acquires shares in the mutual fund, this exception is not to apply.

Investments that jeopardize income or assets.-- The bill also treats as a prohibited transaction investments which jeopardize the income or assets of the trust. This is similar to the rule that private foundations must invest in a manner that does not jeopardize the carrying out of their exempt purposes. It is expected that, under this rule, investment standards will be established for employee-benefit trusts that are similar to the investment standards which have been established for private foundations. In this case also it is not intended that a 'legal list' of investments for pension trusts be established. Of course the prohibited transaction provisions do not prevent an employer, on termination of his plan, from recovering assets not needed to pay plan benefits. Because of this the Internal Revenue Service should take care that this jeopardy rule is administered with due regard to the interests of present and future participants and beneficiaries. If termination is contemplated, it should be clear that investments are not being made **\*4985** or maintained with the interests of potential remaindermen in mind in any case where this is in conflict with the interests of the participants or beneficiaries.

Miscellaneous exceptions from prohibited transaction rules.-- In the interests of making the prohibited transaction rules work in as practical a manner as possible, certain exceptions are provided to them. One of these exceptions provides that a transaction (such as an exchange) between a trust and a party in interest pursuant to a corporate adjustment, such as a liquidation, merger, redemption, or recapitalization is not to be a prohibited transaction if all the securities of the class held by the trust are subject to the same terms. However, a redemption in which only the stock held by the trust plan is redeemed would have to serve a bona fide business purpose.

Recognizing current practice, the bill also does not prohibit a person from serving as a fiduciary in addition to being an officer, employee, agent, or other representative of a party in interest. In addition, the bill provides that plans subject to the prohibited transaction rules are not to include funds held by certain insurance carriers, funds held by an investment company subject to the Investment Company Act of 1940, or plans administered by Federal or State governments or by any agency or instrumentality of these governments.

Transition rules for prohibited transactions.-- To prevent undue hardship, the committee bill provides transition rules for situations where employee benefit trusts are now engaging in activities which do not violate current law but which would be prohibited transactions under the bill.

One of the transition rules permits the leasing or joint use of property involving a trust and a party in interest under a binding contract in effect on August 21, 1973 (or pursuant to renewals of the contract), to continue for 10 years beyond that date, until August 22, 1983. For this transition rule to apply, the lease or joint use must remain at least as favorable to the trust as an arm's-length transaction with an unrelated party, and must not otherwise be a prohibited transaction under present law. A similar 10-year transition rule applies to loans or other extensions of credit under a

binding contract in effect on August 21, 1973 (and renewals thereof), where the loan remains as favorable as an arm's-length transaction and is not prohibited under present law.

Under the general rule in the bill, a trust may not generally acquire or hold a bond or other evidence of indebtedness issued by a party in interest, since it would be a prohibited loan. However, if on August 21, 1973, the trust holds any bonds, debentures, notes, certificates, or other evidence of indebtedness which were issued by a corporation and that have interest coupons or are in registered form, and the holding of these debt obligations is not prohibited under present law, then the trust may continue to hold those bonds, without time limit. However, to the extent the bonds are disposed of by the trust, they cannot be reacquired and held under these transition rules.

In order to avoid disruption of markets where a pension plan already holds employer securities (or where a profit-sharing plan subject to the 10- percent limit discussed above, holds more than that limit), the bill does not require divestiture of present holdings of those securities. For this purpose, additional shares acquired as a result of a stock split or stock dividend are to be treated as securities already **\*4986** held. However, exercise of a right to acquire securities (e.g., through conversion of a convertible security), is not to be permitted. If a trust subject to these limitations disposes of some of its present holdings, it may not thereafter acquire new securities of the employer, unless that acquisition is permitted under the general rules (as distinguished from this transitional provision). For example, a pension trust would not be permitted to reacquire present holdings of employer securities after it had sold them; a 10-percent profit-sharing trust would not be permitted to reacquire present holdings of employer securities after it had sold them, unless it could do so within the 10-percent limit. Present holdings, for these purposes, are holdings as of August 21, 1973, the date the committee bill is reported.

The bill allows a trust to sell property, at arm's-length terms, to a party in interest where the property is now under a lease or joint use which qualifies for the 10-year transition rule described above. Sales of this type must occur before August 22, 1983. A transitional rule of this type is provided because it appears that such leases are not uncommon, and in such cases often a party in interest is the best available buyer.

Definitions used in prohibited transaction provisions.-- The committee bill contains a number of definitions of terms used in describing the operation of the prohibited transaction provisions. These are described below.

The committee bill defines 'fiduciary' as any person who exercises any power of control, management, or disposition with respect to any moneys or other property of the plan, has authority or responsibility to exercise these powers, or is a guardian, trustee, executor, administrator, receiver, conservator, or any person acting in any fiduciary capacity for the plan (as described in sec. 7701(a)(6)). Under this definition, fiduciaries include officers and directors of a trust, members of the trust's investment committee, and persons who select these individuals. Consequently, the definition includes persons who have authority and responsibility with respect to the transaction in question, regardless of their formal title.

The bill's definition of a 'party in interest' includes the following general categories: (1) managers (and employees) of the plan, (2) persons providing benefit plan services to the plan, (3) the employer and its officers, directors, and highly compensated employees, and controlling or controlled parties, or parties under common control, (4) employee organizations (e.g., labor unions, including the national and international unions where a plan covers any local) with members covered by the plan, and officers and directors of those organizations and (5) fiduciaries who benefit other than in their capacity as plan fiduciaries from the particular prohibited transaction. Additionally, certain relatives and certain partners of parties in interest are treated as parties in interest.

It is intended that 'benefit plan services' include investment advisory, actuarial, legal, accounting, computer and bookkeeping, and other similar services necessary for plan operations. Additionally, attribution rules for ownership of stock are provided which are similar to the attribution rules under the private foundation self-dealing rules. Also, in addition, the bill provides that an open-end mutual fund, the mutual fund's investment advisers, and the mutual fund's principal underwriters are not to be considered as plan fiduciaries or parties in **\*4957** interest merely because an employee benefit trust purchases shares in the mutual fund. Mutual funds are currently subject to substantial restrictions on transactions with affiliated persons under the Investment Company Act of 1940, and also it appears that unintended results might occur (such as preventing a trust from redeeming its mutual fund shares) if mutual funds were not excluded from these definitions.

Civil actions.-- The committee recognizes that there are breaches of fiduciary responsibility which may not appropriately be subjected to an excise tax either because the amount involved in the

transaction is difficult to determine, or because formal injunctive action may be necessary or desirable. Also, the committee recognizes that many persons have a direct interest in seeing that trustees do not breach their fiduciary responsibilities. Consequently, in addition to establishing an excise tax on prohibited transactions, the committee bill strengthens the enforcement of fiduciary duties by providing that individual participants and beneficiaries may bring civil actions in State or Federal courts to redress or prevent fiduciary breaches. Additionally, the bill provides that the Secretary of Labor may enforce breaches of fiduciary duty through civil actions in Federal court.
In providing for enforcement by the Secretary of Labor, the committee bill is similar to the 1969 Tax Reform Act which included provisions to strengthen the ability of State attorneys general to enforce the self-dealing rules regarding private foundations. However, since State attorneys general usually do not have the same common law responsibility to oversee employee benefit trusts as they do private foundations, it was believed that the Secretary of Labor was generally the more appropriate Government official in whom to vest enforcement powers.
Under the bill, civil actions to enforce fiduciary duties generally may be brought with regard to any employee benefit plan which maintains a fund of money or other assets in connection with the plan, and is established or maintained by an employer engaged in or affecting interstate commerce or by an employee organization representing employees so engaged. However, plans established by Federal or State governments or agencies or instrumentalities of these governments are excluded, as are workmen's compensation and unemployment compensation disability insurance plans and plans of churches (in accordance with their exception from the insurance provisions, as described above). Employee benefit plans include plans which provide for retirement, medical, surgical, hospital care, sickness, accident, disability, death or unemployment benefits. These plans also include profit-sharing plans and plans with a trust fund subject to the Labor Management Relations Act of 1947 (sec. 302(c) of that act).
A fiduciary is subject to civil action for breach of fiduciary duty if the plan meets these definitions, regardless of the legal form of the plan. The definition of fiduciaries subject to civil actions includes the same types of persons as the definition of fiduciaries who are subject to the prohibited transaction rules under the excise tax, described above. (However, the plan need not be a qualified plan for tax purposes for a person to be a fiduciary subject to civil action.)
The fiduciary duties which may be enforced through civil actions include the transactions which are prohibited transactions (in the above discussion on prohibited transactions, prevented by excise taxes), and include other fiduciary responsibilities as well. If a fiduciary engages **\*4988** in a transaction which is a prohibited transaction subject to the excise tax, or which would be prohibited and subject to tax if the plan were qualified under the tax laws, the fiduciary's misconduct may be redressed (or prevented) by civil action. In addition, the bill provides that a fiduciary must not jeopardize the income or assets of a plan. Also, a fiduciary must not represent any other party dealing with the plan or act on behalf of a party adverse to the plan or its participants or beneficiaries. Breaches of these duties also may be remedied (or prevented) by civil action.
The bill also provides that fiduciaries must act solely in the interests of the participants and their beneficiaries, and in accordance with the documents and instruments governing the plan (if consistent with the bill). These rules now govern plans qualified under the tax laws and, through the civil action provisions, are extended to other plans of employers which affect commerce (or plans of employee organizations whose members affect commerce).
It is intended that under the rule which prohibits a fiduciary from jeopardizing the income or assets of a plan, fiduciaries will be subject to the usual trustees' duties such as (but not limited to) the duty to keep and render clear and accurate accounts, take and keep control of the plan property, protect the plan property from loss and damage, enforce claims of the plan and defend actions against the plan (unless it is reasonable not to do so), and keep plan property separate from other property. It is intended that the investment standard that must be met by a fiduciary is to be the standard established by the prohibited transaction rule discussed above which prohibits investments that jeopardize the income or assets of a trust.
The bill also prohibits a person who has been convicted of a number of specified crimes from acting as a manager, fiduciary, employee, or consultant to an employee benefit plan for 5 years after conviction or after imprisonment. Any willful violation of this prohibition is subject to a penalty of $10,000 and 1 year imprisonment; the same penalty is applicable to anyone who knowingly permits another person to violate this prohibition. Upon an administrative hearing and after giving notice to prosecuting officials, the Board of Parole of the Department of Justice may remove the restriction on serving with a plan if the Board finds that this would not be contrary to the purpose of the bill. The Board's

determination will be final.

Under the bill, the Secretary of Labor and participants and beneficiaries of a plan may bring civil actions for any appropriate legal or equitable relief to redress or restrain a violation of fiduciary duties. The bill specifically makes a fiduciary who breaches any of the specified duties personally liable; the fiduciary must make good any losses which the plan sustained from the breach and must restore to the plan any profits which he made using plan assets. However, a fiduciary is only personally liable where he knew, or would have known if he exercised reasonable diligence, that his act or failure to act constituted a breach of his responsibility. The bill also provides that fiduciaries have a duty to prevent their co-fiduciaries from breaching a fiduciary responsibility and must compel a redress of a breach. However, if the co-fiduciary objects in writing to the specific action and files a copy of the objection with the Secretary of Labor, he will not be liable for any act (or failure to act) of another fiduciary. Furthermore, the bill specifically prohibits exculpatory clauses.

**\*4989** The bill also makes a party in interest who participates in a prohibited transaction (or a transaction which would have been a prohibited transaction if the plan were qualified under the tax laws) personally liable for any losses sustained by the plan and for any profits made through using plan assets. A party in interest is so liable only if he knew that the transaction was prohibited or would have known after exercising reasonable diligence. This liability is appropriate because in these situations often the party in interest is a major beneficiary of a fiduciary breach; in addition, this liability is in accord with the excise tax liability discussed above regarding prohibited transactions. Fiduciaries and parties in interest who are liable on account of a breach of duty in which they both participated are to be jointly and severally liable.

Appropriate equitable relief may be granted in a civil action. For example, injunctions may be granted to prevent a violation of fiduciary duty, and a constructive trust may be imposed on the plan assets, if needed to protect the participants and beneficiaries. Also, the bill specifically provides that a fiduciary may be removed through civil action brought by the Secretary or participants or beneficiaries if he has violated any of the specified fiduciary obligations, or is serving in violation of the criminal conviction provisions. (The Attorney General also may bring an action to remove in the latter case.) It is expected that a fiduciary (other than one serving in violation of the criminal conviction provisions) may be removed for repeated or substantial violations of his responsibilities, and that upon removal the court may, in its discretion, appoint someone to serve until a fiduciary is properly chosen in accordance with the plan.

The bill provides that participants and beneficiaries may bring civil actions to redress a breach of fiduciary responsibility in any State or Federal court of competent jurisdiction. Actions by participants and beneficiaries brought in Federal district court are subject to the $10,000 limit does not apply to actions brought by the Secretary of Labor or the Attorney General.) Where participants and beneficiaries bring a civil action, the Secretary of Labor must be served with a copy of the complaint or petition, and the Secretary may intervene in the action and remove an action from a State court to a Federal district court. Removal is available only when the Secretary could have brought the action initially.

The bill provides that participants or beneficiaries may bring class actions under certain circumstances. Further, in an action by participants or beneficiaries, a court may allow reasonable attorney's fees and costs and may require the plaintiff to post security for payment of these fees and costs. Liberal venue and service provisions are established for actions brought in Federal district court.

If the fiduciary breach is disclosed in a report filed with the Secretary of Labor, civil action may be brought no later than 3 years after the report is filed. In other cases, an action may be brought within 3 years after the plaintiff knows or has reason to know of the violation, but no action may be brought more than 10 years after the transaction occurred. Additionally, where there is a willfully false or fraudulent statement, misrepresentation, concealment or failure to disclose a material fact to the Secretary of Labor, action may be brought within 10 years of the violation.

### **\*4990** Effective date

The effective date of the fiduciary responsibility provision is January 1, 1975.

### Revenue effect

The fiduciary responsibility provisions are not expected to have any significant effect on the revenues.

### H. Administration and Enforcement

(Secs. 101 and 102, 601, 602, and 641 of the bill, and secs. 4974, 7476, 7477, and 7902 of the Code)

The committee bill relies heavily on the tax laws in order to secure compliance with the new requirements that it imposes on employee pension, profit-sharing and stock bonus plans. The bill, in providing new standards of coverage, vesting, funding and fiduciary responsibility, continues the administration of these provisions in the Internal Revenue Service.

Many aspects of compliance have been discussed in conjunction with the various substantive provisions described in the bill. This includes, for example, the new excise taxes imposed with respect to underfunding and those imposed in connection with transactions which are prohibited to qualified plans.

In a number of other ways, however, efforts have been made to improve the provisions of existing law. The provisions of this type discussed here are the new office set up in the Internal Revenue Service to administer the new standards in this bill as well as those of existing law, together with the audit fee tax designed to provide for this administration. In addition, the bill deals with the problem raised as to the absence under existing law of a judicial review for letters of determination as to the qualification status of plans. Procedures are also set out whereby employees can question the qualification of plans. Finally, the bill establishes procedures in the Department of Labor for an administrative review of employee claims as to their rights under qualified plans.

### 1. INTERNAL REVENUE SERVICE

#### Present law

Under present law, the national office of the Internal Revenue Service is organized on a general activity basis rather than a tax or subject basis. [FN141] At the present time, there are six Assistant Commissioners of Internal Revenue in the national office whose activities are broken into the following categories: collection and taxpayer service, compliance (including auditing), inspection (internal security), planning and research, technical (rulings) and administration housekeeping). Similarly, the field offices of the Service are organized on a similar line. Within each of these broad categories there are Service units whose jurisdictional breakdown is by subject matter under examination. For example, the Miscellaneous and Special Provisions Tax Division *4991 under the Office of Assistant Commissioner (Technical) contains a Pension Trust Branch and an Exempt Organization Branch. However, various other aspects of national office employee benefit plan and tax exempt organization administration are under the Office of Assistant Commissioner, Accounts Collection and Taxpayer Service and the Office of Assistant Commissioner, Compliance.

#### General reasons for change

Concern has been expressed in the case of the administration of employee benefit plans (and also tax exempt organizations) as to whether the Internal Revenue Service with its primary concern with the collection of revenues is giving sufficient consideration to the purposes for which these organizations are exempt. Many believe that the present organization of the Service causes it to subordinate concern for the protection of the interests of plan participants (or the educational, charitable, etc., purposes for which the exemptions are provided).

On the other hand, the enormous growth in retirement plans during the last third of a century has proceeded largely under the tax regulations of the Internal Revenue Service. Moreover, clearly the greatest single protection for rank and file employees during this time has been the Internal Revenue Service's administration of the provision denying any special tax treatment for contributions or benefits discriminating in favor of employees who are officers, shareholders, supervisors, or highly compensated employees. The thrust of this provision is to require broader substantial participation in the plans than would be provided but for the Service's administration of the statute.

At the same time, it must be recognized that the natural tendency is for the Service to emphasize those areas that produce revenue rather than those areas primarily concerned with maintaining the integrity and carrying out the purposes of exemption provisions. Similar concern has been expressed

in the past over the Service's administration of the provisions of the tax law relating to exempt organizations.

The committee believes that in the employee benefit plan and tax exempt organization area it should be easier to emphasize the basic objectives involved if the activities relating to these plans and exempt organizations were more closely coordinated, if the activities in these areas relating to auditing, rulings, etc. whether in the field or in the national office are brought together and if the top direction for these activities also has specialized in them. For the reasons outlined, the bill establishes a separate office in the Internal Revenue Service, headed by an Assistant Commissioner for Employee Plans and Exempt Organizations to deal primarily with plans that are (or claim to be) qualified under section 401 of the code and organizations that are (or claim to be) exempt from income taxes under section 501(a) of the code. This includes pension, profit-sharing and stock bonus trusts and plans, religious, educational, charitable, organizations and foundations as well as the various other exempt organizations described in section 501(c) of the code. Similar units are to be established in the various regional and district offices. In addition, the committee has decided to earmark half of the 4-percent private foundations excise tax on investment income as well as the proceeds from a new audit-fee excise tax for the funding of these new offices.

### *4992 Explanation of provisions

Office of Assistant Commissioner, Employee Plans and Exempt Organizations.-- The bill establishes within the Internal Revenue Service a new office of Assistant Commissioner to be known as the Office of Assistant Commissioner, Employee Plans and Exempt Organizations. This office is to have the supervision and direction of the basic activities of the Internal Revenue Service in connection with pensions, etc. plans (governed by secs. 401 through 414 of the code) and tax exempt organizations (exempt from tax under sec. 501(a) of the code). The bill authorizes the prescribing of the activities this office is to be responsible for in connection with organizations exempt from tax (under sec. 501 (a) of the code) and plans to which the special tax benefits of the deferred compensation provisions of the tax laws (secs. 401 through 414 of the code).

In connection with deferred compensation plans it is intended that this office will be made responsible for, among other things, the question as to the qualification of the plan and the related trust and the exemption from tax of the trust. It also is intended that questions as to the deductibility of contributions to a plan, the taxability of a beneficiary of an employees' trust and the taxation of employee annuities be included in the jurisdiction of this office. In addition, it is planned that this office would have responsibility over the minimum standards relating to funding of the plan and the excise tax for underfunding, including the enrollment and reports of actuaries. The new rules relating to prohibited transactions also come within the activities it is intended should be administered by this office.

In connection with organizations exempt from tax (under sec. 501(a) of the code) it is intended that this office have the responsibilities as to an organization's exempt qualification, the taxes on unrelated business income of an organization exempt from tax, and the rules relating to the private foundation provisions of the Internal Revenue Code.

To carry out the provisions of this bill, it is intended that the principal activities referred to above will be transferred from the various Assistant Commissioners' offices to the new Office of the Assistant Commissioner (Employee Plans and Exempt Organizations). With these transfers it is intended that the Assistant Commissioner (Employee Plans and Exempt Organizations), under the direction and supervision of the Secretary, or his delegate, will have the authority to direct national and field office policy in connection with the basic activities of the Service relating to employee plans and exempt organizations.

Salaries.-- The bill provides that the Assistant Commissioner (Employees Plans and Exempt Organizations) is to be classified at a GS-18 level and is in addition to the number of positions authorized by present law (sec. 5109 of Title 5 of the U.S. Code). Present law also is amended (sec. 5108 of Title 5 of the U.S. Code) to provide that in addition to any positions already provided (and without regard to any other restriction of present law) there are to be a total of 20 new positions in the Internal Revenue Service in levels GS- 16 and GS-17. These increases are to become effective on the date of the enactment of the bill.

Authorization of appropriations.-- The responsibilities and functions allocated to this new office are to be funded by separate appropriations, *4993 authorization for which is made in this bill. For this purpose, the bill authorizes that the revenue from the annual $1 audit-fee tax imposed on the

employer for each plan participant (sec. 4974) plus one-half of the revenues from the 4 percent excise tax on foundation investment income (sec. 4940) is authorized to be appropriated to this office for purposes of carrying out the functions of the office.

The investment income tax on foundations currently is yielding $56 million. This suggests that given the present level, $28 million would be authorized for the new office from this source. It is estimated, based upon the present number of covered pension participants, that $30 million will be be collected from the new $1 audit fee tax. Thus, based upon present levels of revenue and participants the revenue provided for the new office is expected to amount to $58 million. Presently the costs of administering the provisions of the tax law relating to exempt organizations is about $20 million and the cost of administering the provisions relating to employee plans is about $22 million. This suggests a total of $42 million, but with the new activities provided in the case of pension plans and the expanded requirements under the 1969 Act with respect to exempt organizations, it is anticipated that significantly more revenue than this will be required to carry out these functions in the future. Because the authorization for the new office is to be based upon estimates of collections from the two taxes referred to above, it is necessary to have collection data available for purposes of this authorization. As a result, the bill provides that generally the amount of the authorization is to be based upon collections for the second preceding fiscal year. Since the audit fee tax is a new tax first going into effect in the calendar year 1974, the collections from this tax will be first realized in the last half of fiscal year 1974, i.e., the first six months of calendar year 1974. This means that collections for the second preceding year with respect to this portion of the revenue of the new office will not be available before the fiscal year 1976. As a result, as a substitute for the audit fee tax in the years 1974 through 1976, the bill authorizes $35 million a year for the new office. This is in addition to the authorization of half of the collections from the foundation investment income tax.

The funds provided by these two taxes which are authorized for the new office in the Internal Revenue Service are to be used only for activities delegated to this new office and may not be transferred or used by the Internal Revenue Service in any other manner.

### Effective date

These provisions are to be effective as of the date of enactment of the bill.

### Revenue effect

It is not believed that this provision will have any revenue effect (but, for revenue raised by the audit-fee tax, see below.)

### 2. EXCISE TAX FOR AUDITING

#### Present law

As indicated above, the present annual cost of administering employee benefit plans subject to the special tax provisions of the Internal Revenue Code is about $22 million. With the increased costs arising *4994* from the expanded duties it is estimated that additional costs will in the near future raise this total to about $35 million. Under present law no audit fees or taxes are paid with respect to a qualified employee plan in order to cover the costs of the Internal Revenue Service in administering qualified employee plans.

#### General reasons for change

The committee's bill (sec. 101) has established a new Office of Assistant Commissioner for Employee Plans and Exempt Organizations to administer the qualified employee plan provisions and the exempt organization provisions of the code. Under present law, private foundations pay a 4 percent excise tax on their investment income (sec. 4940) half of which under the provision described above is to be used to meet the administration of the exempt organization provisions and other costs of the new office. In contrast, qualified employee plans do not presently contribute funds for the administration of the provisions of the tax law relating to their qualified status. The committee believes that qualified employee plans like exempt organizations should contribute to the cost of their administration. Accordingly, the committee has decided to impose a $1 audit fee excise tax on the employer for each

plan participant in a qualified employee plan. As indicated in the provisions described above, the revenue from the $1 audit fee is to be authorized to be used to meet the portion of the joint cost of the new Office of Assistant Commissioner, Employee Plans and Exempt Organizations, which is attributable to pension plans.

### Explanation of provisions

The bill provides that for the calendar year beginning on January 1, 1974, and subsequent years an excise tax is imposed of $1 per participant under an employer pension, profit-sharing, or stock bonus plan (described in sec. 401(a)), or an annuity plan (described in section 403(a)), or a bond purchase plan (described in sec. 405(a)). The $1 tax imposed is to be paid by the employer of each participant under a qualified plan.

For purposes of administration and collection of this tax the employment tax provisions (subtitle C) of the code are to be applicable. Thus, the audit fee tax becomes the liability of the employer when contributions are first made during a calendar year by, or on behalf of, an employee to a qualified employee plan. However, contrary to the employment taxes, the $1 audit fee excise tax is to be deductible as a trade or business expense (i.e., sec. 3502 does not apply).

The tax imposed under this provision is not to apply to participants under a plan of an agency or instrumentality of the United States, a State or political subdivision. For purposes of this provision a plan established by the employer includes a plan established by a predecessor of the employer.

To be a participant, an individual must be actively employed by the employer at any time during the calendar year. Further, the individual must be entitled to have amounts contributed to or under a qualified plan on his behalf by the employer (or to make contributions to the plan) and must not currently be receiving benefits under the qualified plan (that is, is not a retiree).

**\*4995** The Treasury Department is authorized to prescribe such regulations as may be necessary to carry out the provisions imposing the $1 excise tax.

### Effective date

The $1 excise tax is to be applicable to calendar years beginning after December 31, 1973.

### Revenue effect

The enactment of this provision is expected to produce approximately $30 million of excise taxes at 1973 levels of employment.

### 3. TAX COURT DETERMINATIONS

#### Present law

Plans which meet the requirements of the Internal Revenue Code (that is, are exclusively for the benefit of employees, are nondiscriminatory in regard to coverage and benefits, do not engage in prohibited self-dealing transactions and meet certain other qualifications) receive special tax treatment designed to foster their growth. It is not necessary, in order to receive this special tax treatment, that a prior determination be obtained from the Internal Revenue Service as to the qualification of a plan. However, to assist employers in their development of plans or plan amendments, the Internal Revenue Service issues determination letters indicating whether or not proposed plans or amendments qualify for the special tax treatment. As a practical matter, since taxpayers generally want assurance in advance that their plans or amendments will qualify, in most cases they obtain prior determinations from the Internal Revenue Service before adopting a plan or modification. Such a determination relates both to the qualification of the plan (sec. 401 of the Code) and the tax-exempt status of the related trust (sec. 501 of the Code).

Under the Internal Revenue Service's published procedures, this generally takes the form of a determination letter issued by a district director. The district director may request technical advice from the national office on issues arising from a request for a determination letter. Also, the applicant may request national office consideration of the matter if the district director does not act within 30 days from notice of intent to make such a request, or acts adversely.

Standards are set as to the type of situation in which the national office will entertain a request for

consideration of a case. It will, for example, consider a case where the contemplated district office action is in conflict with a determination made in a similar case in the same, or another, district. The procedure provides for a conference in the national office, if it is requested by the applicant.

### General reasons for change

In most cases an employer is ultimately able to obtain national office consideration of a request for a determination by means of a request for technical advice by a district director or by appeal to the national office of a district director's determination or failure to make a determination. In some cases, the Service has refused to make a determination with respect to the status of a plan and related trust. In either case, however, the employer has exhausted his remedies after the action by the national office.

**\*4996** As a practical matter, there is no effective appeal from a Service determination (or refusal to make a determination) that a proposed pension plan fails to qualify for the special tax benefits. In these cases, although there may be a real controversy between the employer and the Service, present law permits the employer to go to court only after he has made contributions to the plan, deducted them, and had those deductions disallowed. The long time period and the related uncertainty, coupled with the threat of the ultimate loss of the tax deduction, almost always causes the employer to go along with the Service, even if he disagrees with the Service's position. In addition, the determination letter procedure does not permit employees, or their unions, to question the qualification of plans.

The committee believes that both employers and employees should have a right to court adjudication in the situations described above. The bill deals with the problem by providing that, in the event of an unfavorable determination (or failure to make a determination), the employer may ask the Tax Court for a declaratory judgment as to the status of a new plan, a plan amendment or a plan to be terminated. In addition, the committee has decided that interested employees should be allowed to participate in the consideration by the Service of an employer's request for a determination and any controversy connected with it. An employee who intervenes in the Service's determination procedure is to be entitled to receive a copy of the determination issued by the Service in connection with the proceeding. If the employee questions a Service determination with respect to the qualification of a particular plan, he may petition the Tax Court to issue a declaratory judgment as to the status of the plan.

The committee believes that this procedure is desirable because it will permit all interested parties to the controversy (the Government, the trustee, the employer, and his employees) to have an opportunity to contest the Service determination of the matter. [FN141A]

While the committee decision permits employers and their employees to petition the Tax Court for a declaratory judgment in connection with a new plan, a plan amendment, or a plan termination, the committee also expects the Service to establish procedures whereby interested parties (including employees regardless of whether they are plan participants or plan beneficiaries) may question the continued qualification of a plan and a related trust and obtain a determination from the Service. In such a case, it is believed that the Service should afford the employer and other interested parties an opportunity to be heard before issuing a determination letter with respect to the plan and related trust. If the Service ultimately concludes that a plan is no longer qualified, then the Service is to proceed in the usual manner by notice of deficiency. Of course, the Service while concluding that the plan remains qualified could conclude that there has been a violation of a fiduciary obligation, and the Service would then proceed by imposition of the excise tax.

**\*4997** While this new procedure is being made available to parties who desire to use it, there is no requirement that a party use this new procedure to to determine the status of a plan. Further, there is no requirement, as a condition for qualification, that a request for a determination be made.

### Explanation of provisions

In general.-- The bill provides that the United States Tax Court is to have jurisdiction to hear and enter judgments with respect to controversies as to the qualification of an employee plan which has been established by an employer. The plans for which the Tax Court may enter a declaratory judgment are pension, profit-sharing, and stock bonus plans (described in sec. 401(a)), annuity plans (described in sec. 403(a)), and bond purchase plans (described in sec. 405(a)). A declaratory judgment issued by the Tax Court is to be treated as the final decision of the court and is to be

appealable to the U.S. Court of Appeals.

The Tax Court is to have jurisdiction to declare whether a plan is, or is not, a qualified plan, but in this judgment is not to determine whether any proposed action is a prohibited transaction (sec. 4973). The Court is to base its determination upon the reasons provided by the Internal Revenue Service in its notice to the party making the request for a determination, or based upon any new matter which the Service may wish to introduce at the time of the trial. The Tax Court decision, however, is to be based upon a redetermination of the Service's determination and not by a general examination of the provisions of the plan or related trust. The judgment is to be binding upon the parties to the case based upon the facts as presented to the Court in the case for the year or years involved. This, of course, does not forclose future action if an examination of the operations of the plan indicates that the plan does not in operation meet the requirements for qualification.

The parties entitled to petition the Tax Court for a declaratory judgment under this provision in general are the trustee of a plan, a taxpayer seeking to take a deduction for contributions to a plan or trust, or an employee of the taxpayer.

Exhaustion of administrative remedies required.-- For a petitioner to receive a declaratory judgment from the Tax Court under this provision, he must demonstrate to the court that he has exhausted all administrative remedies which are available to him within the Internal Revenue Service. Thus, in the case of an employer (or a plan trustee) he must demonstrate that he has made a request to the Internal Revenue Service for a determination and that the Internal Revenue Service has either failed to act, or has acted adversely to him, and that he has appealed any adverse determination by a district office to the national office of the Internal Revenue Service, or has requested or obtained through the district director technical advice of the national office. To exhaust his administrative remedies a party must satisfy all procedural requirements of the Service. For example, the Service may decline to make a determination if an employer fails to supply the Service with the necessary information on which to make a determination. In addition, the Service should decline to make a determination if it is not satisfied that the employer has taken reasonable steps to notify all employees who might have an interest in the action on request for a determination.

*4998 In addition to exhausting administrative remedies, an employer must have placed a plan into effect prior to the petition of the Tax Court for a declaratory judgment. However, a new plan is to be treated as being in effect even if it includes a provision that the funds contributed to it by the employer and employee may be refunded in the event that the plan is not found to be a qualified plan by the Service or the Tax Court. In the event that the contributions are refunded, all deductions for contributions would be includable in income by the person who receives the payment. In the case of a plan amendment or plan termination, the proposed action by the employer or plan trustee also may be put into effect on a conditional basis.

While the Service presently does not provide any procedure for employee objection to proposed determinations concerning the qualification of a plan, it is anticipated that the Service will adopt procedures similar to those procedures provided for employers making the request for the determination. These procedures would permit employees who have an interest in the requirements necessary for the plan to qualify to participate in the administrative determination of whether a plan is entitled to qualified status. An employee must exhaust these remedies before petitioning the Tax Court for a declaratory judgment. If there has been a failure to provide an employee with adequate notice of a request for a determination, then he need only exhaust those administrative remedies that are available to him at the time he receives adequate notice.

Tax Court Commissioners.-- In order to provide the court with flexibility in carrying out this provision, the bill authorizes the Chief Judge of the Tax Court to assign the Commissioners of the Tax Court to hear and make determinations with respect to petitions for a declaratory judgment, subject to such conditions and review as the Court may provide.

Right to petition Tax Court.-- The right to petition the Tax Court for a declaratory judgment is to arise only out of cases involving requests for a determination with respect to a new plan, an amendment to an existing qualified plan, or a termination of an existing qualified plan. The request for a determination must be communicated by the employer (or plan trustee) to the employees at the time that a request for a determination is made to the Service. This apprises the employees of their rights, or lack of rights, under the plan and permits them to participate in the proceedings with the Service and enter an objection to any proposed determination.

An employer (or a trustee of a plan) may bring an action for a declaratory judgment in connection with a pension, profit-sharing, stock bonus, annuity, or bond purchase plan if he has submitted to the Service a request for a determination as to the qualified status of a new plan or the continued

qualified status of a plan that has been amended or the status of a plan which has been terminated. If the action is brought by the employer or trustee, any employee who had intervened in the proceedings before the Service is to be allowed to intervene in the Tax Court proceedings.

An employee may bring an action for a declaratory judgment if his employer or the trustee of his employer's plan obtained a determination from the Service that is adverse to the employee. A determination may be adverse to an employee, for example, if he is excluded *4999 from the group of employees covered by the plan or if his vesting or benefits are not as favorable as he claims they need to be in order to satisfy the nondiscrimination provisions of the tax law. To bring the action an individual must have been an employee of the employer during the period for which he is questioning the qualification of the plan. In any suit by an employee for a declaratory judgment his employer or the trustee of the plan is to be allowed to intervene.

Time for bringing action.-- In general, the petition to the Tax Court for a declaratory judgment just be filed within 90 days after the date on which the Commissioner sends by certified or registered mail his final determination in response to an employer or trustee's request for a determination. Generally, the event causing the period to begin to run is to be a notification by the national office of a refusal to hear an appeal from a district director's determination, or of a notice of a decision with respect to an appeal from a district director's determination. Alternatively, the event may be a notice by the district director of a response by the national office for technical advice. To give interested parties an additional period of time in which to make determinations or file documents, the bill provides that the period for filing a petition may be extended for such additional period as may be needed if agreed to by the Service and the party making the request for a determination.

Generally, the Commissioner is to have 270 days within which to make a final determination. As explained above, however, this period may be extended by consent for whatever period is agreed to by the Commissioner and the party making the request for a determination.

If the Service fails to make a final determination within the specified period of time (including any extensions of time), the employer or trustee may bring his action for a declaratory judgment within 90 days after the expiration of the 270-day period or such longer period for which an extension had been agreed.

Burden of proof.-- The normal rules of burden of proof and evidence for the Tax Court are to be applicable in declaratory judgment cases. The burden of proof is on the petitioner with respect to any ground which was set forth in the determination in a manner which informs the petitioner of the reasons for the Service's action. The burden of proof is on the Service with respect to any reason which was not set forth by the Service as a reason for denial of qualification. If the case involves a request for a declaratory judgment where the Service did not make a determination, the burden of proof is to be on the Service for any ground on which it relies in the declaratory judgment proceeding. If an employee disagrees with the Service's determination that a plan is qualified, the burden of proof is on the employee to show that the plan is not qualified.

### Effective date

The amendments providing for petitioning of the Tax Court to issue declaratory judgments is to take effect on January 1, 1975.

### 4. DETERMINATION OF EMPLOYEE RIGHTS

### Present law

Under present law, retirement plan participants do not have any right under Federal law to access to an inexpensive forum for having their pension rights declared. In the case of those plans which do not *5000 provide for some form of grievance or arbitration procedure, the plan participants generally only have an opportunity to obtain redress of their grievances in State or local courts.

### General reasons for change

The committee believes that all workers and plan beneficiaries should have the opportunity to resolve any controversy over their retirement benefits under qualified plans in an inexpensive and expeditious manner. Hardships have been encountered in the past by workers who are unable to plan for their retirement because of the uncertainty of their benefits and by beneficiaries who have lost benefits to

which they were entitled. Accordingly, the committee has decided to provide that controversies as to retirement benefits are to be heard by the Department of Labor.

The procedures provided by this section of the bill are provided as alternatives to existing procedures that may be available to plan participants or beneficiaries. Nor are these procedures intended to override the provision of any collective bargaining agreement or similar agreement which sets out procedures for employees in redressing their grievances.

### Explanation of provisions

The bill provides a procedure whereby a plan participant or beneficiary may request the Secretary of Labor to hear and decide disputes as to the present or future entitlement of a plan participant or beneficiary to benefits under a plan which is (or was) qualified under the Internal Revenue Code. For this purpose, a qualified plan is a pension, profit-sharing, or stock bonus plan (described in sec. 401 (a) of the code), an annuity plan (described in sec. 403(a) of the code), or a bond purchase plan (described in sec. 405(a) of the code).

To be a participant, an individual must be actively employed by the employer at any time during the calendar year. Further, the individual must be entitled to have amounts contributed to or under a qualified plan on his behalf by the employer (or to make contributions to the plan) and must not currently be receiving benefits under the qualified plan (that is, is not a retiree). A plan beneficiary generally is an individual who is receiving (or claims a right to receive) benefits under a qualified plan.

Upon the application of a plan participant or beneficiary for a determination of his retirement rights the Secretary of Labor is to notify the administrator of the plan under which the applicant is requesting that his rights be declared. The Secretary is to notify the plan administrator of the matters complained of and the relief requested by the applicant, and to hold a proceeding at such time and place and in such manner as to permit the plan participant or beneficiary to be present and to present his case to the Secretary.

The Secretary is to attempt to secure voluntary compliance with any decision he makes with respect to an applicant's retirement rights, but he has the power to issue an order directing the plan administrator to comply with the terms of any decision. In the case of a refusal to comply with a decision of the Secretary, the Secretary may petition any U.S. District Court within the jurisdiction of the proceedings to issue an order requiring compliance.

**\*5001** In any hearing conducted by the Secretary under this proceeding the Secretary is to have the authority to require attendance and to permit examination of witnesses and the production of books, papers, and documents (secs. 49 and 50 of the Federal Trade Commission Act). Under this provision the Secretary also is authorized to examine and copy any documentary evidence of any corporation which is a party to the proceedings and to have the power to require by subpoena the attendance and testimony of witnesses and the production of documentary evidence relating to any matter relative to the proceedings. Other procedures and practices common in administrative determinations of this type are also provided for. It is expected that the procedures adopted by the Secretary will be conducted with a minimum of formality and without requiring a printed record in all cases. It is believed if this procedure is followed, the hearings can be conducted in an expeditious and inexpensive manner.

Any decision made by the Secretary determining the pension benefits of an applicant may be appealed to any United States District Court within the jurisdiction of which the proceeding was held. The provisions of Chapter 7 or Title 5 of the United States Code (relating to judicial review) are to apply to any such appeal and on appeal the facts upon which the decision was based are subject to a trial de novo by the reviewing court.

### Effective date

The provisions of this section are to take effect and apply to applications for determinations made on or after January 1, 1975.

### I. Limitation on Contributions

(Secs. 702, 704, and 706 of the bill and secs. 72, 401, 404, 412, 414, 1379, and 6691 of the Code)

## Present law

Under present law, different rules are provided for employer and employee contributions in the case of plans for self-employed individuals (H.R. 10 plans), plans of 'regular' corporations, and plans of electing small business corporations (subchapter S). [FN142] These are described below.

H.R. 10 plans.-- The amount of deductible contributions to an H.R. 10 plan on behalf of a self-employed person cannot exceed the lesser of 10 percent of his earned income [FN143] or $2,500 (sec. 404(e)). In addition, nondeductible contributions may be made in certain cases, but these contributions on behalf of owner-employees may not exceed the lesser of 10 percent of earned income or $2,500. Allowable voluntary contributions by employees of self-employed individuals must be at least proportionate to allowable voluntary contributions for self-employed (sec. 401(e)(1)(B)(ii)).

**\*5002** 'Regular' corporate plans.-- In the case of a 'regular ' corporate plan there are no limitations on how much may be contributed by the employer. There are, however, limitations on the amount of the contribution that is deductible. Different limitations apply to profit-sharing and stock bonus plans and to pension plans.

In the case of profit-sharing or stock bonus plans, the amount of the contribution that is allowable as a deduction is not to exceed in the aggregate 15 percent of compensation to employees covered under the plan. Contributions in excess of the 15-percent limitation may be carried over to future years. In addition, within certain limits, to the extent that an employer does not make the full 15-percent contribution in one year he may increase the amount of his deductible contribution in a future year.

In the case of pension plans, the amount of the contribution that is deductible is not to exceed 5 percent of the compensation to employees covered under the plan, plus the amount of the contribution in excess of 5 percent of compensation to the extent necessary to fund normal pension costs and remaining past service costs of all employees under the plan as a level amount or as a level percent of compensation. In the alternative, the taxpayer may compute the limit on his deductible contributions by limiting his deduction to his normal cost for the plan plus 10 percent of the past service cost of the plan (sec. 404(a)). In practice, these limitations have very little effect in limiting contributions to regular corporate pension plans.

Where an employer contributes to two or more retirement plans which are governed by different limits on deductions (pension, profit-sharing or stock bonus, or employee annuities), the total amount annually deductible under all the plans cannot be more than 25 percent of compensation otherwise earned by the plan beneficiaries. If any excess is contributed, it may be deducted in the following year; the maximum deduction in the following year (for carryover and current contributions together) is 30 percent of compensation. A carryover is available for additional excess contributions which are deductible in the succeeding taxable years in order of time.

Subchapter S plans.-- The limitations on the deductibility of contributions to a subchapter S corporation plan are the same as those in 'regular' corporate plans. However, a shareholder-employee (an employee who owns more than 5 percent of the outstanding stock of such a corporation) must include in his gross income the amount by which the deductible contributions paid on his behalf exceeds the lesser of 10 percent of his compensation or $2,500 (sec. 1379(b)).

Professional corporations.-- Generally, lawyers, doctors, accountants and certain other professional groups in the past have been unable to carry on their professions through the form of corporations because of the personal nature of their responsibility or liability for the work performed for a client or patient. Consequently, their contributions to retirement plans were limited by the rules governing self-employed persons. In recent years, however, all States have adopted special incorporation laws which provide for what are generally known as 'professional corporations.' These have been used increasingly by groups of professional persons, primarily to obtain the more favorable tax treatment for pensions generally available to corporate **\*5003** employees. The Treasury Department, in the so-called Kintner regulations, held that professional corporations were not taxable as corporations. A number of court cases, however, have overturned the regulations and the Service has now acquiesced and generally recognizes these professional corporations as corporations for income tax purposes.

## General reasons for change

Many self-employed people, especially professionals, feel that they are discriminated against as compared with corporate executives and proprietary employees of corporations in regard to the tax treatment of retirement savings. This is because, at present, there is no comprehensive limit on the amounts the corporate employer can contribute on behalf of its executives and proprietary employees. Self-employed persons, on the other hand, are subject to the contribution limits described above.

In addition, many of the self-employed argue that, as a result of these contribution limits, it is difficult for them to provide adequately for their retirement, particularly as many professionals have a limited number of years of peak earnings, in which it is comparatively easy to set something aside. It is also argued that the $2,500 limit is no longer appropriate, since in the approximately 10 years since H.R. 10 was first enacted, there has been a substantial inflation factor in the economy. Furthermore, it is contended that the present law in the retirement plan area creates an artificial incentive for the incorporation of businesses which more traditionally, and perhaps more appropriately, have been conducted in unincorporated form. For all of these reasons, the committee believes that a substantial increase in deductible contributions for self-employed individuals is justified at the present time. Under the committee bill, the present limits would generally be increased to 15 percent of earned income, up to a maximum deduction of $7,500 per annum.

At the same time, it is clear to the committee that the formation of professional corporations, a practice which has proliferated enormously in recent years, has had the effect of circumventing the limitations which Congress intended to impose on deductible contributions by persons who are essentially, in most respects, self-employed. In many corporate plans a much larger percentage of the contributions and benefits go to 'rank and file ' employees than is the case with regard to most H.R. 10 plans. In such corporate plans, if large contributions are made for executives, then the antidiscrimination provisions of present law (sec. 401(a)(4)) require that proportionate contributions be made on behalf of rank and file employees. Not only does this 'financial drag' effect tend to impose practical restrictions on the size of contributions made for the highest level employees, but it also means that, if large contributions are made for this group, then lower level employees will also benefit. Thus, it appears that many corporate plans are subject to practical limitations which do not apply in in the case of self-employed plans. The absence of such practical limitations is the reason that it has been thought necessary to impose legal limitations upon self-employed plans. However, it appears to the committee that the current method of limitations does not apply equally to all situations where 'financial *5004 drag' is very small or nonexistent. Also, the committee feels that the present system discriminates in favor of those who choose to incorporate, and against those who do business in the more traditional partnership form. Similarly, other small businesses in corporate form are treated differently for pension plan purposes depending whether or not they are under subchapter S, and without regard to whether most of the benefits under the retirement plan go to rank and file employees.

The committee bill would correct this situation by putting the regulation of retirement benefits on a realistic basis, applying limitations where they are appropriate, whereas the current system depends too greatly on the form of business operation. Thus, under the committee bill, limitations on contributions would be imposed not only on self employed plans, as under present law, but also on proprietary employees holding a two percent or greater interest in an incorporated business, but only where all such persons, in the aggregate, have more than a 25-percent interest in benefits under the plan.

### Explanation of provisions

The committee bill increases the maximum deductible contribution on behalf of self-employed persons to the lesser of $7,500, or 15 percent of earned income. (A similar, although not identical, rule is applied in the case of defined benefit pension plans.) However, no more than the first $100,000 of earned income may be taken into account in applying the percentage limits. The $100,000 ceiling on the earned income rate base means that a self-employed person with more than $100,000 income will have to contribute at a rate of at least 7 1/2 percent on behalf of his employees if he wishes to take the full $7,500 deduction on his own behalf (in order to comply with the antidiscrimination requirements). [FN144] A self-employed person earning more than $100,000 who wishes to contribute $5,000 for himself will have to contribute at least 5 percent on behalf of his employees. The committee bill also extends the application of these provisions to plans for the benefit of 'proprietary employees.' In general, a 'proprietary employee' would be any individual owning either

directly, or through attribution rules (those prescribed in sec. 1563(e)), at least 2 percent of the total combined voting stock of the corporation, or 2 percent of the total value of all shares of stock in the corporation. However, the provision does not apply unless all proprietary employees who are active participants, as a class, have more than 25 percent of the total account balances for active participants under a defined contribution plan (such as a money purchase plan), or in other cases have more than 25 percent of the present value of all accrued benefits under the plan (whether or not vested) for active plan participants. [FN145] The committee believes that this approach will place the treatment of corporate plans on a more realistic and equitable basis-- where most of the benefits under the plan are for individuals who are not proprietary employees, the contribution ceiling will not apply, but *5005 where a substantial portion of the plan benefits are for proprietary employees, the ceiling will apply.

The new rules are also to apply in the case of subchapter S corporations. Under the committee bill, section 1379 is repealed. However, subchapter S corporations would remain subject to limitations under the same rules applicable to other corporations. Thus, if more than 25 percent of the benefits under the plan were for individuals who each held at least 2 percent of the stock in the corporation, these stockholders would be considered to be proprietary employees, and would be subject to the 15 percent-- $7,500 limitation. But if less than 25 percent of the benefits were for these individuals, these limitations would not apply.

As is the case under present law with respect to an owner-employee, a proprietary employee (or a group of two or more proprietary employees) who controls more than one business would be required under the bill to group together all controlled business activities for the purpose of determining whether all employees of the proprietary employee are covered by a retirement plan on a nondiscriminatory basis, and also for the purpose of assuring that the limitations on contributions are not exceeded. As a result of this requirement, a proprietary employee could not make contributions under two or more retirement plans, which, when totaled together exceed $7,500. This provision ensures that a proprietary employee may not exceed the limitations on deductible contributions by splitting his activities among two or more businesses and establishing retirement plans in each, nor could he divide his business and set up a retirement plan in one business where, for example, he is the only employee.

The bill also provides that-- like an H.R. 10 owner-employee under present law-- an individual who is a proprietary employee in a business (whether or not he controls the business), and is also a proprietary employee in another business which he controls, may not be covered under the plan of the first business unless he has established a plan for the employees of the business which he controls. The plan for the business which he controls must provide contributions and benefits for employees which are at least as favorable as the contributions and benefits provided for him under the plan of the first business.

The rules outlined above also apply in cases where an individual is an owner-employee in one firm and a proprietary employee in a second business.

Defined benefit plans-- limitation on benefits.-- The committee bill also contains a provision, which applies in the case of all defined benefit plans (including corporate plans without proprietary employees), generally limiting the annual benefits which can be paid out under these plans (as of age 65) to 100 percent of the participant's average compensation from the employer during his highest 3 consecutive years of earnings. A pension is essentially a substitute for earning power during the retirement years and the committee believes that no qualified pension plan should pay defined benefits which are higher than an employee's average earnings during his highest 3 years. It is the understanding of the committee that this provision is consistent with present law (Rev. Rul. 72-3, 1972-1 C.B. 105) and by this provision the committee only intends to clarify and make more explicit present law.

*5006 The plan could, however, provide for a cost of living adjustment over and above the 100 percent limit. However, benefits paid in the event of early retirement would have to be scaled down from the 100 percent of salary level on an actuarial basis. In general, in the case of any defined benefit pension plan which does not pay benefits in the form of a straight life annuity, commencing at age 65, or which provides ancillary benefits, the 100 percent limitation would have to be adjusted in accordance with regulations. [FN146] In the case of a contributory plan, upward adjustments in the benefit schedule would be permitted in accordance with regulations, to reflect the fact that part of the annuity had been purchased with the employee's own after-tax dollars.

In the case of an employee who is a participant in both a defined benefit pension plan and a money purchase pension plan, the maximum 100 percent of salary benefit under the defined benefit pension

plan would be reduced under the committee bill by multiplying 100 percent of the participant's average compensation contributed under the money purchase plan, and the denominator of which is 20. (Under another provision of the committee bill, 20 percent would be the maximum tax-excludable contribution under a money purchase plan.)

For example, if an employee had an average high-three-year salary of $20,000, and a 10 percent of salary contribution had been made on his behalf to a money purchase plan, his maximum yearly benefit under the defined benefit pension plan could not exceed $10,000 (10/20ths of $20,000). This would prevent the situation where an employee might seek to circumvent the limitations on benefits under a defined benefit plan, or on tax-excludable contributions under a money-purchase plan, by setting up two different types of plans for himself. (In cases where the rate of contributions to a money purchase plan fluctuated over the career of the employee, or were made for certain years when he was a participant under the defined benefit plan, but not for others, appropriate adjustments to this formula will be made in accordance with regulations.)

As a further adjustment, in the case of an employee who participates in a defined benefit plan for less than 10 years, the defined benefit otherwise allowable in accordance with the rules described above is to be reduced by multiplying the otherwise allowable benefit by a fraction, the numerator of which is the proprietary employee's years of active participation in the plan, and the denominator of which is 10. For example, if an individual who was an active participant for 3 years under the plan had an average high-three years salary of $50,000 (and no other adjustments were required) his maximum benefit could not exceed 3/10ths of $50,000, or $15,000 per annum.

This would prevent a situation where an individual might receive an extremely high pension, even though he had only a few years of active service under a plan.

Defined benefit plans for proprietary employee corporations.-- At present, many small corporate plans are defined benefit plans, although *5007 most self-employed plans are defined contribution plans because of the limitations on contributions imposed on self-employed persons under present law. The committee was concerned that in extending the contribution limits to certain proprietary employee corporate plans, the committee bill might inadvertently take away, as a practical matter, the option of having defined benefit plans from these corporations. As a result, the committee bill contains a formula (which under the bill may also be used by self-employed individuals) which would allow proprietary employees, in effect, to translate the 15 percent-- $7,500 limitations on contributions, to which they would otherwise be subject, into limitations on benefits which they could receive under a defined benefit plan. (Of course, all employees of all corporations, and all self-employed individuals, remain subject to the 100 percent of salary limitations, discussed above.)

Under the formula, the basic benefit for the employee (that is, a straight life annuity commencing at the later of age 65 or 5 years from the time the participant's current period of participation began, with no ancillary benefits) is not to exceed the amount of the employee's compensation which is covered under the plan (up to a maximum of $50,000) times the percentage shown on the following table.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

The percentages in early years are higher to reflect the fact that contributions made during these time periods earn interest for a longer period prior to retirement than contributions made in later years. The Secretary or his delegate is to have authority to prescribe regulations in cases of plans which provide something other than the 'basic benefit.' also, the regulations are to specify percentages for individuals who become participants at ages other than those shown on the table. In addition, the Secretary or his delegate is given authority to prescribe new percentages, to be used in years beginning after December 31, 1977, based on changes in money rates and mortality tables occurring after 1973.

To illustrate how this formula would work, assume that a self-employed person enters a defined benefit plan at age 30, and participates in the plan for 5 years, with income covered under the plan of $20,000 per annum. At age 35, he leaves the plan, but at age 50, he again becomes a participant. For the first 5 years his covered income is $30,000 per year, then $40,000 for the next 5 years, and finally $50,000 for the last five years prior to his retirement.

The calculation would work as follows:

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

*5008 Thus, the maximum benefit which could be paid to the individual under the plan in the form of a single life annuity commencing at age 65 with no ancillary benefits would be $24,500 per year.

The committee bill also provides that for purposes of the antidiscrimination rules, the maximum amount of compensation which is to be taken into account is to be $100,000. (This is the same ceiling

provided in connection with contributions to a money purchase plan.) For example, if a self-employed person established a defined benefit plan for himself at age 50 (where a 3 percent rate would apply) and earned $100,000 per year, benefits under the plan for his employees would be earned at the rate of 1.5 percent of covered compensation, and the plan would not be considered to be discriminatory. In other words, the maximum benefit which could accrue per year for the self-employed person would be 3 percent of $50,000, or $1,500, which is equivalent to 1.5 percent on a $100,000 base. Thus, the self-employed person would be permitted to make contributions which would purchase a 1.5 percent benefit for his employees. However, even if the self-employed person's earnings were $20,000, benefits earned for the employees under the plan could not drop below the 1.5 percent rate.

Limitations on contributions to money purchase plans.-- The committee bill also contains a provision which would limit tax excludable contributions under a money-purchase plan. Cases have been found where the stockholders of small corporations invest very substantial percentages of their income in what is, in effect, a deferred compensation arrangement. As discussed above, the Internal Revenue Service has ruled (Rev. Rul. 72-3, 1972-1 C.B. 105) that a pension is essentially a substitute for earning power during the retirement years and that, in general, a pension plan does not qualify in cases where the pension benefit is more than the employee's highest average salary. The committee agrees with this interpretation of present law, but the 100-percent-of-salary limitation is difficult to apply in the case of money purchase plans because the amount of the pension benefit which will ultimately be received cannot be determined with precision. Thus, the committee bill, as a corollary to the 100-percent-of-salary limitation for defined benefit plans, also contains a provision that tax excludable contributions to a money purchase or other defined contribution plan cannot exceed 20 percent of the employee's compensation. Any additional contributions on behalf of the employee must be included in income by him. [FN147]

To enforce these provisions, employers or pension plan custodians would be required to report to the Service, in accordance with regulations, whenever contributions in excess of the 20 percent limitation had been made, and a penalty ($10 a day up to a $5,000 maximum) would be imposed for each instance of unexcused failure to comply with these reporting requirements.

Any amount included in gross income under this provision would be considered as part of the employee's investment in the contract for purposes of computing the taxable amount of a distribution from the plan to the employee. However, these contributions would be considered to be made by the employer for purposes of qualification of the **\*5009** plan. If the employee's rights under the plan should terminate before tax excludable payments under the plan equaled the amounts included in gross income under this provision, a tax deduction would be allowed equal to the uncovered contributions.

Integration rules for plans benefiting proprietary employees.-- Under present law, any H.R. 10 plan which benefits owner-employees is subject to certain additional rules with respect to integration. If more than one-third of the contributions under the plan are made on behalf of owner-employees, the plan is not permitted to integrate with social security. On the other hand, if less than one-third of the contributions are made for owner-employees, and the owner-employee treats the self-employment taxes which he pays as contributions on his own behalf under the plan, the plan may integrate by treating the employer's social security contributions on behalf of his employees as contributions made under the plan (sec. 401(d)(6)). By contrast, a qualified employer plan may integrate by treating social security benefits as benefits provided under the plan (within certain limits).

Under the committee bill, essentially these same provisions would be applied in the case of plans for proprietary employees. Otherwise, it was apparent to the committee that professionals and others would still have a substantial artificial tax incentive to incorporate rather than to do business in more traditional forms. In addition, it seemed reasonable that the same general considerations which led the committee to conclude that it was desirable to extend the limitations on contributions to certain corporate plans, also suggest that employees of those corporations should have the extra protection against erosion of their pensions through integration that the special rules afford.

Therefore, under the committee bill, it is provided, in general, that in any plan for the benefit of proprietary employees, the plan may not integrate if more than one-third of the account balances or accrued benefits under the plan are for the benefit of individuals each of whom holds 10 percent or more of the stock in the corporation. Other proprietary employee plans may integrate, but only on the same basis as an owner-employee plan could integrate, (that is, by treating social security taxes paid for the employees as contributions paid on their behalf under the plan).

At the same time, the committee recognizes that there are many small corporate plans, already in existence, which now use integration, and which might be seriously affected if the rules in this area

were to be altered too abruptly.

The committee bill provides a transitional rule, under which any proprietary employee plan which was in existence on July 24, 1973, may continue to integrate (in plan years beginning before January 1, 1980) at the same level of integration (if any) as was In effect under the plan on July 24, 1973, but the level of integration may not increase. (For example, when the social security rate base rises, the plan must still continue to integrate at the old level.) However, any self-employed plan which elects to convert to a defined benefit basis (using the table and formula described above) and any new proprietary plan, created after July 24, 1973, which elects a defined **\*5010** benefit approach, may not integrate. Also, any proprietary plan in existence on July 24, 1973, which shifts from a defined contribution plan to a defined plan may not integrate.

Other special rules for proprietary employee plans.-- The committee bill also extends certain other provisions which apply to H.R. 10 plans under present law to plans for the benefit of proprietary employees as well. For example, payments under a qualified pension plan to a proprietary employee would have to begin by the time he attained age 70 1/2, and the employee's account would have to be paid out at least ratably over the life of the employee or the lives of the employee and his spouse (sec. 401(a)(9)). Also, if a proprietary employee should die before his entire interest in the plan had been distributed to him, the plan would generally be required to distribute that interest, or purchase an annuity for his beneficiaries, within 5 years after his death (sec. 401(d)(7)).

Also, excess contributions on behalf of any proprietary employee would have to be prohibited by the plan (although, as under present law, nondeductible employee contributions could be made by a proprietary employee, up to $2,500 per year, in plans where such contributions may be made by employees who are not proprietors) (secs. 401(d)(5)(A) and (B), and 401(e)(1)). Any excess contributions which were made inadvertently would have to be repaid by the plan to the corporation within 6 months after mailing of notice of the over-contribution by the Internal Revenue Service (secs. 401(d)(8)(A) and 401(e)(2)(C)).

Also, death benefits paid by a qualified plan to a proprietary employee would not qualify for the $5,000 death benefit exclusion for purposes of the Federal income tax (sec. 101). Proprietary employees (and individuals who had been proprietary employees at any time within 5 years prior to the distribution) would be treated the same as self-employed persons for purposes of the rules with respect to the income tax treatment of lump-sum distributions (sec. 72(n)).

In addition, if a proprietary employee borrows money, pledging his interest in the pension plan as security, the portion pledged as security shall be treated as a distribution under the pension plan to the employee (sec. 72(m)(4)). The purpose of this rule is to prevent the employee from engaging in an arbitrage type of transaction, in which he makes a tax deductible contribution to the pension, which also earns tax-free interest, then gets the money out of the plan, in effect, by means of a loan secured by his portion of the plan assets, and also receives a tax deduction for the amount of interest paid on the loan (subject to certain limitations on excess investment interest (sec. 163(d)).

Time for making contributions.-- Under present law, contributions to a self-employed plan must be made by the end of the taxable year in order to be deductible for that year. Often this can create difficulties for the self- employed person, who may not have at hand all the information necessary for him to determine how much he is permitted to contribute on his own behalf. In order to meet this problem, the committee bill provides that tax deductible contributions to self-employed plans (and all other qualified plans) may be made at any time up to the point when the Federal income tax return (corporate or individual, as the case may be) for that year is due (including any extension). **\*5011** This rule should provide the additional time necessary for the individuals involved to make the required calculations and determine the amount of the maximum deductible contribution which is permitted for the taxable year in question.

Custodial Accounts.-- Under present law, a custodial account may be treated as a qualified trust, but only if the custodian is a bank, and the investments are made solely in annuity, endowment, or life insurance contracts (and certain other conditions are met) (sec. 401(f)). The committee believes that present law is too restrictive in this respect and the committee bill would allow the custodian of the account to be someone other than a bank, provided, however, that the custodian would have to establish, to the satisfaction of the Internal Revenue Service, that it would manage the assets of the account in a manner consistent with the intention of the tax law. (For example, it would have to be shown that no premature distribution prior to age 59 1/2 would be made to owner-employees.) Also, a formal custodial account would no longer be necessary under the bill. Any similar arrangement having appropriate safeguards could be used if approved by the Secretary.

Also, the committee bill would provide that someone other than the trustee or custodian, including

the employer, can have authority to control the investments of the plan account, either by directing the investment policy of the plan, or by exercising a veto power.

Generally, the requirement of the bill would be satisfied in a situation, where, for example, a regulated investment company or other investment advisor might make investment decisions with respect to the assets of the account, but an independent third party, which might be a bank or some other responsible institution, would administer the plan, and handle distributions. The committee is desirous of affording extra flexibility in this area, and reducing the cost of pension plan administration, but it also wishes to preserve the safeguard of a plan administrator which is independent with respect to the employer.

Withdrawal of voluntary contributions by owner-employees.-- Under present law, amounts received from a retirement plan before retirement are tax free to all participants other than owner-employees to the extent of all nondeductible contributions made to the plan by the participants. Thus, all participants other than owner-employees may, if the plan permits it, withdraw their voluntary contributions prior to retirement. The committee bill would extend this same treatment to owner-employees.

### Effective date

Generally, these provisions would take effect in plan years beginning after December 31, 1973. However, in the case of proprietary employee plans in existence on July 24, 1973, that will be made subject under the bill to certain rules and limitations which, under present law, apply only in the case of owner-employee plans, the committee believes that a transitional period is necessary to allow time for plan amendments. Thus, proprietary plans in existence on July 24, 1973, will generally be made subject to the contribution limits for plan years beginning after December 31, 1974. Extension of H.R. 10 owner-employee plan restrictions to proprietary employee plans in *5012 existence on July 24, 1973, will also generally take effect in plan years beginning after December 31, 1974. In addition, proprietary employee plans which were integrated on July 24, 1973, may continue as integrated plans, but may not increase the level of integration.

The repeal of the special subchapter S limitation (sec. 1379) is effective for plan years beginning after December 31, 1973, and subchapter S corporations will then become subject to corporate rules (including the rules on proprietary employee plans) in this area.

The treatment of proprietary employees as self-employed persons for purposes of the death benefit income tax exclusion (sec. 101) and the rules on lump-sum distributions (sec. 72(n)) will apply to taxable years beginning after December 31, 1973.

The amended rules, with respect to custodial accounts apply to plan years beginning after December 31, 1973.

### Revenue effect

By increasing the maximum amount that self-employed persons will be allowed to deduct as contributions under H.R. 10 plans to 15 percent of earned income up to $7,500 a year, an increased revenue loss is estimated that will amount to $175 million annually. The provision in the bill that allows individuals who are not covered presently by pension plans to deduct up to $1,000 a year as contributions to personal retirement plans will reduce revenues by an estimated $270 million a year. A revenue gain of $125 million is estimated to be the result of the provision that applies to certain proprietary employees of corporations the same limitations on deductible pension contributions that apply to self-employed individuals under H.R. 10 plans. The net result of these three provisions that are designed to equalize tax treatment under pension plans is a revenue loss of $320 million. These estimates assume 1973 levels of income and employment.

### J. Employee Savings for Retirement

(Secs. 701 and 706 of the bill and secs. 72, 219, 408, 409, and 4960 of the Code)

### Present law

Generally, an employee is not allowed a deduction for amounts which he contributes from his own

S. REP. 93-383

Case 1:07-bk-10312-GM    Doc 102-1    Filed 09/26/08    Entered 09/26/08 12:54:41    Desc
Page 24 of 29
Supplement Senate Report Excerpts    Page 25 of 30

funds to a retirement plan. There is no provision for an employee to establish his own retirement plan with tax-free dollars. Also, while an employer's qualified plan may allow employees to contribute their own funds to the plan, [FN148] no deduction is allowed for these contributions (except to the extent that tax plans, described below, may be viewed as employee contributions). However, the income earned on employee contributions to an employer's qualified plan is not taxed until it is distributed. [FN149]

In the case of a salary reduction plan, however, in the past employees have been permitted to exclude from income amounts contributed by **\*5013** their employers to a pension or profit-sharing plan, even where the source of these amounts is the employees' agreement to take salary reductions or forego salary increases. If the plan met certain nondiscrimination requirements, the Internal Revenue Service in the past had taken the position in rulings that, under certain circumstances, the amount of the salary reduction would be treated as an employer contribution to a qualified pension plan, not taxable to the employee (until benefits were received from the plan). The maximum amount that could be so treated was 6 percent of compensation. [FN150]

On December 6, 1972, however, the Service issued proposed regulations (37 Fed.Reg.No. 235, p. 25938) which would change this result in the case of qualified pension plans by providing that amounts contributed by an employer to such plans in return for a reduction in the employee's total compensation, or in lieu of an increase in such compensation, will be considered to have been contributed by the employee and consequently will be taxable income to the employee. [FN151] Public hearings have been held on these proposed regulations but regulations in final form have not yet been issued.

### General reasons for change

While in the case of many millions of employees provision is made for their retirement out of tax-free dollars by their participation in qualified retirement plans, many other employees do not have the opportunity to participate in qualified plans. Often plans are not available because an employer is not willing to incur the cost of contributing to a retirement plan. This may be so even though the employees would be willing to contribute their own funds for this purpose. The employees not covered under a qualified plan who, as a result, are not able to set anything aside for their retirement out of after-tax dollars, are further disadvantaged by the fact that in their case earnings on their retirement savings are subject to tax, and grow more slowly than the tax sheltered earnings on contributions to a qualified plan.

The committee bill deals with this problem by making available a special deduction for amounts set aside for retirement by employees who are not covered under a qualified plan (including an H.R. 10 plan), a government plan, or a tax exempt organization annuity plan (sec. 403(b)). Individuals in this status, in computing their income tax, will be permitted to deduct up to $1,000 a year for contributions to an individual retirement account. The earnings on this amount will also be tax free. As in the case of H.R. 10 plans, the amounts set aside plus the earnings become taxable to the individual generally after he has reached retirement age, when he receives benefits from the account. In addition, as a way of gradually converting **\*5014** retirement accounts of this type into qualified retirement plans, the bill provides that employers can (but are not required to) provide part or all of the $1,000 retirement savings for employees.

### Explanation of provisions

In general.-- Under the committee bill, any individual who was not covered during a year as an active participant in a qualified retirement plan, or a government plan (whether or not qualified), or a section 403(b) annuity plan, [FN152] is to be permitted a deduction of up to $1,000 a year from earned income for contributions to a personal retirement account. In order to provide the widest possible scope for the provision, the committee bill provides that the deduction in this case is to be from gross income, and as a result can be taken even by those taxpayers who do not itemize the rest of their deductions. This is designed to assure every employee, or self-employed person, the opportunity to set aside at least some retirement savings on a tax sheltered basis. Earnings on these contributions would also be tax free (until actually distributed to the employee as benefits from the account).

In the case of a married couple, each spouse may establish his or her separate retirement savings account and the $1,000 limitation is to be applied separately to the earned income of each spouse.

For example, a married woman with only a limited amount of earned income from part-time employment would be enabled, under the committee bill, to set this aside for her own retirement. (For this purpose, earned income is to be attributed to the person earning the income without regard to any State community property laws.) This provision permits an individual to set something aside for his or her own retirement based on his or her own earned income.

Under the bill, the employee can establish his own retirement savings account, or the retirement savings can be made through the medium of contributions by an employer (either in the form of additional compensation provided by the employer or a salary reduction plan) if there is no qualified, government or exempt organization plan which covers the employees in question. In other words, if the employer does not have a qualified plan, or if he has such a plan but it does not cover certain employees, the employer can establish a retirement savings account of up to $1,000 for each of these employees. Any employees not covered under the employer plan (including those excluded from participation due to length of service requirements, or excluded from participation due to length of service requirements, or because of age) can be covered under an employer-sponsored retirement account, or alternatively, those individuals can establish their own individual retirement accounts. The committee believes, however, that it is important to preserve the employer-sponsored retirement account as an option, because it may be easier administratively for the employer to set up individual retirement accounts for his employees than for each employee to have to set up his own account. In addition such an employer-sponsored plan is likely to grow into a qualified pension or profit-sharing plan.

**\*5015** Where individual retirement accounts are set up by the employer, the aggregate tax excludable contributions and tax deductible contributions by the employee (which are to be accounted for separately in the records of the account) are not to exceed $1,000 per year. [FN153] Of course, all benefits under the salary reduction plan are to be immediately vested, since the contributions, in effect, either represent compensation to the employee or come from his own funds.

It is the intention of the committee that where an employer has both a qualified plan and employer-sponsored retirement accounts, that the qualified plan must meet the nondiscrimination standards without regard to the individual retirement accounts.

Since the deduction for contributions to individual retirement accounts is to be available to the self-employed as well as employees, the committee bill will also benefit people such as jockeys, who in years of low earnings are limited in what they can contribute to an H.R. 10 plan by the percentage-of-income limitation (15 percent under the bill). However, since there is no such limitation on contributions for personal retirement savings, an individual could, if he chose, contribute all of his earned income to a qualified retirement account, up to the $1,000 ceiling. Moreover, a self-employed person, such as a jockey, might, if he chose, participate in an H.R. 10 plan in certain years, and make contributions to an individual retirement account in other years so long as he does not actively participate in both types of plans in the same year.

Requirements for an individual retirement account.-- An individual who wishes to establish an individual retirement account (instead of participating in an employer-sponsored retirement account) would have to maintain, under the provisions of a written governing instrument, a separate accounting of his contributions, the earnings on them, and the distributions made either to the individual involved or to his beneficiaries. [FN154] The balance in the account could, for example, be invested in insurance annuity contracts, in a common trust fund managed by a bank, in a savings account with a savings and loan institution or a credit union, or in stock of a mutual fund. However, in any case, the funds must be held by a bank or other person who establishes to the satisfaction of the Service that the manner in which it will hold the balance in the account is consistent with the intention of the new provision. The funds might be held in a trust, a custodial account, or any similar arrangement approved by the Secretary of the Treasury.

The bill also contains a number of other provisions designed to ensure that the accounts will be used for retirement savings, many of which are similar to requirements which are already in the law with respect to H.R. 10 plans.

One of these requirements relates to excess contributions. The written governing instrument is to provide that no contributions in excess of **\*5016** the deductible limit can be made to the plan. Any excess contributions inadvertently made would have to be refunded to the individual with interest within 6 months after notice of the excess contribution was sent by the Internal Revenue Service. If the excess contributions were not repaid, the account would be disqualified for that year and all succeeding taxable years. In this case, the individual would also be required to take into income the assets of the account (valued as of the first day of the taxable year in which the account became

S. REP. 93-383
Case 1:07-bk-10312-GM   Doc 102-1   Filed 09/26/08   Entered 09/26/08 12:54:41   Desc
Supplement Senate Report Excerpts   Page 27 of 30

Page 26 of 29

disqualified), reduced by any contributions in the account for the current year (for which deductions are denied).

In addition, if it is found that the excess contributions are made willfully, the taxpayer's interest in all individual retirement accounts is to be distributed to him and he is not to be permitted to establish another retirement account for a period of five years (in the same way that owner-employees are subject to similar penalties for excess contributions to H.R. 10 plans).

An example of an excess contribution which would not be willful might occur where the employee made a $1,000 contribution to a retirement account believing at that time he would be eligible to receive the deduction for this amount. Later in the year, however, the employee might become ineligible because he changed jobs and became a participant in a government or qualified pension plan. Under these circumstances, the employee would receive no deduction for the contribution to the qualified retirement account, and the proper procedure, in order to preserve the qualified status of the account, would be to request repayment of the excess contribution.

Generally, an individual would only be permitted to receive a deduction for contributions to one individual retirement account in any one taxable year. However, the bill provides an exception to cover the situation where the employee entered or left employment during the year with an employer who contributed to his qualified retirement account. For example, under these circumstances, an employee would be permitted to contribute $200 to an account which he established, and then, upon entering his new employment, the employee and employer together could contribute up to $800 on a tax-free basis to an account established by the employer.

In addition to the rules on excess contributions, the written instrument is also required to provide that no distributions can be made to the individual prior to age 59 1/2, except in the event of death or disability. On the other hand, under the bill, the plan is required to begin distributions when the individual attains the age of 70 1/2, and distributions then have to be made at least on a ratable basis over the life expectancy of the individual, or the individual and his spouse. After age 70 1/2, an excise tax of 10 percent a year is imposed on any amounts in the individual's account in excess of the amounts to be ratably distributed. Also, under the committee bill, no tax deductible contributions could be made to the account after the individual attains the age of 70 1/2. By these provisions the committee hopes to encourage the use of the proceeds of these accounts for retirement purposes. If the individual establishing the account should die before his entire interest in the account has been distributed to him, the governing instrument is generally to require that the undistributed assets be **\*5017** distributed, or applied to the purchase of an annuity for his beneficiaries, within 5 years after his death. However, this rule does not apply if distributions began prior to his death, and the account was to be completely distributed over a period not exceeding the life expectancy of the individual and his spouse (measured as of the time when distributions from the account began).

In addition, if the assets of the account are invested in an insurance contract, the governing instrument must provide that any refunds of premiums are to be held by the insurance company and applied toward the payment of future premiums or the purchase of additional benefits within the current taxable year or the next succeeding year.

Premature distributions.-- Premature distributions frustrate the intention of saving for retirement, and the committee bill, to prevent this from happening, imposes a penalty tax. If a premature distribution from the account is made before the individual attains the age of 59 1/2, the distribution is subjected to a penalty tax of 30 percent. [FN155] This is in addition to any other income taxes payable on this distribution, and would not be offset by any tax credits (other than the refundable credits for overwithholding, overpayment of tax, and the gasoline tax credit). Also, this tax would not be treated as reducing the individual's tax liability under the minimum tax provisions (sec. 56).

The penalty tax is not to apply in the event of death or disability. However, the committee expects that the Internal Revenue Service will require that the custodian must receive proof of disability before making distributions under the disability provision. Generally it is intended that the proof be the same as where the individual applies for disability payments under social security.

The penalty tax also is not applied in the case of a refund of excess contributions which were not willful. [FN156]

Taxation of beneficiaries.-- Generally, the proceeds of an individual retirement account are to be taxable to the individual when distributed. Since the contributions to the account will be made with tax free dollars, the employee's basis in the account will be zero.

The amounts distributed to the individual are not to be eligible for capital gains treatment, and the special averaging rules applicable to lump sum distributions (under sec. 72) are not to be available. This should encourage the individual to take down the amounts ratably over the period of his

**retirement**. However, the individual would be permitted to use the general averaging rules (sec. 1301).

If any individual borrows money, pledging his interest in the **retirement** account as security, the portion pledged as security is to be treated as a distribution from the **retirement** account to the individual. This treatment also is consistent with the committee's intention to encourage **retirement** savings, since in this case if the employee had already pledged his **retirement** account as security for a loan, he has no funds left for **retirement**. For the same reasons, any contribution to an individual **retirement** account, or any income of the account, applied to the purchase of life insurance protection under any **retirement *5018** income, endowment, or other life insurance contract also will constitute income to the individual.

For purposes of the estate and gift taxes the amounts in individual **retirement** accounts are not to be excluded from tax (secs. 2039(c) and 2517). This too is consistent with the committee's intent that the funds be spent during the individual's period of **retirement**.

Rollovers.-- To permit flexibility with respect to the investment of an individual **retirement** account, the bill provides that money or property may be distributed from an individual **retirement** account, without payment of tax, provided this same money or property is reinvested by the individual within 60 days in another qualifying individual **retirement** account. The transfer may be desired because the individual desires to **shift** his investments, for example, from, or to, an annuity contract, a mutual fund, a savings account or perhaps to a Government bond (described below). To prevent **too** much **shifting** of investments under this provision, the committee bill provides that this rollover can only be used once every three years. Also, before releasing the account, the committee anticipates that the custodian will be required by the Internal Revenue Service to receive a declaration of intention from the individual as to the proposed reinvestment (except in the case of an individual who was entitled to receive a distribution because of his retirement at age 59 1/2, or because of disability). The custodian is also to be required to notify the Service that a distribution of assets from the account had been made.

Qualified retirement bonds.-- In addition to the various types of investment described above in which an individual retirement account can be placed, the bill also provides that these amounts may be invested annually in a retirement bond, to be issued by the government. The bonds are to be issued under the Second Liberty Bond Act and provide for the accumulation of interest until the time of redemption. In conformity with the general provisions for individual retirement accounts, the bill provides that the bonds generally can only be cashed after the individual has reached the age of 59 1/2 years, or if he becomes disabled. If he dies, the bonds could be redeemed by his estate. There would be one further exception to cover the case of an individual who purchased the bonds, believing that he would be eligible for the deduction for that year, only to discover later that he was not eligible. For example, an individual might purchase the bond early in the year, and later become a participant under a qualified retirement plan sponsored by his employer. To meet this situation, the committee bill provides that the bond may be redeemed at any time within 12 months of its purchase without penalty (and without payment of interest). [FN157] This provision could also be used by individuals who purchased the bond, but discovered within a year that they needed the money for other purposes. In this case the Internal Revenue Service would be notified that the bond had been redeemed and, therefore, would be on notice that no deduction should be allowed because of its purchase.

Consistent with the general rules for individual retirement accounts, the bill provides that the bonds are to cease to bear interest when the **\*5019** individual reaches age 70 1/2. In addition, during that year the individual is also required to take any of these bonds he is still holding into income, even if he does not cash them in. It is anticipated that these rules will be set forth on the face or back of the bonds.

Also, for similar reasons, the committee bill provides that bonds are to cease to bear interest not later than five years after the death of the individual in whose name the bonds have been issued.

The bonds are to be issued in the name of the individual who purchases them for his retirement and are not to be transferrable, under any circumstances, except to his executor in the event of his death (or to a trustee for his benefit in the event he became incompetent to manage his own affairs). For example, the bonds could not be pledged for the payment of debts, and could not be assigned to a trustee in bankruptcy. Also, the bonds could not be awarded to the individual's spouse as the result of a divorce settlement.

When the bonds are redeemed, the full proceeds of the bonds, including any interest earned on them, is to be treated as ordinary income to the individual, whose basis in the bonds would be zero.

[FN158] However, if the individual chose to do so, he could treat this income under the general averaging provisions of the tax law (sec. 1301 et seq.).

Other rules.-- To safeguard the individual retirement accounts, the committee bill imposes certain additional rules with respect to fiduciary standards and reporting. Under these provisions, the qualified retirement account is to be treated as an owner-employee plan for purposes of the rules with respect to the excise tax on prohibited transactions (sec. 551 of the bill and sec. 4973 of the code) and also for purposes of the provisions relating to returns of information by exempt organizations (sec. 6033) and fiduciary returns required to be filed in connection with certain trusts, annuity and bond purchase plans (sec. 6047). In addition, the rules with respect to unrelated business income (sec. 511) also are to apply to these accounts.

A special rule is also provided in the case of divorce settlements. Under present law, if an asset of an individual is transferred pursuant to a divorce settlement, the individual is deemed to realize gain on the difference between his basis in the asset and its fair market value at the time of the transfer (if the asset has appreciated). The committee believes that this is not a desirable result with respect to individual retirement accounts. As a result, under the committee bill, if an individual retirement account should be transferred to the individual's spouse pursuant to a divorce decree, or settlement agreement, this transfer is not to be taxable under the bill. Thereafter, the account would be maintained for the benefit of the spouse, and only the spouse could make further contributions to the account.

Six percent salary reduction plans.-- The committee bill also clarifies the law with respect to the tax treatment of 6 percent salary reduction plans. As discussed above, until recently, the Internal Revenue Service had taken the position that amounts contributed to a qualified retirement plan on a salary-reduction basis could, under certain conditions, be considered as tax excludable employer contributions to the plan. **\*5020** Under the committee bill, this treatment is continued with respect to contributions to a qualified pension or profit-sharing plan made prior to January 1, 1974. Thereafter, as is already true under present law, in the case of employee contributions under the Federal Civil Service Plan, or similar government plans, contributions which are really employee contributions (whether required to be made or made at the individual option of the employee in return for a reduction in his basic or regular compensation, or in lieu of an increase in such compensation) are to be treated as such and will no longer be excludable from income by the employee. The only modification in this rule is that where an individual is not covered by a qualified plan, a government plan, or a sec. 403(b) annuity plan, employer contributions of up to $1,000 per annum can be made to an individual retirement savings account under a salary reduction arrangement. Income earned on amounts contributed under a salary reduction plan prior to 1974 would for the future remain tax exempt as also would the earnings on these amounts.

Section 403(b) annuity plans.-- Under present law, the proceeds of a section 403(b) annuity plan, for the benefit of teachers or employees of tax-exempt organizations, may be invested only in insurance contracts. The committee believes that it would be desirable to provide more flexibility in this area and, accordingly, the committee bill provides that the assets of these accounts may also be invested in mutual funds, under appropriate custodial restrictions.

**Retirement** income credit.-- A conforming amendment provides that amounts distributed from an individual **retirement** account, or the proceeds of qualified **retirement** bonds, are to be treated as **retirement** income for purposes of the **retirement** income credit. As a result, this form of **retirement** income will form part of the base for determining the credit, in the same manner as other forms of taxable **retirement** income do under present law.

Net operating loss provisions.-- The bill provides that any individual **retirement** account contributions by individuals which are deductible are to be treated as personal expenses and not as trade or business expenses of the individual for purposes of the net operating loss provisions. As a result, contributions to a qualified retirement account may not be used to create or increase a net operating loss. This is consistent with the treatment afforded contributions under H.R. 10 plans.

Effective date

These provisions will apply with respect to taxable years beginning after December 31, 1973.

Revenue effect

It is estimated that these provisions (at 1973 levels of income) will result in a revenue loss of $170

million in 1974, rising to $270 million.

## K. Lump-Sum Distributions

(Sec. 703 of the bill and secs. 72, 402, and 403 of the Code)

### Present law

Retirement benefits generally are taxed as ordinary income under the annuity rules (sec. 72) when the amounts are distributed, to the extent they do not represent a recovery of the amounts contributed *5021 by the employee. However, an exception to this general rule under the law in effect before the Tax Reform Act of 1969 provided that if an employee's total accrued benefits were distributed or paid in a lump-sum distribution from a qualified plan within one taxable year on account of death or other separation from service (or death after separation from service), the taxable portion of the payment was treated as a long-term capital gain, rather than as ordinary income.
The capital gains treatment accorded these lump-sum distributions allowed employees to receive substantial amounts of deferred compensation at more favorable tax rates than other compensation received currently. The more significant benefits under this treatment apparently accrued to taxpayers with adjusted gross incomes in excess of $50,000, particularly in view of the fact that a number of lump-sum distributions of over $800,000 have been made.
To correct this problem, the Tax Reform Act of 1969 provided that part of a lump-sum distribution received from a qualified employee's trust within one taxable year on account of death or other separation from the service (or death after separation from service) is to be given ordinary income treatment, instead of the capital gains treatment it had been given under prior law. The ordinary income treatment applies to the taxable portion of the distribution (i.e., the total distribution less the employee's contribution) which exceeds the sum of the benefits accrued during plan years beginning before 1970, and the portion of the benefits accrued thereafter which does not consist of employer contributions (sec. 402(a)(5) and 403(a)(2)(c)).
The 1969 Act provided a special limitation in the form of a seven-year 'forward' averaging formula which applies to the portion of the lump-sum distribution treated as ordinary income. An employee (or beneficiary) is eligible for the special 7-year forward averaging provision if the distribution is made on account of death or other separation from service (or death after separation from service) [FN159] and, in the case of receipt by an employee, if he has been a participant in the plan for 5 or more taxable years before the taxable year in which the distribution is made.

### Reasons for change

The Treasury has had great difficulty in formulating regulations to carry out the 1969 Act provisions for determining the precise breakdown between ordinary

Adobe Reader is required to view PDF images.


© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

First Part | <<Previous Part | Next Part>>