[Code of Federal Regulations]
[Title 26, Volume 5]
[Revised as of April 1, 2004]
From the U.S. Government Printing Office via GPO Access
[CITE: 26CFR1.401(a)(31)-1]

[Page 266-274]

### TITLE 26--INTERNAL REVENUE

#### CHAPTER I--INTERNAL REVENUE SERVICE, DEPARTMENT OF THE TREASURY (CONTINUED)

PART 1_INCOME TAXES--Table of Contents

Sec. 1.401(a)(31)-1  Requirement to offer direct rollover of eligible rollover distributions; questions and answers.

    The following questions and answers relate to the qualification requirement imposed by section 401(a)(31) of the Internal Revenue Code of 1986, pertaining to the direct rollover option for eligible rollover distributions from pension, profit-sharing, and stock bonus plans. Section 401(a)(31) was added by section 522(a) of the Unemployment Compensation Amendments of 1992, Public Law 102-318, 106 Stat. 290 (UCA). For additional UCA guidance under sections 402(c), 402(f), 403(b)(8) and (10), and

[[Page 267]]

3405(c), see Sec. Sec. 1.402(c)-2, 1.402(f)-1, and 1.403(b)-2, and Sec. 31.3405(c)-1 of this chapter, respectively.

### List of Questions

    Q-1: What are the direct rollover requirements under section 401(a)(31)?
    Q-2: Does section 401(a)(31) require that a qualified plan permit a direct rollover to be made to a qualified trust that is not part of a defined contribution plan?
    Q-3: What is a direct rollover that satisfies section 401(a)(31), and how is it accomplished?
    Q-4: Is providing a distributee with a check for delivery to an eligible retirement plan a reasonable means of accomplishing a direct rollover?
    Q-5: Is an eligible rollover distribution that is paid to an eligible retirement plan in a direct rollover currently includible in gross income or subject to 20-percent withholding?
    Q-6: What procedures may a plan administrator prescribe for electing a direct rollover, and what information may the plan administrator require a distributee to provide when electing a direct rollover?
    Q-7: May the plan administrator treat a distributee as having made an election under a default procedure where the distributee does not affirmatively elect to make or not make a direct rollover within a certain time period?
    Q-8: May the plan administrator establish a deadline after which the distributee may not revoke an election to make or not make a direct rollover?
    Q-9: Must the plan administrator permit a distributee to elect to have a portion of an eligible rollover distribution paid to an eligible

retirement plan in a direct rollover and to have the remainder of that distribution paid to the distributee?

Q-10: Must the plan administrator allow a distributee to divide an eligible rollover distribution into two or more separate distributions to be paid in direct rollovers to two or more eligible retirement plans?

Q-11: Will a plan satisfy section 401(a)(31) if the plan administrator does not permit a distributee to elect a direct rollover if his or her eligible rollover distributions during a year are reasonably expected to total less than $200?

Q-12: Is a plan administrator permitted to treat a distributee's election to make or not make a direct rollover with respect to one payment in a series of periodic payments as applying to all subsequent payments in the series?

Q-13: Is the eligible retirement plan designated by a distributee to receive a direct rollover distribution required to accept the distribution?

Q-14. If a plan accepts an invalid rollover contribution, whether or not as a direct rollover, how will the contribution be treated for purposes of applying the qualification requirements of section 401(a) or 403(a) to the plan?

Q-15: For purposes of applying the plan qualification requirements of section 401(a), is an eligible rollover distribution that is paid to an eligible retirement plan in a direct rollover a distribution and rollover or is it a transfer of assets and liabilities?

Q-16: Must a direct rollover option be provided for an eligible rollover distribution that is in the form of a plan loan offset amount?

Q-17: Must a direct rollover option be provided for an eligible rollover distribution from a qualified plan distributed annuity contract?

Q-18: What assumptions may a plan administrator make regarding whether a benefit is an eligible rollover distribution?

Q-19: When must a qualified plan be amended to comply with section 401(a)(31)?

### Questions and Answers

Q-1: What are the direct rollover requirements under section 401(a)(31)?

A-1: (a) General rule. To satisfy section 401(a)(31), added by UCA, a plan must provide that if the distributee of any eligible rollover distribution elects to have the distribution paid directly to an eligible retirement plan, and specifies the eligible retirement plan to which the distribution is to be paid, then the distribution will be paid to that eligible retirement plan in a direct rollover described in Q&A-3 of this section. Thus, the plan must give the distributee the option of having his or her distribution paid in a direct rollover to an eligible retirement plan specified by the distributee. For purposes of section 401(a)(31) and this section, eligible rollover distribution has the meaning set forth in section 402(c)(4) and Sec. 1.402(c)-2, Q&A-3 through Q&A-10 and Q&A-14, except as otherwise provided in Q&A-2 of this section, eligible retirement plan has the meaning set forth in section 402(c)(8)(B) and Sec. 1.402(c)-2, Q&A-2.

(b) Related Internal Revenue Code provisions--(1) Mandatory withholding. If a distributee of an eligible rollover distribution does not elect to have the eligible rollover distribution paid directly from the plan to an eligible retirement plan in a direct rollover under section

[[Page 268]]

401(a)(31), the eligible rollover distribution is subject to 20-percent income tax withholding under section 3405(c). See Sec. 31.3405(c)-1 of this chapter for guidance concerning the withholding requirements applicable to eligible rollover distributions.

(2) Notice requirement. Section 402(f) requires the plan administrator of a qualified plan to provide, within a reasonable period of time before making an eligible rollover distribution, a written explanation to the distributee of the distributee's right to elect a direct rollover and the withholding consequences of not making that election. The explanation also is required to provide certain other relevant information relating to the taxation of distributions. See Sec. 1.402(f)-1 for guidance concerning the written explanation required under section 402(f).

(3) Section 403(b) annuities. Section 403(b)(10) provides that requirements similar to those imposed by section 401(a)(31) apply to annuities described in section 403(b). See Sec. 1.403(b)-2 for guidance concerning the direct rollover requirements for distributions from annuities described in section 403(b).

(c) Effective date--(1) Statutory effective date. Section 401(a)(31) applies to eligible rollover distributions made on or after January 1, 1993.

(2) Regulatory effective date. This section applies to eligible rollover distributions made on or after October 19, 1995. For eligible rollover distributions made on or after January 1, 1993 and before October 19, 1995, Sec. 1.401(a)(31)-1T (as it appeared in the April 1, 1995 edition of 26 CFR part 1), applies. However, for any distribution made on or after January 1, 1993 but before October 19, 1995, a plan may satisfy section 401(a)(31) by substituting any or all provisions of this section for the corresponding provisions of Sec. 1.401(a)(31)-1T, if any.

Q-2: Does section 401(a)(31) require that a qualified plan permit a direct rollover to be made to a qualified trust that is not part of a defined contribution plan?

A-2: No. Section 401(a)(31)(D) limits the types of qualified trusts that are treated as eligible retirement plans to defined contribution plans that accept eligible rollover distributions. Therefore, although a plan is permitted, at a participant's election, to make a direct rollover to any type of eligible retirement plan, as defined in section 402(c)(8)(B) (including a defined benefit plan), a plan will not fail to satisfy section 401(a)(31) solely because the plan will not permit a direct rollover to a qualified trust that is part of a defined benefit plan. In contrast, if a distributee elects a direct rollover of an eligible rollover distribution to an annuity plan described in section 403(a), that distribution must be paid to the annuity plan, even if the recipient annuity plan is a defined benefit plan.

Q-3: What is a direct rollover that satisfies section 401(a)(31), and how is it accomplished?

A-3: A direct rollover that satisfies section 401(a)(31) is an eligible rollover distribution that is paid directly to an eligible retirement plan for the benefit of the distributee. A direct rollover may be accomplished by any reasonable means of direct payment to an eligible retirement plan. Reasonable means of direct payment include, for example, a wire transfer or the mailing of a check to the eligible retirement plan. If payment is made by check, the check must be negotiable only by the trustee of the eligible retirement plan. If the payment is made by wire transfer, the wire transfer must be directed only to the trustee of the eligible retirement plan. In the case of an eligible retirement plan that does not have a trustee (such as a custodial individual retirement account or an individual retirement annuity), the custodian of the plan or issuer of the contract under the

plan, as appropriate, should be substituted for the trustee for purposes of this Q&A-3, and Q&A-4 of this section.

Q-4: Is providing a distributee with a check for delivery to an eligible retirement plan a reasonable means of accomplishing a direct rollover?

A-4: Providing the distributee with a check and instructing the distributee to deliver the check to the eligible retirement plan is a reasonable means of direct payment, provided that the check is made payable as follows: [Name of the trustee] as trustee of [name of the eligible retirement plan]. For example, if the name of the eligible

[[Page 269]]

retirement plan is ``Individual Retirement Account of John Q. Smith,'' and the name of the trustee is ``ABC Bank,'' the payee line of a check would read ``ABC Bank as trustee of Individual Retirement Account of John Q. Smith.'' Unless the name of the distributee is included in the name of the eligible retirement plan, the check also must indicate that it is for the benefit of the distributee. If the eligible retirement plan is not an individual retirement account or an individual retirement annuity, the payee line of the check need not identify the trustee by name. For example, the payee line of a check for the benefit of distributee Jane Doe might read, ``Trustee of XYZ Corporation Savings Plan FBO Jane Doe.''

Q-5: Is an eligible rollover distribution that is paid to an eligible retirement plan in a direct rollover currently includible in gross income or subject to 20-percent withholding?

A-5: No. An eligible rollover distribution that is paid to an eligible retirement plan in a direct rollover is not currently includible in the distributee's gross income under section 402(c) and is exempt from the 20-percent withholding imposed under section 3405(c)(2). However, when any portion of the eligible rollover distribution is subsequently distributed from the eligible retirement plan, that portion will be includible in gross income to the extent required under section 402, 403, or 408.

Q-6: What procedures may a plan administrator prescribe for electing a direct rollover, and what information may the plan administrator require a distributee to provide when electing a direct rollover?

A-6: (a) Permissible procedures. Except as otherwise provided in paragraph (b) of this Q&A-6, the plan administrator may prescribe any procedure for a distributee to elect a direct rollover under section 401(a)(31), provided that the procedure is reasonable. The procedure may include any reasonable requirement for information or documentation from the distributee in addition to the items of adequate information specified in Sec. 31.3405(c)-1(b), Q&A-7 of this chapter. For example, it would be reasonable for the plan administrator to require that the distributee provide a statement from the designated recipient plan that the plan will accept the direct rollover for the benefit of the distributee and that the recipient plan is, or is intended to be, an individual retirement account, an individual retirement annuity, a qualified annuity plan described in section 403(a), or a qualified trust described in section 401(a), as applicable. In the case of a designated recipient plan that is a qualified trust, it also would be reasonable for the plan administrator to require a statement that the qualified trust is not excepted from the definition of an eligible retirement plan by section 401(a)(31)(D) (i.e., is not a defined benefit plan).

(b) Impermissible procedures. A plan will fail to satisfy section 401(a)(31) if the plan administrator prescribes any unreasonable procedure, or requires information or documentation, that effectively eliminates or substantially impairs the distributee's ability to elect a

direct rollover. For example, it would effectively eliminate or
substantially impair the distributee's ability to elect a direct
rollover if the recipient plan required the distributee to obtain an
opinion of counsel stating that the eligible retirement plan receiving
the rollover is a qualified plan or individual retirement account.
Similarly, it would effectively eliminate or substantially impair the
distributee's ability to elect a direct rollover if the distributing
plan required a letter from the recipient eligible retirement plan
stating that, upon request by the distributing plan, the recipient plan
will automatically return any direct rollover amount that the
distributing plan advises the recipient plan was paid incorrectly. It
would also effectively eliminate or substantially impair the
distributee's ability to elect a direct rollover if the distributing
plan required, as a condition for making a direct rollover, a letter
from the recipient eligible retirement plan indemnifying the
distributing plan for any liability arising from the distribution.
    Q-7: May the plan administrator treat a distributee as having made
an election under a default procedure

[[Page 270]]

where the distributee does not affirmatively elect to make or not make a
direct rollover within a certain time period?
    A-7: Yes, the plan administrator may establish a default procedure
whereby any distributee who fails to make an affirmative election is
treated as having either made or not made a direct rollover election.
However, the plan administrator may not make a distribution under any
default procedure unless the distributee has received an explanation of
the default procedure and an explanation of the direct rollover option
as required under section 402(f) and Sec. 1.402(f)-1, Q&A-1 and unless
the timing requirements described in Sec. 1.402(f)-1, Q&A-2 and Q&A-3
have been satisfied with respect to the explanations of both the default
procedure and the direct rollover option.
    Q-8: May the plan administrator establish a deadline after which the
distributee may not revoke an election to make or not make a direct
rollover?
    A-8: Yes, but the plan administrator is not permitted to prescribe
any deadline or time period with respect to revocation of a direct
rollover election that is more restrictive for the distributee than that
which otherwise applies under the plan to revocation of the form of
distribution elected by the distributee.
    Q-9: Must the plan administrator permit a distributee to elect to
have a portion of an eligible rollover distribution paid to an eligible
retirement plan in a direct rollover and to have the remainder of that
distribution paid to the distributee?
    A-9: Yes, the plan administrator must permit a distributee to elect
to have a portion of an eligible rollover distribution paid to an
eligible retirement plan in a direct rollover and to have the remainder
paid to the distributee. However, the plan administrator is permitted to
require that, if the distributee elects to have only a portion of an
eligible rollover distribution paid to an eligible retirement plan in a
direct rollover, that portion be equal to at least a specified minimum
amount, provided the specified minimum amount is less than or equal to
$500 or any greater amount as prescribed by the Commissioner in revenue
rulings, notices, and other guidance published in the Internal Revenue
Bulletin. See Sec. 601.601(d)(2)(ii)(b) of this chapter. If the entire
amount of the eligible rollover distribution is less than or equal to
the specified minimum amount, the plan administrator need not allow the
distributee to divide the distribution.
    Q-10: Must the plan administrator allow a distributee to divide an

eligible rollover distribution into two or more separate distributions
to be paid in direct rollovers to two or more eligible retirement plans?

A-10: No. The plan administrator is not required (but is permitted)
to allow the distributee to divide an eligible rollover distribution
into separate distributions to be paid to two or more eligible
retirement plans in direct rollovers. Thus, the plan administrator may
require that the distributee select a single eligible retirement plan to
which the eligible rollover distribution (or portion thereof) will be
distributed in a direct rollover.

Q-11: Will a plan satisfy section 401(a)(31) if the plan
administrator does not permit a distributee to elect a direct rollover
if his or her eligible rollover distributions during a year are
reasonably expected to total less than $200?

A-11: Yes. A plan will satisfy section 401(a)(31) even though the
plan administrator does not permit any distributee to elect a direct
rollover with respect to eligible rollover distributions during a year
that are reasonably expected to total less than $200 or any lower
minimum amount specified by the plan administrator. The rules described
in Sec. 31.3405(c)-1, Q&A-14 of this chapter (relating to whether
withholding under section 3405(c) is required for an eligible rollover
distribution that is less than $200) also apply for purposes of
determining whether a direct rollover election under section 401(a)(31)
must be provided for an eligible rollover distribution that is less than
$200 or the lower specified amount.

Q-12: Is a plan administrator permitted to treat a distributee's
election to make or not make a direct rollover with respect to one
payment in a series

[[Page 271]]

of periodic payments as applying to all subsequent payments in the
series?

A-12: (a) Yes. A plan administrator is permitted to treat a
distributee's election to make or not make a direct rollover with
respect to one payment in a series of periodic payments as applying to
all subsequent payments in the series, provided that:

(1) The employee is permitted at any time to change, with respect to
subsequent payments, a previous election to make or not make a direct
rollover; and

(2) The written explanation provided under section 402(f) explains
that the election to make or not make a direct rollover will apply to
all future payments unless the employee subsequently changes the
election.

(b) See Sec. 1.402(f)-1, Q&A-3 for further guidance concerning the
rules for providing section 402(f) notices when eligible rollover
distributions are made in a series of periodic payments.

Q-13: Is the eligible retirement plan designated by a distributee to
receive a direct rollover distribution required to accept the
distribution?

A-13: No. Although section 401(a)(31) requires qualified plans to
provide distributees the option to make a direct rollover of their
eligible rollover distributions to an eligible retirement plan, it
imposes no requirement that any eligible retirement plan accept
rollovers. Thus, a plan can refuse to accept rollovers. Alternatively, a
plan can limit the circumstances under which it will accept rollovers.
For example, a plan can limit the types of plans from which it will
accept a rollover or limit the types of assets it will accept in a
rollover (such as accepting only cash or its equivalent).

Q-14. If a plan accepts an invalid rollover contribution, whether or
not as a direct rollover, how will the contribution be treated for

purposes of applying the qualification requirements of section 401(a) or 403(a) to the plan?

A-14. (a) Acceptance of invalid rollover contribution. If a plan accepts an invalid rollover contribution, the contribution will be treated, for purposes of applying the qualification requirements of section 401(a) or 403(a) to the receiving plan, as if it were a valid rollover contribution, if the following two conditions are satisfied. First, when accepting the amount from the employee as a rollover contribution, the plan administrator of the receiving plan reasonably concludes that the contribution is a valid rollover contribution. While evidence that the distributing plan is the subject of a determination letter from the Commissioner indicating that the distributing plan is qualified would be useful to the receiving plan administrator in reasonably concluding that the contribution is a valid rollover contribution, it is not necessary for the distributing plan to have such a determination letter in order for the receiving plan administrator to reach that conclusion. Second, if the plan administrator of the receiving plan later determines that the contribution was an invalid rollover contribution, the amount of the invalid rollover contribution, plus any earnings attributable thereto, is distributed to the employee within a reasonable time after such determination.

(b) Definitions. For purposes of this Q&A-14:

(1) An invalid rollover contribution is an amount that is accepted by a plan as a rollover within the meaning of Sec. 1.402(c)-2, Q&A-1 (or as a rollover contribution within the meaning of section 408(d)(3)(A)(ii)) but that is not an eligible rollover distribution from a qualified plan (or an amount described in section 408(d)(3)(A)(ii)) or that does not satisfy the other requirements of section 401(a)(31), 402(c), or 408(d)(3) for treatment as a rollover or a rollover contribution.

(2) A valid rollover contribution is a contribution that is accepted by a plan as a rollover within the meaning of Sec. 1.402(c)-2, Q&A-1 or as a rollover contribution within the meaning of section 408(d)(3) and that satisfies the requirements of section 401(a)(31), 402(c), or 408(d)(3) for treatment as a rollover or a rollover contribution.

(c) Examples. The provisions of paragraph (a) of this Q&A-14 are illustrated by the following examples:

Example 1. (i) Employer X maintains for its employees Plan M, a profit sharing plan qualified under section 401(a). Plan M provides that any employee of Employer X may make a rollover contribution to Plan M. Employee A is an employee of Employer X, will

[[Page 272]]

not have attained age 70\1/2\ by the end of the year, and has a vested account balance in Plan O (a plan maintained by Employee A's prior employer). Employee A elects a single sum distribution from Plan O and elects that it be paid to Plan M in a direct rollover.

(ii) Employee A provides the plan administrator of Plan M with a letter from the plan administrator of Plan O stating that Plan O has received a determination letter from the Commissioner indicating that Plan O is qualified.

(iii) Based upon such a letter, absent facts to the contrary, a plan administrator may reasonably conclude that Plan O is qualified and that the amount paid as a direct rollover is an eligible rollover distribution.

Example 2. (i) The facts are the same as Example 1, except that, instead of the letter provided in paragraph (ii) of Example 1, Employee A provides the plan administrator of Plan M with a letter from the plan

administrator of Plan O representing that Plan O satisfies the
requirements of section 401(a) (or representing that Plan O is intended
to satisfy the requirements of section 401(a) and that the administrator
of Plan O is not aware of any Plan O provision or operation that would
result in the disqualification of Plan O).

(ii) Based upon such a letter, absent facts to the contrary, a plan
administrator may reasonably conclude that Plan O is qualified and that
the amount paid as a direct rollover is an eligible rollover
distribution.

Example 3. (i) Same facts as Example 1, except that Employee A
elects to receive the distribution from Plan O and wishes to make a
rollover contribution described in section 402 rather than a direct
rollover.

(ii) When making the rollover contribution, Employee A certifies
that, to the best of Employee A's knowledge, Employee A is entitled to
the distribution as an employee and not as a beneficiary, the
distribution from Plan O to be contributed to Plan M is not one of a
series of periodic payments, the distribution from Plan O was received
by Employee A not more than 60 days before the date of the rollover
contribution, and the entire amount of the rollover contribution would
be includible in gross income if it were not being rolled over.

(iii) As support for these certifications, Employee A provides the
plan administrator of Plan M with two statements from Plan O. The first
is a letter from the plan administrator of Plan O, as described in
Example 1, stating that Plan O has received a determination letter from
the Commissioner indicating that Plan O is qualified. The second is the
distribution statement that accompanied the distribution check. The
distribution statement indicates that the distribution is being made by
Plan O to Employee A, indicates the gross amount of the distribution,
and indicates the amount withheld as Federal income tax. The amount
withheld as Federal income tax is 20 percent of the gross amount of the
distribution. Employee A contributes to Plan M an amount not greater
than the gross amount of the distribution stated in the letter from Plan
O and the contribution is made within 60 days of the date of the
distribution statement from Plan O.

(iv) Based on the certifications and documentation provided by
Employee A, absent facts to the contrary, a plan administrator may
reasonably conclude that Plan O is qualified and that the distribution
otherwise satisfies the requirements of section 402(c) for treatment as
a rollover contribution.

Example 4. (i) The facts are the same as in Example 3, except that,
rather than contributing the distribution from Plan O to Plan M,
Employee A contributes the distribution from Plan O to IRA P, an
individual retirement account described in section 408(a). After the
contribution of the distribution from Plan O to IRA P, but before the
year in which Employee A attains age 70\1/2\, Employee A requests a
distribution from IRA P and decides to contribute it to Plan M as a
rollover contribution. To make the rollover contribution, Employee A
endorses the check received from IRA P as payable to Plan M.

(ii) In addition to providing the certifications described in
Example 3 with respect to the distribution from Plan O, Employee A
certifies that, to the best of Employee A's knowledge, the contribution
to IRA P was not made more than 60 days after the date Employee A
received the distribution from Plan O, no amount other than the
distribution from Plan O has been contributed to IRA P, and the
distribution from IRA P was received not more than 60 days earlier than
the rollover contribution to Plan M.

(iii) As support for these certifications, in addition to the two
statements from Plan O described in Example 3, Employee A provides
copies of statements from IRA P. The statements indicate that the

account is identified as an IRA, the account was established within 60
days of the date of the letter from Plan O informing Employee A that an
amount had been distributed, and the opening balance in the IRA does not
exceed the amount of the distribution described in the letter from Plan
O. There is no indication in the statements that any additional
contributions have been made to IRA P since the account was opened. The
date on the check from IRA P is less than 60 days before the date that
Employee A makes the contribution to Plan M.

(iv) Based on the certifications and documentation provided by
Employee A, absent facts to the contrary, a plan administrator may
reasonably conclude that Plan O is qualified and that the contribution
by Employee A is a rollover contribution described in section
408(d)(3)(A)(ii) that satisfies the

[[Page 273]]

other requirements of section 408(d)(3) for treatment as a rollover
contribution.

Q-15: For purposes of applying the plan qualification requirements
of section 401(a), is an eligible rollover distribution that is paid to
an eligible retirement plan in a direct rollover a distribution and
rollover or is it a transfer of assets and liabilities?

A-15: For purposes of applying the plan qualification requirements
of section 401(a), a direct rollover is a distribution and rollover of
the eligible rollover distribution and not a transfer of assets and
liabilities. For example, if the consent requirements under section
411(a)(11) or sections 401(a)(11) and 417(a)(2) apply to the
distribution, they must be satisfied before the eligible rollover
distribution may be distributed in a direct rollover. Similarly, the
direct rollover is not a transfer of assets and liabilities that must
satisfy the requirements of section 414(1). Finally, a direct rollover
is not a transfer of benefits for purposes of applying the requirements
under section 411(d)(6), as described in Sec. 1.411(d)-4, Q&A-3.
Therefore, for example, the eligible retirement plan is not required to
provide, with respect to amounts paid to it in a direct rollover, the
same optional forms of benefits that were provided under the plan that
made the direct rollover. The direct rollover requirements of section
401(a)(31) do not affect the ability of a qualified plan to make an
elective or nonelective transfer of assets and liabilities to another
qualified plan in accordance with applicable law (such as section
414(1)).

Q-16: Must a direct rollover option be provided for an eligible
rollover distribution that is in the form of a plan loan offset amount?

A-16: A plan will not fail to satisfy section 401(a)(31) merely
because the plan does not permit a distributee to elect a direct
rollover of an eligible rollover distribution in the form of a plan loan
offset amount. Section 1.402(c)-2(b), Q&A-9 defines a plan loan offset
amount, in general, as a distribution that occurs when, under the terms
governing a plan loan, the participant's accrued benefit is reduced
(offset) in order to repay the loan. A plan administrator is permitted
to allow a direct rollover of a participant note for a plan loan to a
qualified trust described in section 401(a) or a qualified annuity plan
described in section 403(a). See Sec. 1.402(c)-2, Q&A-9 for examples
illustrating the rules for plan loan offset amounts that are set forth
in this Q&A-16. See Sec. 31.3405(c)-1, Q&A-11 of this chapter for
guidance concerning special withholding rules that apply to a
distribution in the form of a plan loan offset amount.

Q-17: Must a direct rollover option be provided for an eligible
rollover distribution from a qualified plan distributed annuity

contract?

A-17: Yes. If any amount to be distributed under a qualified plan distributed annuity contract is an eligible rollover distribution (in accordance with Sec. 1.402(c)-2), Q&A-10 the annuity contract must satisfy section 401(a)(31) in the same manner as a qualified plan under section 401(a). Section 1.402(c)-2, Q&A-10 defines a qualified plan distributed annuity contract as an annuity contract purchased for a participant, and distributed to the participant, by a qualified plan. In the case of a qualified plan distributed annuity contract, the payor under the contract is treated as the plan administrator. See Sec. 31.3405(c)-1, Q&A-13 of this chapter concerning the application of mandatory 20-percent withholding requirements to distributions from a qualified plan distributed annuity contract.

Q-18: What assumptions may a plan administrator make regarding whether a benefit is an eligible rollover distribution?

A-18: (a) General rule. For purposes of section 401(a)(31), a plan administrator may make the assumptions described in paragraphs (b) and (c) of this Q&A-18 in determining the amount of a distribution that is an eligible rollover distribution for which a direct rollover option must be provided. Section 31.3405(c)-1, Q&A-10 of this chapter provides assumptions for purposes of complying with section 3405(c). See Sec. 1.402(c)-2, Q&A-15 concerning the effect of these assumptions for purposes of section 402(c).

(b) $5,000 death benefit. A plan administrator is permitted to assume that a distribution from the plan that qualifies for the $5,000 death benefit exclusion under section 101(b) is the only

[[Page 274]]

death benefit being paid with respect to a deceased employee that qualifies for that exclusion. Thus, to the extent that such a distribution would be excludible from gross income based on this assumption, the plan administrator is permitted to assume that it is not an eligible rollover distribution.

(c) Determination of designated beneficiary. For the purpose of determining the amount of the minimum distribution required to satisfy section 401(a)(9)(A) for any calendar year, the plan administrator is permitted to assume that there is no designated beneficiary.

Q-19: When must a qualified plan be amended to comply with section 401(a)(31)?

A-19: Even though section 401(a)(31) applies to distributions from qualified plans made on or after January 1, 1993, a qualified plan is not required to be amended before the last day by which amendments must be made to comply with the Tax Reform Act of 1986 and related provisions, as permitted in other administrative guidance of general applicability, provided that:

(a) In the interim period between January 1, 1993, and the date on which the plan is amended, the plan is operated in accordance with the requirements of section 401(a)(31); and

(b) The amendment applies retroactively to January 1, 1993.

[T.D. 8619, 60 FR 49204, Sept. 22, 1995, as amended by T.D. 8880, 65 FR 21314, Apr. 21, 2000; 65 FR 34534, May 30, 2000]

THOMSON
RIA

41 T.C. 214

## Tax Court of the United States.
### GEORGIE S. CARY, Petitioner,
*v.*
### COMMISSIONER OF INTERNAL REVENUE, Respondent
Docket No. 95259.
Filed November 15, 1963.

Petitioner owned 145 shares of the common stock of a corporation, such shares having a basis in her hands, as well as a fair market value, of $206,625. The remaining 5 outstanding shares of the corporation were owned by petitioner's son. On December 13, 1957, after having severed her relationship as an officer and director, all of petitioner's shares in the corporation were redeemed for a price of $206,625. Petitioner reported the redemption on her 1957 return as a sale of stock at basis, resulting in no gain or loss. Through inadvertence, however, she did not attach to this return the agreement provided for by section 302(c)(2)(A)(iii), I.R.C. 1954, and the regulations thereunder, to notify the Commissioner of any reacquisitions of stock within a 10-year period following the redemption. In 1959, during an audit of her 1957 return by the Internal Revenue Service, the absence of the above agreement was brought to petitioner's attention, whereupon she promptly filed an *amended* return for 1957 attaching said agreement. This amended return was duly received and acknowledged by the appropriate district director. *Held:* The provisions of section 302(c)(2)(A)(iii), requiring the filing of an agreement to notify the Commissioner of reacquisitions of stock within a 10-year period of a section 302(b)(3) redemption in the manner prescribed by regulation, are directory rather than mandatory. Since petitioner's failure to file the agreement was through inadvertence, since she forthwith filed it upon learning of the defect, and since in the interim she acquired no interest in the corporation, substantial compliance with the statute was effected.

***215** Sam G. Winstead* and *Larry L. L. Bean*, for the petitioner.

*Harold D. Rogers*, for the respondent.

DAWSON, *Judge:*
    Respondent determined a deficiency in petitioner's income tax for the year 1957 in the amount of $167,048.29.

The principal issues presented are whether the provisions of section 302(c)(2)(A)(iii), I.R.C. 1954, and the regulations thereunder, providing for the nonapplicability of section 318(a)(1) to stock redemptions which would otherwise qualify as in complete termination of a stockholder's interest in the redeeming corporation, are mandatory, requiring strict compliance, or merely directory, requiring substantial compliance; and, if merely directory, whether petitioner substantially complied with such provisions.

### FINDINGS OF FACT

Most of the facts necessary for a resolution of the above issues have been stipulated by the parties and are found accordingly.

Georgie S. Cary (hereinafter referred to as petitioner) is an individual presently residing in Dallas, Tex. Her individual income tax return for the taxable year 1957 was filed with the district director of internal revenue, Dallas, Tex.

Petitioner is the widow of Dr. E. H. Cary. Dr. Cary died testate on December 11, 1953, appointing the Republic National Bank of Dallas and his son, E. H. Cary, Jr., independent coexecutors and trustees of his estate. Under the terms of Dr. Cary's will, the residue of his estate was left in equal shares to four separate trusts, one for each of his four children, with petitioner, the surviving widow, having a life interest in each of these trusts.

Dr. Cary's estate at the time of his death consisted only of community property in which petitioner, as his surviving wife, had a one-half interest. The principal assets of his estate consisted of 145 shares of common capital stock in the Medical Arts Hospital of Dallas (hereinafter sometimes referred to as Medical), a Texas corporation, and other miscellaneous stocks, bonds, and real estate. From the time of its incorporation to the time of Dr. Cary's death, all of the outstanding stock in the Medical Arts Hospital was owned as follows:

**\*216** In closing the administration of Dr. Cary's estate petitioner received, as part of her community property share, the 145 shares of Medical Arts stock. For Federal estate tax purposes these shares were reported by the E. H. Cary estate at a total fair market value of $206,625, or $1,425 per share, and this valuation was accepted by the Commissioner of Internal Revenue as correct. Pursuant to the provisions of section 1014(b)(6), petitioner's basis for the 145 shares thus received was $206,625. After the settlement of Dr. Cary's estate, all of the outstanding stock in the Medical Arts Hospital was owned 5 shares by E. H. Cary, Jr., and 145 shares by petitioner.

On December 12, 1957, petitioner resigned the positions which she had held as an officer and director of Medical Arts Hospital. On December 13, 1957, Medical redeemed the 145 shares of its stock held by petitioner, distributing to her in exchange the sum of $206,625 which was both petitioner's basis for such stock and the fair market value thereof on the date of the redemption. Immediately after the redemption all of the outstanding 5 shares of Medical's stock were owned by E. H. Cary, Jr., petitioner's son, and none were owned directly by petitioner.

On her Federal income tax return for the taxable year 1957, petitioner reported the December 13, 1957, transaction as a sale of stock resulting in no gain or loss, on the theory that the distribution by Medical was in complete redemption of all of the Medical stock owned by her and that the amount received was equal to her basis in the stock redeemed. Petitioner's income tax return for the taxable year 1957 was prepared and filed by a reputable firm of certified public accountants in Dallas, Tex., specializing in the auditing and preparation of Federal income tax returns. This firm had prepared petitioner's Federal income tax returns for many years, was fully conversant with her financial affairs, and was advised of petitioner's resignation on December 12, 1957, from the board of Medical, as well as the stockholder resolution authorizing the December 13, 1957, stock redemption.

In 1959, during an audit of petitioner's 1957 return by the Internal Revenue Service, it was discovered that petitioner had failed to file with that return an agreement, as provided by section 302 (c)(2)(A)(iii) and the regulations thereunder, to notify the district director of internal revenue in the event she reacquired any stock in Medical within 10 years following the December 13, 1957, redemption. Thereafter, from records maintained by petitioner, an amended return for 1957 was filed with the agreement attached in accordance with section 1.302-4(a) Income Tax Regs. This amended return, with agreement attached, was received by the district director at Dallas on August 3, 1959.

**\*217** Since her resignation from the board on December 12, 1957, petitioner has not served either as an employee, officer, or director of Medical; nor, since the redemption of her stock on December 13, 1957, has she reacquired any interest in that corporation as a stockholder. In his notice of deficiency respondent determined that the distribution made by Medical to petitioner in redemption of her stock on December 13, 1957, was the essential equivalent of a taxable dividend in the amount of $206,625.

### OPINION

The tax treatment to be accorded distributions in redemption of stock made after December 31,

1954, is controlled by section 302 of the Internal Revenue Code of 1954. That section provides that such distributions are to be treated as in part or fully payment in exchange for the stock redeemed where the redemption, pursuant to which the distribution was made, qualifies as an exchange under paragraphs (1), (2), (3), or (4) of section 302(b). It is petitioner's position that the redemption of December 13, 1957, does so qualify under the provisions of paragraph (3) of section 302(b).

Section 302(b)(3) permits exchange treatment of a redemption which is made 'in complete redemption of all of the stock of a corporation owned by the shareholder.' Moreover, while the constructive ownership provisions of section 318(a) are made expressly applicable to determinations of stock ownership for the purposes of section 302, an exception to this rule is provided in cases of section 302(b)(3) redemptions by section 302(c)(2)(A). That section states that:

(A) In the case of a distribution described in * * * [sec. 302(b)(3)], section 318(a)(1) [which for purposes pertinent to the instant case would attribute the ownership of stock, owned by taxpayer's children, to the taxpayer] shall not apply if-

(i) immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee), other than an interest as a creditor,

(ii) the distributee does not acquire any such interest (other than stock acquired by bequest or inheritance) within 10 years from the date of such distribution, and

(iii) the distributee, at such time and in such manner as the Secretary or his delegate by regulations prescribes, files an agreement to notify the Secretary or his delegate of any acquisition described in clause (ii) and to retain such records as may be necessary for the application of this paragraph.

If the distributee acquires such an interest in the corporation (other than by bequest or inheritance) within 10 years from the date of the distribution, then the periods of limitation provided sections 6501 and 6502 on the making of an assessment and the collection by levy or a proceeding in court shall, with respect to any deficiency (including interest and additions to the tax) resulting from such acquisition, include one year immediately following the date on which the distributee (in accordance with regulations prescribed by the Secretary or his delegate) notifies the Secretary or his delegate of such acquisition; **\*218** and such assessment and collection may be made notwithstanding any provision of law or rule of law which otherwise would prevent such assessment and collection.

The regulation referred to in section 302(c)(2)(A)(iii) is section 1.302-4(a):

The agreement specified in section 302(c)(2)(A)(iii) shall be in the form of a separate statement in duplicate signed by the distributee and attached to his return timely filed for the year in which the distribution described in section 302(b)(3) occurs. The agreement shall recite that the distributee has not acquired any interest in the corporation * * * since such distribution, and that he agrees to notify the district director of internal revenue * * * of any acquisition of such an interest in the corporation within 30 days after such acquisition if such acquisition occurs within 10 years from the date of such distribution.

Immediately after the December 13, 1957, redemption by which the 145 shares of Medical stock owned by petitioner were redeemed, her son, E. H. Cary, Jr., continued to own the remaining 5 outstanding shares of stock in that corporation. Unless the application of the constructive ownership rules of section 318(a)(1) is barred by section 302(c)(2)(A), supra, it is clear that the redemption of December 13 does not qualify as a complete termination of petitioner's interest in the redeeming corporation within the meaning of section 302(b)(3).

Petitioner did not file the agreement contemplated by section 302(c)(2)(A)(iii) with her return for 1957. She did, however, report on that return the redemption of her stock by Medical as a sale which resulted in no gain or loss since her basis for the stock sold was equal to the amount received by her from the sale. When in 1959, during an audit of her 1957 return, petitioner's failure to file the

agreement was brought to her attention, she promptly filed an amended return for 1957 attaching that agreement. It is respondent's position that petitioner's failure to file the section 302(c)(2)(A)(iii) agreement *in the manner prescribed by section 1.302-4(a), Income Tax Regs.*, precludes her use of the exemption provided by section 302(c)(2). Petitioner contends that the *statute* requires only *substantial*, rather than strict, compliance, and that substantial compliance was effected.

We agree with petitioner. The *essence* of section 302(c)(2) taken in conjunction with section 302 (b)(3) is to allow exchange treatment to redemptions which result in the complete cessation of a shareholder's interest in a corporation for a period of 10 years. In this connection, we observe that section 302, as originally enacted by the House, provided that the rules of family attribution (now section 318(a)(1)) would not be applicable to redemptions in complete termination of a shareholder's interest if only *two* conditions were met, viz, that 'immediately [after the redemption] * * * the distributee **\*219** has no interest in the corporation * * * and * * * such distributee does not acquire any such interest in [the] corporation within 10 years from the date of the distribution in redemption.'FN1 We further note that the *House* version of the statute exacted *no* requirement that an agreement be filed with the Secretary or his delegate before 'complete termination' redemptions would qualify for exemption from the family attribution rules.

The *Senate* version of section 302 retained the two *essential* requirements for the exemption of redemptions in complete termination from the family attribution rules, and added a third provision, relating to the filing of an agreement, with this explanation:

Moreover, in order to qualify for nonattribution between members of a family, sub-paragraph (A) (iii) [of section 302(c)(2)] requires that the distributee, under regulations prescribed by the Secretary or his delegate, file an agreement to notify the Secretary or his delegate of any acquisition of any interest (other than by bequest or inheritance) within the 10 year period and to retain such records as the Secretary or his delegate may prescribe as necessary for the application of paragraph (2) [of section 302(c)]. *Thus, your committee anticipates that the Secretary or his delegate may require that the distributee retain personal income tax returns and other records indicating fully the amount of tax which would have been payable had the redemption not been treated as a distribution in full payment for his stock.*FN2 [Emphasis supplied.]

It would thus appear that a *primary* purpose for the addition of section 302(c)(2)(A)(iii) to the House version of section 302 was so that records, 'indicating fully the amount of tax which would have been payable had the redemption not been treated as a distribution in full payment for his stock,' could be required of distributees by the Commissioner of Internal Revenue.

As we have hereinbefore noted, what is essential with respect to sections 302(b)(3) and (c)(2) is that the redemption result in the complete cessation of the shareholder's interest in the corporation, and, that such cessation extend for a period of 10 years. The requirement that the distributee agree to retain records of the redemption does not relate to the substance of the transaction, but, on the contrary, relates merely to procedural detail. Such a requirement can, in our view, be satisfied by substantial compliance with its provisions. Respondent, however, contends that such a view would be prejudicial to him.

Relying on the case of *Archbold* v. *United States*, 201 F. Supp. 329 (D.N.J. 1962), affirmed per curiam 311 F. 2d 228 (C.A. 3, 1963), respondent argues that section 302(c)(2)(A)(iii) was designed principally to protect the Government from any attempt on the part of a **\*220** taxpayer to terminate his interest in a corporation for the 3-year period of limitations provided by section 6501 and *then* reacquire this interest after having taken advantage of the favored capital gains treatment afforded by section 302(b)(3). *Archbold*, in denying a taxpayer-distributee's request to file a section 302(c)(2) (A)(iii) agreement 2 years after the return was filed, reasoned that if the agreement was not required to be timely filed (i.e., with the original return), a situation would be created where a distributee could reacquire the stock after the running of the 3-year statute of limitations with impunity, while should his return be audited *within* 3 years of the year of distribution, he need only file the agreement to retain his section 302(b)(3) treatment. With this reasoning we respectfully disagree.

Looking once again to the legislative history of section 302, we find that, as originally enacted by the House, that section provided:

that in any case in which the [section 302(b)(3)] distributee acquires an interest in [the redeeming] corporation in less than 10 years from the date of such distribution [in complete redemption], the amount of tax attributable to the inclusion in income pursuant to section 301 of the amount of such distribution *shall be assessed and collected notwithstanding any statutes of limitation or other rule of law.*[FN3] [Emphasis supplied.]

However, consistent with the theory that some statute of repose is necessary in order to insure the taxpayer, who has made an honest return, that after such period his tax liability will not be reopened, see *Mabel Elevator Co.*, 2 B.T.A. 517, 519 (1925), the Senate amended section 302 to provide that:

In the event that the [section 302(b)(3)] distributee acquires an interest in the corporation * * * within the 10 years from the date of distribution, *then the period of limitation provided in sections 6501 and 6502 * * * shall*, with respect to any deficiency * * * resulting from such acquisition, *include 1 year following the date the distributee*, in accordance with regulations, *notifies the Secretary or his delegate* [of such acquisition].[FN4] [Emphasis supplied.]

Thus, as originally written, section 302 contained *no* statute of limitations on the assessment and collection of deficiencies which resulted from reacquisitions within the 10-year period. The Senate amendment modified the House version by providing that, in the case of reacquisitions, the Government would have, in addition to the periods already provided by section 6501 and 6502, '1 year following the date the distributee * * * *notifies* the Secretary or his delegate' of such acquisition to make assessment or collection of any deficiencies in tax arising as a result of said acquisition. Since the additional 1-year statute does not *begin* to run until *after* notification by the distributee **\*221** of reacquisition, the Government is fully protected even where the section 302(c)(2)(A)(iii) agreement is not filed.

This same result was reached by the District Court in the recent case of *Van Keppel* v. *United States*, 206 F. Supp. 42 (D. Kan. 1962), affd. 321 F. 2d 717 (C.A. 10, 1963). The facts of the *Van Keppel* case are, for all practical purposes, indistinguishable from those in the instant case.[FN5] There, as here, the Government contended for the application of the *Archbold* rationale. This approach was rejected by the District Court, which stated:

I disagree with * * * [ *Archbold*] because in my opinion the three year statute does not bar recovery of additional taxes upon reacquisition of stock within ten years. * * * Section 302(c)(2) provides for the assessment of tax deficiencies within one year after notice of reacquisition is given. The statute does not say the one-year statute of limitation is applicable only if an agreement is filed. It says the one-year statute of limitation applies if the taxpayer reaquires an interest within ten years.

* * *

If the statute of limitation extends to one year after notice, regardless of a filed agreement, both the taxpayer and the Government are fully protected. Obviously, a filed agreement would make it easier for the Director to detect reacquisitions; but detection is not the essence of section 302(c)(2), since the taxpayer must notify the Director in order to set the one year statute of limitations in motion.

In affirming *Van Keppel* we note that the Tenth Circuit chose to distinguish, rather than disagree with, the Third Circuit's affirmance of *Archbold*.[FN6] The Tenth Circuit found that:

Nothing in the statutes or regulations precludes the Director from accepting an agreement filed after the prescribed period. Establish administrative practice has long recognized and accepted amended returns filed after the due date 'for the purpose of correcting clear errors or plain mistakes inhering in original returns.' [Citing authorities.]

* * *

The Director did not reject the agreement or the amended return. Unless the assessment of the deficiency may be considered a rejection, the Government has never disclaimed the agreement and the taxpayers are bound by it. The situation *222 is different from that presented in *Archbold* v. *United States* [citation]. That case did not consider a claim of mistake. [In *Archbold,*] *after* the Director had made a deficiency assessment on the basis that a redemption was ordinary income, the taxpayers offered to file an amended return appending the required agreement. Here the failure of the taxpayers to file the agreement was a mistake, the submission of the agreement preceded the assessment, and the record does not disclose any rejection of the agreement other than the deficiency assessment. * * * Acceptance of the late filing was discretionary. Fairness to the taxpayers requires that the discretion be exercised for their benefit and failure to do so was an abuse of discretion. [Emphasis supplied.]

While, as stated earlier, we disagree with the substantive rationale of the *Archbold* case, it is to be noted that all of the factors used by the Tenth Circuit to distinguish *Van Keppel* from *Archbold* are present here. Petitioner is a widow, who was 73 years of age at the time of the December 13, 1957, redemption of her Medical stock. Her return for the year 1957 was prepared by competent certified public accountants, familiar with her financial affairs, in consultation with her attorneys. On her 1957 return the redemption was reported as a sale of stock. Through the inadvertence of someone, no section 302(c)(2)(A)(iii) agreement was attached to the return. When petitioner's 1957 return was audited in 1959 and the absence of the agreement was made known to her, she promptly filed an amended 1957 return attaching the agreement. The district director duly acknowledged receipt of this amended return and agreement on August 3, 1959. Since that time he has neither rejected the return nor, quite obviously, has there ever been an assessment of the alleged deficiency. These being the relevant facts, if *Archbold* in distinguishable from *Van Keppel*, then it is also distinguishable for the same reasons from the instant case.

It is our decision that the provisions of section 302(c)(2)(A)(iii), requiring the filing of an agreement to notify the Secretary or his delegate of reacquisitions of stock within a 10-year period of a section 302(b)(3) redemption in the manner prescribed by regulation, are directory rather than mandatory. It appearing that petitioner's failure to file the agreement was through inadvertence, that she forthwith filed it upon learning of the defect, that in the interim she acquired no interest in Medical Arts Hospital, and that she maintained appropriate records relating to the transaction, we hold that she substantially complied with the statute.

This disposition of the case makes it unnecessary for us to consider other issues raised by the parties.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

FN1 H. Rept. No. 1337, 83d Cong., 2d Sess., p. A75 (1954).

FN2 S. Rept. No. 1622, 83d Cong., 2d Sess., p. 236 (1954).

FN3 H. Rept. No. 1337, 83d Cong., 2d Sess., p. A75-76 (1954).

FN4 S. Rept. No. 1622, 83d Cong., 2d Sess., p. 236 (1954).

41 T.C. 214

Case 1:07-bk-10312-GM    Doc 105-1    Filed 10/10/08    Entered 10/10/08 12:07:38    Desc
Appendix Authorities Relied Upon In Brief    Page 17 of 47

Page 7 of 7

FN5 In *Van Keppel*, a husband owned 1,124, and a wife owned 375, of the 2,000 authorized shares of stock in a corporation. In 1956 the corporation redeemed all of the wife's shares of stock. This transaction was reported in 1956 by the taxpayers as a sale of the wife's stock resulting in capital gain. The taxpayers' 1956 joint return was prepared by a CPA in consultation with the taxpayers' lawyer. 'Through the inadvertence of someone, no [sec. 302(c)(2)(A)(iii)] agreement was attached to the [1956] return.' In 1958, during an audit of the 1956 return, it was discovered that no agreement had been filed. The taxpayers promptly submitted an agreement to the district director and he did not reject it. They then filed an amended return for 1956 to which a copy of the agreement was attached. Receipt of this return was duly acknowledged by the district director. Thereafter, the Commissioner of Internal Revenue determined that the proceeds of the 1956 redemption were taxable as a dividend and a deficiency for 1956 was accordingly assessed.

FN6 See *United States v. Van Keppel*, 321 F. 2d 717, 720 (C.A. 10, 1963), footnote 9.

Tax Court 1963.
GEROGIE S. CARY, PETITIONER
41 T.C. 214

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

THOMSON
RIA


THOMSON
RIA

67 T.C. 736

## United States Tax Court
### HEWLETT-PACKARD COMPANY, PETITIONER
v.
### COMMISSIONER OF INTERNAL REVENUE, RESPONDENT
Docket No. 3151-75.
Filed January 31, 1977.

1. Held, petitioner substantially complied with the directions of sec. 1.964-1(c)(3), Income Tax Regs., prescribing the procedure for the election of depreciation accounting methods, and the earnings and profits of three of its controlled foreign subsidiaries for the taxable years ended Oct. 31 of 1967 through 1970, properly reflected adjustments for accelerated depreciation.

2. Held, further, petitioner did not satisfy the 'minimum overall tax burden' test prescribed by sec. 1.963-4(a), Income Tax Regs., and is not entitled to exclude for its taxable year ended Oct. 31, 1968, the subpart F income of its chain of controlled foreign corporations headed by Hewlett-Packard S.A., Geneva, Switzerland.

*736 John B. Jones, Jr., and Michael R. Levy, for the petitioner.

Robert E. Casey, for the respondent.

FEATHERSTON, Judge:
Respondent determined deficiencies in petitioner's Federal income tax as follows:

| TYE Oct. 31- | Amount of deficiency |
|---|---|
| 1967 | $158,119.01 |
| 1968 | 135,309.01 |
| 1969 | 582,216.03 |
| 1970 | 490,022.34 |

*737 Other issues having been settled by the parties or severed for separate trial,[FN1] those remaining for decision are as follows:

(1) Whether petitioner effectively elected for its taxable years ended October 31 of 1967 through 1970, a method of accelerated depreciation for computing the earnings and profits of three of its controlled foreign subsidiaries when it filed for its taxable years ended in 1964 through 1967 its 'written statement' and related information with the District Director, Internal Revenue Service, rather than with the Director of International Operations, Internal Revenue Service, Washington, D.C. 20225, as directed by section 1.964-1(c)(3)(ii), Income Tax Regs., for those taxable periods.

(2) Whether petitioner has satisfied for its taxable year ended October 31, 1968, the 'minimum overall tax burden' test prescribed by section 1.963-4(a), Income Tax Regs., so as to be entitled to exclude from gross income for such year the subpart F income of Hewlett-Packard S.A., Geneva, Switzerland, a controlled foreign corporation.

### FINDINGS OF FACT

*General*

Hewlett-Packard Co. (hereinafter petitioner), a California corporation, had its principal office in Palo Alto, Calif., at the time its petition herein was filed. For its taxable years ended October 31 of 1964, 1965, 1966, and 1967, petitioner filed its Federal income tax returns with the District Director of Internal Revenue, San Francisco, Calif. For its taxable years ended October 31 of 1968, 1969, and 1970, petitioner filed Federal income tax returns with the Internal Revenue Service Center, Ogden, Utah.

**\*738** *Issue 1. Accelerated Depreciation Election*

During the period from sometime prior to its taxable year ended in 1964 through its taxable year ended in 1970, petitioner owned 100 percent of the stock of Hewlett-Packard S.A., Geneva, Switzerland (hereinafter HPSA), which, in turn, owned 100 percent of the stock of two West German companies, Hewlett-Packard GmbH (hereinafter GmbH) and Hewlett-Packard VmbH (hereinafter VmbH). By reason of this ownership, HPSA, GmbH, and VmbH were controlled foreign corporations within the meaning of section 957(a).[FN2] During the same period referred to above, HPSA, together with its several second-tier subsidiaries including GmbH and VmbH, comprised a 'chain of controlled foreign corporations,' as defined in section 963(c)(2). Petitioner's taxable year ended October 31, 1964, was its first taxable year beginning after December 31, 1962, during which HPSA, GmbH, and VmbH were controlled foreign corporations or for which they were included in a chain election under section 963(c)(2).

Commencing with the taxable year ended October 31, 1964, and continuing through the taxable year ended October 31, 1970, the earnings and profits of HPSA, GmbH, and Vm bH reflected adjustments for accelerated depreciation.

For each of its taxable years ended October 31, 1964, through October 31, 1970, petitioner filed Treasury Forms 2952 (Information Return with Respect to Controlled Foreign Corporations) with its Federal income tax return on behalf of HPSA, GmbH, and VmbH. Each such Form 2952 with respect to GmbH and VmbH stated that HPSA owned 100 percent of the respective corporation's stock. Each such Form 2952 with respect to HPSA stated that petitioner owned 100 percent of that subsidiary's stock. For each of its taxable years ended October 31 of 1965 through 1970, petitioner also filed Forms 3646 (Income From Controlled Foreign Corporation) with its Federal income tax return on behalf of HPSA, GmbH, and VmbH. Form 3646 was not in existence at the time petitioner filed its tax return for its taxable year ended October 31, 1964. **\*739** Attached to and filed with each of petitioner's Federal income tax returns for its taxable years ended October 31, 1964, through October 31, 1970, was a statement of 'Investments in Affiliates,' which indicated that in each of these years petitioner owned 100 percent of HPSA, which, in turn, owned 100 percent of both GmbH and VmbH.

Attached to and made a part of petitioner's Federal income tax return for its taxable year ended October 31, 1964, timely filed on April 15, 1965, with the District Director of Internal Revenue, San Francisco, Calif., was a statement entitled 'Statements of Consent to Elections under IRS Sections.' Paragraph C and D of that statement are as follows:

C. We wish to make a group election under Code Section 963 (minimum distribution rule) for the year ended October 31, 1964. Detailed schedule of the group is attached.

D. We also elect that under the provisions of Code Section 964 the earnings and profits and the deficits in earnings of the Foreign group (Part C) for the year ended October 31, 1964 were determined according to the rules substantially similar to those applicable to domestic corporations.

Also attached to and made a part of that return was a schedule containing a page 3 entitled 'Information Required of U.S. Shareholders with Income from Controlled Foreign Corporations-Announcement 64-122-Year ended 10/31/64.' Immediately above the figures on this page of the schedule appears the caption 'Recast of Depr. 1964 Purchases from S.L. to 200% D.B. and Freight

and Duty.' With respect to HPSA, GmbH, and VmbH, the schedule identifies the amount of straight line depreciation per books of each and the amount of depreciation recast to a 200-percent declining balance. The schedule further shows that petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH.

Attached to and made a part of petitioner's Federal income tax returns for its taxable years ended October 31, 1965, through October 31, 1967, each return timely filed with the District Director of Internal Revenue, San Francisco, Calif., were statements entitled 'Statements of Consent to Elections under I.R.S. Sections.' Paragraph D of the statement attached to the 1965 return is as follows:

We also elect that under the provisions of (C)ode section 964 the earnings and profits and the deficits in earnings of the foreign group * * * for the **\*740** year ended October 31, 1965 were determined according to the rules substantially similar to those applicable to domestic corporations; i.e.,

1. Accounting methods reflect the provisions of section 446 and the regulations thereunder.

2. Inventories in accordance with the provisions of section 471 and 472 and the regulations thereunder.

3. Depreciation computed in accordance with section 167 and the regulations thereunder.

The statements attached to the returns for the taxable years ended in 1966 and 1967 contain identical language with the exception of the applicable dates.

With respect to the years ended October 31, 1964, through October 31, 1967, petitioner's tax manager, who was responsible for filing its income tax returns, knew that a written statement was required in order to elect to adopt an accelerated depreciation accounting method for its controlled foreign corporations. However, for those years, he was not aware of the specific provisions of the Treasury regulations regarding such statements and was not aware that such statements were supposed to be filed with the Director of International Operations, Internal Revenue Service (sometimes hereinafter referred to as OIO), separate from its income tax returns. Prior to its taxable year ended October 31, 1964, petitioner's tax manager had never filed any forms with OIO on behalf of petitioner's foreign subsidiaries.

In 1968, during the course of an examination of petitioner's returns for the years ended October 31 of 1964 through 1967, an agent brought to the attention of petitioner's tax manager that these required statements should be more elaborate and detailed and should have been filed with OIO in Washington, D.C. With respect to each of its taxable years ended October 31, 1968, through October 31, 1970, petitioner timely filed with OIO, Washington, D.C., a statement in letter form with a subject heading 'Statement of Consent to Elections Under I.R.S. Sections.' Paragraph B of the statement filed in 1969 for the October 31, 1968, taxable year provides as follows:

We also elect that under the provisions of Code Section 964, the earnings and profits (or deficit in earnings and profits) of the foreign group * * * for the year ended October 31, 1968 were computed substantially as if such corporations were domestic corporations, i.e. (:)

1. Accounting methods reflect the provisions of Section 446 and the regulations thereunder; i.e., taxable income has been computed under the **\*741** accrual method of accounting. Adjustments for foreign accounting practices have been made to conform to U.S. accounting practices.

2. Inventories in accordance with the provisions of Section 471 and 472 and the regulations thereunder; i.e., inventories are valued at cost or market, whichever is lower, and freight and customs duty have been removed from its value.

3. Depreciation computed in accordance with Section 167 and the regulations thereunder; i.e., new assets with useful life of three or more years, the sum of the years digits method, used assets 150% declining balance method or straight line method. Useful lives and methods are similar to those

used by the U.S. parent shareholder.

The statements filed in 1970 and 1971 for the taxable years ended October 31 of 1969 and 1970, contain identical language with the exception of the applicable dates. Each of these statements also indicates that petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH.

In its Federal income tax returns with respect to its taxable years ended October 31, 1967, through October 31, 1970, petitioner claimed accelerated depreciation deductions in computing the earnings and profits of HPSA, GmbH, and VmbH, which exceeded straight-line depreciation computations by the following amounts:

| | *Taxable year ended Oct. 31-* | | | |
|---|---|---|---|---|
| | *1967* | *1968* | *1969* | *1970* |
| HPSA | $20,151 | $18,353 | $19,478 | $19,543 |
| GmbH | 35,041 | 11,479 | 58,961 | 122,409 |
| VmbH | 9,866 | 7,102 | 14,866 | 14,462 |

In his statutory notice of deficiency, respondent disallowed the use of accelerated depreciation in computing the earnings and profits of HPSA, GmbH, and VmbH and decreased petitioner's claimed deductions by the above amounts.

### Issue 2. Minimum Overall Tax Burden Test

For its taxable year ended October 31, 1968, petitioner elected to exclude HPSA's subpart F income from its own income by reason of the receipt of a 'minimum distribution' with respect to the consolidated earnings and profits of its chain of controlled foreign corporations, as provided in section 963(a) (2). For purposes of computing the percentage of the earnings and profits of petitioner's chain of controlled foreign **\*742** corporations required to be distributed as the minimum distribution in accordance with section 963(b), the 'effective foreign tax rate,' as defined in section 963(d)(2), equaled or exceeded 47.38 percent.[FN3]

For petitioner's taxable year ended October 31, 1968, 83.3 percent of the days of that period were within the 'surcharge period' referred to in section 963(b). The minimum distribution required under section 963(b)(1) for this portion within the surcharge period was zero percent of the earnings and profits of petitioner's chain of controlled foreign corporations because the effective foreign tax rate exceeded 47 percent.

For that portion of petitioner's taxable year ended in 1968 which was not within the surcharge period, the minimum distribution required under section 963(b)(3) was zero percent of the earnings and profits of petitioner's chain of controlled foreign corporations because the effective foreign tax rate exceeded 43 percent. Thus, for petitioner's entire taxable year ended October 31, 1968, the applicable minimum distribution requirement of section 963(a)(2), computed in accordance with section 963(b) but without reference to the 'minimum overall tax burden 'test prescribed by section 1.963-4(a), Income Tax Regs., was zero.

In the statutory notice of deficiency for petitioner's taxable year ended October 31, 1968, respondent determined that petitioner was not entitled to exclude from its gross income HPSA's subpart F income because petitioner did not satisfy the 'minimum overall tax burden' test provided for by section 1.963-4(a), Income Tax Regs.

For the purpose of section 1.963-4(a)(1), Income Tax Regs., the 'overall United States and foreign income tax,' as defined in regulations section 1.963-4(a)(2)(ii), of petitioner's chain of controlled foreign corporations for its taxable year ended October 31, 1968, was $3,172,537. The consolidated (pretax) earnings and profits of petitioner's chain of controlled foreign corporations for its taxable year ended October 31, 1968, as referred to in section 1.963-4(a)(1)(i), Income Tax Regs., was

$7,002,953.[FN4]

## *743 OPINION

### Issue 1. Accelerated Depreciation Election

We hold that petitioner made valid elections to make adjustments for accelerated depreciation in computing the earnings and profits of its foreign subsidiaries for the taxable years ended October 31 of 1964 through 1970. As we view the evidence, petitioner effectively committed itself to employ such method beginning with its return for the taxable year ended October 31, 1964, and continuing through the year ended October 31, 1970, and adequately informed the Internal Revenue Service that it elected to do so. We base our holding on an analysis of the general scheme for taxing the income of controlled foreign corporations, the provisions of the statute, the applicable regulations concerning the adoption and change of accounting methods, and the peculiar facts of this case.

The key operative provision of subpart F of Part III, subchapter N, chapter 1, of The Code is section 951, which requires the United States shareholders of a controlled foreign corporation (defined in section 957(a)) to include in their gross income their pro rata shares of such corporation's subpart F income (defined in section 952(a)) for any taxable year beginning after December 31, 1962. Section 952(c) limits, in general, a controlled foreign corporation's subpart F income for a taxable year to such corporation's earnings and profits for the taxable year. Therefore, in computing the controlled foreign corporation's subpart F income for any taxable year, it is necessary to determine the foreign corporation's earnings and profits for that year. Section 964(a) provides that:

For purposes of this subpart, the earnings and profits of any foreign corporation, and the deficit in earnings and profits of any foreign corporation, for any taxable year shall be determined according to rules *744 substantially similar to those applicable to domestic corporations, under regulations prescribed by the Secretary or his delegate.

The regulations under section 964(a) contemplate that the accounting methods employed by controlled foreign corporations will substantially conform with United States accounting practices for purposes of determining such corporations' earnings and profits. In order to effectuate such conformity, the regulations provide for various accounting and tax adjustments through the allowance of elections by the controlling domestic shareholders. One of the required adjustments, the one with which we are here concerned, is that depreciation must be computed in accordance with section 167 and the regulations thereunder. Sec. 1.964-1(c)(1)(iii), Income Tax Regs. In general, the controlling domestic shareholders are permitted to make any election which is allowed for domestic corporations. Sec. 1.964-1(c)(1)(iv), Income Tax Regs.

Section 1.964-1(c)(2), Income Tax Regs., provides, with respect to a controlled foreign corporation, an exception to the procedural requirements which domestic corporations must satisfy for an election to adopt or change a method of accounting. That subparagraph provides in pertinent part as follows:

(2) Adoption of method. For the first taxable year beginning after December 31, 1962, in which the foreign corporation is a controlled foreign corporation (within the meaning of section 957) or for which it is included in a chain or group under section 963(c)(2)(B) or (3)(B) * * * there may be adopted or made by such corporation or on its behalf any method of accounting or election allowable under this section notwithstanding that, in previous years, its earnings and profits were computed, or its books or financial statements prepared, on a different basis and notwithstanding that such election is required by the Code or regulations to be made in a prior taxable year. * * *

This transitional rule allows a qualifying foreign corporation to change its method of accounting in the first taxable year beginning after December 31, 1962 (hereinafter referred to as first post-1962 taxable year), without first securing the consent of the Commissioner. In other words, the foreign corporation is permitted to start with a clean slate in the first year in which it is covered by these

67 T.C. 736
Case 1:07-bk-10312-GM    Doc 105-1    Filed 10/10/08    Entered 10/10/08 12:07:38    Desc
Appendix Authorities Relied Upon In Brief    Page 23 of 47

Page 6 of 15

provisions. Thus, any method of depreciation computation permissible under section 167 can be adopted for both new and used assets in the first ***745*** post-1962 taxable year, regardless of the method used theretofore for previously acquired assets.[FN5]

Normally, to elect to use one of the accelerated methods of depreciation specified in section 167 (b)(2), (3), and (4) for a qualifying asset or group of assets, all a taxpayer has to do is compute the depreciation under the selected method for the taxable year 'in which the property may first be depreciated by him.' Sec. 1.167(c)-1(c), Income Tax Regs. However, section 1.964-1(c)(3), [FN6] Income Tax Regs., contemplates two added steps in making a depreciation accounting method election on behalf of a controlled foreign corporation in its first post-1962 taxable year. The first step, and the one on which this issue turns, is that the controlling United States shareholders should file a written statement, jointly executed by those shareholders, with the Director of International Operations, Internal Revenue Service, Washington, D.C. 20225,[FN7] within ***746*** 180 days of the close of the taxable year of the foreign corporation with respect to which the election is made or the adoption or change of method effected, or before May 1, 1965, whichever is later. This written statement should set forth the name and country of organization of the foreign corporation, the names, addresses, and stock interests of the controlling United States shareholders, the nature of the action taken, the names and addresses of all other United States shareholders notified of the election or adoption or change of method, and such other information as the Commissioner may by forms require. Sec. 1.964-1(c)(3)(ii), Income Tax Regs.

The second step is that, before filing this written statement, the controlling United States shareholders should give written notice in a specified form of the election made or the adoption or change of method effected to all other persons known by them to be United States shareholders owning (within the meaning of section 958(a)) stock in the foreign corporation. Sec. 1.964-1(c) (3) (iii), Income Tax Regs. Since petitioner directly or indirectly owned all of the stock of the three foreign corporations here involved, this second step is not applicable in this case.

After the first post-1962 taxable year, an election on behalf of the controlled foreign corporation to adopt a method of depreciation accounting different from the one adopted for those assets (both new and used) in that year requires the consent of the Commissioner (see section 1.964-1(c)(3)(i) (a), Income Tax Regs.), plus the filing of the written statement described in section 1.964-1(c)(3)(i)(b) and (ii), Income Tax Regs., and the notification of other shareholders under regulations section 1.964-1(c)(3)(i)(c) and (iii).

In the instant case, subpart F was first applicable to petitioner for its taxable year ended October 31, 1964. Prior to that taxable year, petitioner had depreciated the assets of HPSA, GmbH, and VmbH on its books on a straight line basis. In its first post-1962 taxable year, petitioner changed from straight line depreciation to the double declining balance method of depreciation with respect to those corporations' depreciable assets on hand at the beginning of the taxable ***747*** year as well as to assets acquired by them during the taxable year and used the double declining balance method in computing the earnings and profits of those controlled foreign corporations. It is stipulated that commencing with the taxable year ended October 31, 1964, and continuing through the taxable year ended October 31, 1970, the earnings and profits of all three corporations reflected adjustments for accelerated depreciation.

Respondent contends that petitioner's election for the taxable year ended October 31, 1964, was invalid on the grounds that (1) the 'written statement' filed by petitioner was not legally sufficient under section 1.964-1(c), Income Tax Regs., because it did not state in adequate detail what election the taxpayer was making, and (2) the 'written statement' required by regulations section 1.964-1(c) (3)(ii) was filed with the District Director of Internal Revenue, San Francisco, Calif., rather than with the OIO in Washington, D.C. Respondent contends that as a result of petitioner's invalid election for the taxable year ended October 31, 1964, petitioner is not entitled to use the accelerated depreciation method of accounting for any assets, new or used, for the taxable years at issue herein. We disagree.

As noted above, petitioner was entitled, for purposes of choosing a method of depreciation, to treat previously acquired assets as newly acquired assets in the taxable year ended October 31,

1964.[FN8] To elect, on behalf of a foreign corporation, to use the accelerated depreciation method for those assets, both new and old, all petitioner had to do was compute depreciation under the selected method for this first post-1962 taxable year and fulfill the written statement directions of section 1.964-1(c)(3)(ii), Income Tax Regs. [FN9] Petitioner's return for the taxable year ended October 31, 1964, reflects that petitioner computed depreciation according to the double declining balance method. Thus, whether **\*748** petitioner validly elected to use the double declining balance method of depreciation for its first post-1962 taxable year depends on whether it complied sufficiently with the 'written statement' directions of section 1.964-1(c)(3)(ii), Income Tax Regs.

It is true that petitioner did not literally comply with the 'written statement' portions of the election provisions of section 1.964-1(c)(3), Income Tax Regs. Petitioner filed nothing with OIO, Washington, D.C., for its taxable year ended October 31, 1964. Rather, it attached a 'written statement' to, and included other pertinent information elsewhere in, its income tax return for that year which it filed with the District Director of Internal Revenue, San Francisco, Calif.

However, literal compliance with the procedural directions in Treasury regulations on making elections, such as the 'written statement' and place-of-filing provisions with which we are here concerned, is not always required. Repeatedly this Court has held elections effective where the taxpayer complied with the essential requirements of a regulation even though the taxpayer failed to comply with certain procedural directions therein. Columbia Iron & Metal Co., 61 T.C. 5, 8-10 (1973) (copy of corporate minutes regarding a charitable contribution, filed subsequent to filing of return); Alfred N. Hoffman, 47 T.C. 218, 236 -237 (1966), affd. per curiam 391 F.2d 930 (5th Cir. 1968) (imperfect revocation of a subchapter S election); Fred J. Sperapani, 42 T.C. 308, 330-333 (1964) (failure to follow procedural details in election of a proprietorship to be taxed as a corporation); John P. Reaver, 42 T.C. 72, 80-83 (1964) (election of installment reporting in an amended, rather than original, return); Georgie S. Cary, 41 T.C. 214 (1963) (information required, but furnished after return was filed, for election to treat a stock redemption as a dividend or an exchange). Although there exists no litmus test for determining whether literal compliance with a procedural regulation is called for, this Court in Octavio J. Valdes, 60 T.C. 910, 913 (1973), enumerated as follows certain factors which should be considered:[FN10]

**\*749** In ascertaining whether a particular provision of a regulation stating how an election is to be made must be literally complied with, it is necessary to examine its purpose, its relationship to other provisions, the terms of the underlying statute, and the consequences of failure to comply with the provision in question. \* \* \*

As to the legal sufficiency of petitioner's 'written statement' filed with its income 10/31/64,' and it lists the foreign ended October 31, 1964, quoted in pertinent part in our Findings, petitioner elected in this statement to determine the earnings and profits and the deficits in earnings of the foreign group according to the rules 'substantially similar' to those applicable to domestic corporations. See sec. 1.964-1(a), Income Tax Regs. This statement standing alone was insufficient to notify respondent that an election to use accelerated depreciation was made or that petitioner was the sole shareholder of those foreign corporations on behalf of which the election was made. However, this statement, coupled with a schedule attached to the 1964 return, contains all the 'written statement' information specified in section 1.964-1(c)(3), Income Tax Regs., quoted in part in footnote 6 above.

Page 3 of the schedule attached to the return for the October 31, 1964, taxable year is captioned 'Information Required of U.S. Shareholders with income from Controlled Foreign Corporations-Announcement 64-122-Year ended 10/61/64,' and it lists the foreign corporations for which the section 964 election was made. Included in the information provided in that schedule are the name and country of organization of HPSA, GmbH, and VmbH, and the stock interest (100 percent) of petitioner in each of those controlled foreign corporations.[FN11] The schedule prescribes the nature of the action taken as 'Recast of Depr. 1964 Purchases from S.L. to 200% D.B. and Freight and Duty.' From these entries in the 1964 return, it is clear (1) that petitioner was the sole United States shareholder of HPSA, GmbH, and VmbH, (2) that petitioner treated all assets of the controlled foreign **\*750** corporations as newly acquired in 1964, and (3) that petitioner elected for its first post-1962 taxable year to adopt the double declining balance method of depreciation. The return was filed within

the time limit set for filing the written statement (i.e., 'within 180 days after the close of the taxable year of the foreign corporation with respect to which the election is made * * * or before May 1, 1965, whichever is later'). Sec. 1.964-1(c)(3)(ii), Income Tax Regs.

We think the statement and material contained in the schedule referred to above, though not contained in a single document, substantially complied with the applicable regulation and thus were legally sufficient to constitute an election by petitioner. Petitioner obtained no advantage and caused respondent to suffer no inconvenience by failing to consolidate all the written statement data into a single document. Petitioner unequivocally committed itself to the double declining balance method of computing depreciation. If the shoe were on the other foot, respondent's position that petitioner had made an election not changeable without permission, sec. 1.964-1(c)(3)(i)(a), Income Tax Regs., would be unassailable.

We also think that, in view of the regulatory scheme, the consequences of imprecise compliance, and the peculiar facts of this case, literal compliance as to the place-of-filing direction was not necessary, and petitioner's filing of the statement and schedule with the District Director of Internal Revenue substantially complied with the applicable regulation. See Octavio J. Valdes, supra at 913-914. The purpose of having United States shareholders file a written statement with the OIO is reflected by section 1.964-1(c), Income Tax Regs., viewed in its entirety. Immediately following the recitation of the written statement and shareholder notification directions of subparagraph (3) of that regulation, section 1.964-1(c)(4),[FN12] Income Tax Regs., explains the effect which *751 the controlling domestic shareholders' election on behalf of a controlled foreign corporation will have on certain United States shareholders. The stated purpose of regulations section 1.964-1(c)(4) is to require that the controlling shareholders' election or other action with respect to the computation of the controlled foreign corporation's earnings and profits be consistently reflected to the extent that it bears upon the tax liability of those United States shareholders who received actual notice of the election (or who have failed to provide respondent with the information necessary for their notification).

To the extent that the controlling United States shareholders are aware of other United States shareholders, respondent places the burden of notification upon the controlling shareholders. Sec. 1.964-1(c)(3)(iii), Income Tax Regs. But in order to assure notification to those other shareholders of whom the controlling shareholders are unaware, section 1.964-1(c)(3)(ii), Income Tax Regs., requires the controlling shareholders to file the written statement (which is to include a list of the shareholders notified of the election) with the OIO. Then, by comparing the names and addresses of the shareholders listed on the written statement to the shareholder list prepared from information on the Forms 959 required also to be filed with the OIO pursuant to section 6046 and the regulations thereunder,[FN13] the OIO is able to determine who the unnotified shareholders are and to provide them with exactly the same information as the controlling shareholders would have provided under section 1.964-1(c)(3)(iii), Income Tax Regs., had they been aware of such *752 shareholders. Thus, the purpose of filing the written statement with the OIO becomes evident-to enable that office to give notice of the action taken to persons whose status as United States shareholders is established by the OIO's records but is unknown to the controlling United States shareholders.

In the instant case, during the taxable years ended October 31, 1964, through October 31, 1970, petitioner owned, directly or indirectly, 100 percent of the stock of HPSA, GmbH, and VmbH. There were no other shareholders of these controlled foreign corporations to be notified of petitioner's election. The failure to file the written statement with the proper office did not, under these circumstances, cause any prejudice to either party or to the essential purpose of section 1.964-1(c)(3)(ii) of the regulations. See Octavio J. Valdes, 60 T.C. at 913.

The responsibility of the Director of International Operations, in the context of this regulatory provision, moreover, is essentially a ministerial or clerical one, and his receipt of the written statements involves no audit functions.[FN14] Jurisdiction to audit a return filed with the proper District Director by a United States shareholder of a foreign corporation which has subpart F income remains lodged with that District Director. I.R. Manual 1118.4(1); compare I.R. Manual 1113.56, 1113.562, and 1113.563. Therefore, where the controlling shareholders fail to comply with the notice and

67 T.C. 736
Case 1:07-bk-10312-GM    Doc 105-1    Filed 10/10/08    Entered 10/10/08 12:07:38    Desc
Appendix Authorities Relied Upon In Brief    Page 26 of 47

Page 9 of 15

written statement requirements, the audit function is nonetheless safeguarded by the controlling shareholders' required compliance with the existing statutory rules and regulations which attend such election.

**\*753** Thus, we think that petitioner, having validly elected to use double declining balance depreciation for its first post-1962 taxable year for newly acquired assets (as well as for the assets treated as newly acquired), was bound in subsequent years to that method for those assets, unless and until it received the consent of the Commissioner to change that method. For the reasons discussed above with respect to its taxable year ended October 31, 1964, we think that petitioner also substantially complied with the regulations in electing to use a method of accelerated depreciation for those assets newly acquired in each of its taxable years ended October 31 of 1965, 1966, and 1967. Therefore, the earnings and profits for 1967 of the three foreign subsidiaries should reflect the methods of depreciation elected for assets acquired in each of the taxable years ended October 31 of 1964, 1965, 1966, and 1967. And, finally, since the 'written statement' directions of the regulations were fully complied with for the taxable years ended October 31 of 1968, 1969, and 1970, the sum of the years-digits method of accelerated depreciation for assets placed in service during those years may be used in computing the foreign subsidiaries' earnings and profits.[FN15]

In concluding that petitioner's failure to file a written statement with the OIO did not nullify its accelerated depreciation election, we do not purport to lay down any general rule which would undermine the regulatory direction that such statements be filed with that office. We confine our holding to the facts of this case. Petitioner's failure to file a written statement literally complying with the directions of the regulations was a mistake, but that mistake was not 'to any degree attributable to any willful misconduct' by its officers or employees. Edward F. Dixon, 60 T.C. 802, 805 (1973). Petitioner had never filed any forms with the OIO on behalf of its foreign subsidiaries. Although its tax manager knew a written statement was to be filed, he was not aware that such statement was to be filed with the OIO.

Indeed, the regulations requiring the written statement to be filed with the OIO became final on October 27, 1964, only 4 **\*754** days before the end of petitioner's first taxable year for which an election was to be made. T.D. 6764, 1964-2 C.B. 260, 265. Form 3646, requiring certain information from controlled corporations, was not in existence when petitioner filed its return for the taxable year ended October 31, 1964. Failure to comply with all the directions of the regulations caused no prejudice to the Internal Revenue Service, and since petitioner owned, directly or indirectly, all the foreign subsidiaries' stock, literal compliance would not have served any useful purpose. As soon as petitioner's tax manager learned during 1968 that written statements were to be filed with the OIO, he thereafter filed them with that office as directed by the regulations. Therefore, we think petitioner made a good-faith effort to comply with the applicable regulations. See Bell Fibre Products Corp., 65 T.C. 753, 764-765 (1976).

Finally, the regulations do not contemplate that they will be given the harsh literal reading here advocated by respondent. The failure of the controlling United States shareholder to provide notice of an election to a person required to be notified under the regulations does not invalidate the election made 'if it is established to the satisfaction of the Commissioner that reasonable cause existed for such failure.' Sec. 1.964-1(c)(3)(iii), Income Tax Regs. Further, if failure to take any action within the prescribed time period required in making an election is 'shown to the satisfaction of the Commissioner to be due to inadvertence or a reasonable cause,' the Commissioner may specify a later date for compliance. Sec. 1.964-1(c)(6), Income Tax Regs. Thus, mere inadvertence is sufficient to excuse a taxpayer's failure to timely take all the steps required for a valid election.

Since we have concluded, in the light of the facts of this case, that petitioner's returns and accompanying statements and schedule, filed with the District Director of Internal Revenue, substantially complied with the directions of the regulations, these 'escape' provisions are technically inapplicable. However, they serve to demonstrate that reason is to reign in applying the regulations. The written statement and place-of-filing directions are not intended to be traps for the unknowing. Rather, they are intended only to contribute to the effective administration of section 964, and in the **\*755** circumstances of this case, the form and content of the materials filed with the District Director served that purpose.

*Issue 2. Minimum Overall Tax Burden Test*

Section 963 permits a United States corporate shareholder to avoid a tax on its subpart F income where a timely election to take such exclusion was made and where certain prescribed standards of minimum distributions of earnings and profits to that shareholder were met.[FN16] The purpose of this provision is to relieve the United States shareholder of any tax with respect to the foreign subsidiary's undistributed income in those cases where the combined foreign tax and United States tax (to the extent the latter is paid on distributed income) is not substantially below the United States corporate tax rate. S. Rept. No. 1881, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 794. Thus, as the effective foreign tax rate increases, the required minimum distribution of earnings and profits by the foreign subsidiary decreases. S. Rept. No. 1881, supra, 1962-3 C.B. at 794-795; see tables in sec. 963(b). To qualify for this relief, however, a corporation is required under section 963(a)[FN17] to consent in its election to 'all the regulations prescribed by the Secretary or his delegate under this section.'

For its taxable year ended October 31, 1968, petitioner made a timely election under section 963. As reflected in our Findings, the foreign tax rate was sufficient to eliminate the necessity of any distribution in order to meet the minimum distribution requirements of section 963(b). There remains, **\*756** however, the issue as to whether the 'minimum overall tax burden' test prescribed by section 1.963-4(a), Income Tax Regs., to which petitioner consented, has also been met.

This separate and additional test prescribed by regulations section 1.963-4(a) is to be met by a chain or group of corporations, as in the case of HPSA and its subsidiaries, GmbH and VmbH.[FN18] It deals with the problem not covered by the express language of section 963, of a United States corporate shareholder receiving grossly unequal distributions from the members of a chain or group of controlled foreign corporations. The amount of such distributions could be arranged so as to take advantage of the varying foreign tax rates in the foreign countries involved and yet still satisfy the minimum distribution test. Allowance of such a practice would have distorted the balance contemplated by section 963 between the percentage of creditable foreign taxes and the percentage of earnings and profits required to be distributed. [FN19]

The means adopted to solve this problem was to require the actual overall foreign and United States tax burden on the earnings of a chain or group to be 90 percent of the tax which would have been imposed if those earnings and profits had been fully subject to United States taxation. If the overall burden was less than required, the United States shareholder might increase the distributions it received until the minimum **\*757** overall tax burden was met. Thus, the purpose of the 'minimum overall tax burden' test was to insure that the relief granted by the 'minimum distribution' provisions of section 963 was not abused by non-pro rata distributions.

The regulation (sec. 1.963-4(a)(1)(i)) provides that no exclusion should be allowed unless the overall United States and foreign income tax for the taxable year with respect to which the distribution is made equals or exceeds 90 percent of an amount determined by multiplying the sum of the consolidated earnings and profits and the consolidated foreign income taxes of the chain or group of corporations for the taxable year 'by a percentage which equals the sum of the normal tax rate and the surtax rate (determined without regard to the surtax exemption) prescribed by section 11 for the taxable year of the shareholder.' The issue is narrowed to whether the surcharge imposed by section 51 is added to this percentage for petitioner's taxable year ended October 31, 1968.

Petitioner contends that, since the surcharge rate was imposed by section 51 rather than section 11, only the normal tax rate and the surtax rate prescribed by section 11, without regard for the surcharge rate prescribed by section 51(a)(2), is multiplied by the consolidated earnings and profits ($7,002,953) of petitioner's chain of controlled foreign corporations. Ninety percent of the resulting amount ($3,361,417) is $3,025,276. Since this amount is less than the overall United States and foreign income tax ($3,172,537), petitioner maintains that it satisfied the test and is entitled to exclude HPSA's subpart F income pursuant to section 963.

Respondent contends that, in applying the 'minimum overall tax burden' test of regulations section 1.963-4(a)(1)(i), the surcharge rate prescribed by section 51(a)(2) is added to the normal tax rate and the surtax rate prescribed by section 11, and the total is multiplied by the consolidated (pretax) earnings and profits ($7,002,953) of petitioner's chain of controlled foreign corporations.[FN20] The result is $3,641,536, and **\*758** 90 percent of this amount is $3,277,382. Since this latter amount is greater than the overall United States and foreign income tax ($3,172,537), respondent contends that petitioner did not satisfy the test and is not entitled to exclude HPSA's subpart F income pursuant to section 963. We agree with respondent.

Section 51, added to the Internal Revenue Code by section 102(a) of the Act of June 28, 1968, Pub. L. 90-364, 82 Stat. 251, imposed a surcharge on the income of individuals, estates and trusts, and corporations. Section 51(a)(1)(B) imposed on the income of every corporation a tax computed as a percentage of the adjusted tax (as defined in section 51(b)) in addition to the other taxes imposed by chapter 1 of the Code. For corporations, the surcharge was applicable for taxable years ended after December 31, 1967, and beginning before July 1, 1970. Sec. 51; sec. 1.51-1(c)(2), Income Tax Regs. The stated purpose for the surcharge on the tax liabilities of business corporations was to dampen inflationary pressures and keep the economy under control. H. Rept. No. 91-413 (Part 1), 91st Cong., 1st Sess. (1969), 1969-3 C.B. 200, 309. The section was not expected or intended to be a permanent addition to the Code.

When the surcharge was added to the Code in 1968, the 'minimum distribution' provisions of section 963 were amended to reflect this original enactment. Sec. 102(b) of Act of June 28, 1968, Pub. L. 90-364, 82 Stat. 255. Subsequently, every time the surcharge was extended, section 963 was amended to take into account such extensions. Sec. 5(b) of Act of Aug. 7, 1969, Pub. L. 91-53, 83 Stat. 95; sec. 701(b) of Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 659. Thus, Congress expressly recognized the relationship between section 51 and the 'minimum distribution' provisions of section 963.

Moreover, section 51(f) laid down the general rule that the surcharge rate, where attributable to another tax-imposing section of chapter 1 of the Code, should be considered as emanating from such other section. That section reads as follows:

**\*759** For purposes of this title, to the extent the tax imposed by this section is attributable (under regulations prescribed by the Secretary or his delegate) to a tax imposed by another section of this chapter, such tax shall be deemed to be imposed by such other section.

Consistent with section 51(f), section 1.51-1(h)(1), Income Tax Regs., in part as follows, was adopted to provide that-

to the extent the tax imposed by section 51 is attributable to a tax imposed by another section of chapter 1 of the Code, such tax shall be deemed to be imposed by such other section. For example, if the only tax (other than the surcharge) imposed under chapter 1 of the Code to which a particular corporation is subject is the tax imposed by section 11, then the surcharge imposed on such corporation shall be deemed to be imposed by section 11. * * *

Thus, section 51(f) and this implementing regulation have the effect of treating the section 51 surcharge as imposed by section 11.

Therefore, we do not believe that it can be disputed that Congress fully intended that during the surcharge period, the surcharge rate should apply to section 963 and to any regulations promulgated thereunder. To hold otherwise would allow the erosion of the 'minimum distribution' provisions of section 963, which the 'minimum overall tax burden' test of the regulations was designed to prevent. No requirements less stringent than those of section 963(b) could be applied if section 1.963-4(a), Income Tax Regs., is to serve its intended purpose.

In reaching this conclusion, we are applying the same commonsense interpretation to regulations section 1.963-4(a) as we have applied in the discussion of the accelerated depreciation election issue,

above. The objective of this regulation section could not be achieved by reading it in isolation even though, as emphasized by petitioner, it is legislative in character. This section must be read in the light of section 51(f) and its implementing regulation which make it clear that the section 51 surcharge is to be deemed to have been imposed by section 11. While it might have been technically more elegant for the Commissioner to have amended section 1.963-4(a), Income Tax Regs., to refer to the temporary section 51 surcharge while it was in effect, we think it was permissible to achieve the same result by promulgating the general provision of section 1.51-1(h)(1), Income Tax Regs., quoted in pertinent part above.

*760 Since the surcharge rate imposed by section 51(a)(1)(B) must be added to the normal tax rate and surtax rate imposed by section 11 of chapter 1 of the Internal Revenue Code for that part of petitioner's taxable year within the surcharge period, petitioner failed to satisfy the 'minimum overall tax burden' test prescribed by section 1.963-4(a), Income Tax Regs., and is not entitled to exclude from gross income for the taxable year ended October 31, 1968, the subpart F income of HPSA.

The parties will be expected to file an appropriate motion in respect of the further handling of the severed issue.

An appropriate order will be issued.

FN1. Prior to the trial of this case, an issue concerning the computation of earnings and profits of certain of petitioner's controlled foreign corporations was severed for separate trial or other disposition pursuant to the Court's order dated June 10, 1976. More specifically, the severed issue concerns the basis for purposes of computing depreciation pursuant to sec. 167, I.R.C. 1954, and the regulations thereunder.

FN2. All section references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue, unless otherwise noted. References to certain Code sections which have been repealed subsequent to the periods herein before the Court are given in the present tense for purposes of this opinion.

FN3. If petitioner prevails on the accelerated depreciation election issue, the effective foreign tax rate will be higher than 47.38 percent, but this will have no bearing on the outcome of the minimum overall tax burden test issue.

FN4. The parties disagree as to the amount of the earnings and profits of petitioner's chain of controlled foreign corporations for the taxable year ended Oct. 31, 1968. This disagreement is the subject of the accelerated depreciation election issue. However, for the purpose of applying sec. 1.963-4(a)(1)(i), Income Tax Regs., and since the amount in disagreement is not sufficiently large to have a bearing on the outcome of the minimum overall tax burden test issue, the parties have agreed to regard the amount of $7,002,953 as the 1968 consolidated earnings and profits figure.

FN5. See Cook, 'Problems in computing earnings and profits of a controlled foreign corporation,' 25 J. Taxation 48 (July 1966); Weiss, 'Application of American Accounting Methods To Foreign Operations: Government Objectives in Setting Up Accounting Requirements,' 23d Ann. N.Y.U. Tax Inst. 981 (1965).

FN6. Sec. 1.964-1 Determination of the earnings and profits of a foreign corporation.(c) Tax adjustments-* * *(3) Action on behalf of corporation-(i) In general. An election shall be deemed made, or an adoption or change in method of accounting deemed effectuated, on behalf of the foreign corporation only if its controlling United States shareholders (as

defined in subparagraph (5) of this paragraph)-(a) Satisfy for such corporation any requirements imposed by the Code or applicable regulations with respect to such election or such adoption or change in method, such as the filing of forms, the execution of consents, securing the permission of the Commissioner, or maintaining books and records in a particular manner,(b) File the written statement described in subdivision (ii) of this subparagraph at the time and in the manner prescribed therein, and(c) Provide the written notice required by subdivision (iii) of this subparagraph at the time and in the manner prescribed therein.(ii) Written statement. The written statement required by subdivision (i) of this subparagraph shall be jointly executed by the controlling United States shareholders, shall be filed with the Director of International Operations, Internal Revenue Service, Washington, D.C., 20225, within 180 days after the close of the taxable year of the foreign corporation with respect to which the election is made or the adoption or change of method effected, or before May 1, 1965, whichever is later, and shall set forth the name and country of organization of the foreign corporation, the names, addresses, and stock interests of the controlling United States shareholders, the nature of the action taken, the names and addresses of all other United States shareholders notified of the election or adoption or change of method, and such other information as the Commissioner may by forms require.

FN7. This requirement of the regulation was amended in 1974 to provide for filing the written statement with the Director of the Internal Revenue Service Center, 11601 Roosevelt Blvd., Philadelphia, Pa. 19155. T.D. 7322, 1974-2 C.B. 216, 217.

FN8. Although, for purposes of choosing a method of depreciation, previously acquired assets are treated as new assets in the first post-1962 taxable year, we express no opinion as to the basis from which depreciation is taken on these used assets. This is involved in the severed issue.

FN9. Since petitioner was the sole shareholder of HPSA, GmbH, and VmbH at all times material herein, as explained above in the text, the notification requirement of sec. 1.964-1(c)(3)(iii), Income Tax Regs., although referred to in the discussion that follows, is technically not applicable.

FN10. Respondent emphasizes that the regulations here involved are 'legislative' in character in the sense that they were adopted pursuant to the specific delegation of authority contained in sec. 964(a), quoted above, and for this reason should be literally observed. The statute involved in each of the cases cited above in the text contains similar authorizations. Yet the Court in each of those cases rejected an argument that the taxpayer was required to comply literally with the procedural directions in the applicable regulation.

FN11. This information is also provided in Form 2952 (entitled 'Information Return by a Domestic Corporation with Respect to Controlled Foreign Corporations') and the statement of 'Investments in Affiliates' filed with the return.

FN12. Sec. 1.964-1(c)(4), Income Tax Regs., provides in part as follows:(4) Effect of action by controlling United States shareholders. Any action taken by the controlling United States shareholders on behalf of the foreign corporation pursuant to subparagraph (3) of this paragraph shall be reflected in the computation of the earnings and profits of such corporation under this section to the extent that it bears upon the tax liability of a United States shareholder who either-(i) Was a controlling United States shareholder with

respect to the action taken;(ii) Received the written notice provided by subparagraph (3) (iii) of this paragraph;(iii) Failed to file any of the returns required by section 6046 and the regulations thereunder within the period prescribed by section 6046(d); or(iv) Was notified by the Director of International Operations of the action taken-(a) Within 240 days after the close of the taxable year (of the foreign corporation) to which such action first relates, or(b) Within 180 days after the close of the first taxable year in which such shareholder becomes a United States shareholder, or(c) Before July 1, 1965, whichever is latest.Subdiv. (iv) was amended in 1965 by T.D. 6829, 1965-2 C.B. 258, but such amendment was merely directory and does not change the thrust of the regulation.

FN13. In 1974, pursuant to T.D. 7322, 1974-2 C.B. 216, 217, previously referred to in n. 7 above, the place of filing Forms 959 was changed from the Director of International Operations (OIO) to the 'Internal Revenue Service Center designated in the instructions of the applicable form.' Sec. 1.6046-1(j)(2), Income Tax Regs. The instructions of Form 959 designate the Philadelphia Service Center, the same place T.D. 7322 requires the written statement to be filed.

FN14. Respondent's brief summarizes the reasons for directing the filing of the written statements with the Director of International Operations as follows:1. To afford the Office of International Operations (OIO), Internal Revenue Service, the opportunity to give notice of the action taken to persons whose status as United States shareholders is established by OIO's records but is unknown to the controlling United States shareholders.2. To assure that a single earnings and profits figure for the controlled foreign corporation would be arrived at rather than different earnings and profits figures for each shareholder of the controlled foreign corporation.3. To provide a central reference point for other shareholders and/or the Internal Revenue Service to determine if and when an election had been made or if an adoption or change of a method of accounting had been effectuated and from which to review and examine the nature and/or the sufficiency of an election made or the adoption or change of a method of accounting effectuated.

FN15. Since the issue as to the basis of the depreciated assets was severed for separate trial or settlement, the record contains few details as to the property owned by each of the controlled foreign corporations or as to the property on hand at the beginning of, or acquired during, each of the years before the Court.

FN16. Sec. 963 was repealed by sec. 603(a)(1) of Pub. L. 94-12 (Mar. 29, 1975), 89 Stat. 58, effective (sec. 602(f) of Pub. L. 94-12, 89 Stat. 64) for taxable years of foreign corporations beginning after Dec. 31, 1975, and for taxable years of U.S. shareholders within which or with which such taxable years of such foreign corporations end.

FN17. SEC. 963. RECEIPT OF MINIMUM DISTRIBUTIONS BY DOMESTIC CORPORATIONS. (a) GENERAL RULE.-In the case of a United States shareholder which is a domestic corporation and which consents to all the regulations prescribed by the Secretary or his delegate under this section prior to the last day prescribed by law for filing its return of the tax imposed by this chapter for the taxable year, no amount shall be included in gross income under section 951(a)(1)(A)(i) for the taxable year with respect to the subpart F income of a controlled foreign corporation, if-(1) in the case of a controlled foreign corporation described in subsection (c)(1), the United States shareholder receives a minimum distribution of the earnings and profits for the taxable year of such controlled foreign corporation;

FN18. This regulation was promulgated under sec. 963(f), which provides in part that the Secretary of the Treasury- shall prescribe such regulations as he may deem necessary to carry out the provisions of this section, including regulations for the determination of the amount of foreign tax credit in the case of distributions with respect to the earnings and profits of two or more foreign corporations.

FN19. In its brief, petitioner presents the following example which illustrates the problem of non-pro rata distributions from members of a chain or group of controlled foreign corporations to a U.S. corporate shareholder:'if in 1966 two controlled foreign corporations had equal pre-tax earnings but were subject to effective tax rates of 30 percent and 50 percent respectively, the effective foreign tax rate would have been 40 percent. This rate would have been the basis for determining the minimum distribution under Code section 963(b), in this hypothetical case 37 percent. If the foreign corporation taxed at 50 percent had distributed 75 percent of its earnings, the test would have been satisfied. But the United States would have received no taxes because of the 50 percent foreign tax credit. If the distribution had been pro rata, the United States would have collected tax on the half distributed from the corporation taxed at 30 percent.'

FN20. For the calendar year 1968, sec. 51(a)(1)(B) imposed a surcharge on corporations equal generally to 10 percent of their tax liability without regard to the surcharge. Sec. 51(a)(2)(A) provided that the surcharge would be allocated for fiscal years according to the number of days falling in the surcharge period. For petitioner's taxable year ended Oct. 31, 1968, 83.3 percent of the days of that fiscal year were within the surcharge period. As a result, the applicable surcharge rate was 4 percent (.48 .10 .833 = .039984).

Tax Court 1977.
HEWLETT-PACKARD CO.
67 T.C. 736

END OF DOCUMENT

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

THOMSON
RIA

Page 285

## 41 F.3d 285

### 74 A.F.T.R.2d 94-7034, 18 Employee Benefits Cas. 2589,
### Pens. Plan Guide P 23903B

### Nicolette Anne BUTLER, Plaintiff-Appellee,
### v.
### ENCYCLOPEDIA BRITTANICA, INC., a New York Corporation, and
### Equitable Life Assurance Society of the United
### States, Defendants-Appellees,
### and
### Anthony J. Cotini, Defendant-Appellant.
### Nicolette Anne BUTLER, Plaintiff-Appellee,
### v.
### ENCYCLOPEDIA BRITTANICA, INC., a New York Corporation,
### Defendant-Appellant.

### Nos. 94-1271, 94-1418.

### United States Court of Appeals,
### Seventh Circuit.

### Argued Sept. 8, 1994.
### Decided Nov. 23, 1994.
### Rehearing and Suggestion for Rehearing En Banc Denied Dec.
### 20, 1994. *

Page 286

John J. Casey, Chicago, IL (argued), for Nicolette Anne Butler.

Marcia E. Goodman (argued), Joan E. Brophy, Joyce L. Meyer, Mayer, Brown & Platt, Chicago, IL, for Encyclopaedia Brittanica, Inc.

Shelley R. Smith, Ronald N. Lorenzini, Jr., Kemp, Grzelakowski & Lorenzini, Oak Brook, IL, for Equitable Life Assur. Soc. of U.S.

George N. Vurdelja, Jr. (argued), Griswold L. Ware, Vurdelja & Associates, Chicago, IL, for Anthony J. Cotini.

Before COFFEY and ROVNER, Circuit Judges, and FOREMAN, District Judge. **

FOREMAN, District Judge.

This action was brought under the Employee Retirement Income Security Act

(ERISA), 29 U.S.C. Secs. 1001-1461, to determine the proper distribution of pension and savings plan benefits accumulated by an employee of the Encyclopedia Brittanica company who is now deceased. The district court's decision awarding all of these benefits to the decedent's daughter is affirmed in part and reversed in part.

## I. FACTS

Celia Cotini was an employee of Encyclopedia Brittanica and a participant in the company's Pension Plan and Savings Plan, both of which are governed by ERISA. Prior to her death, she had filed beneficiary designation forms that purported to designate her daughter, Nicolette Butler, as the beneficiary under both plans. Part of each form contained a "Spouse's Waiver of Primary Beneficiary Designation" which stated that Celia Cotini's spouse, Anthony Cotini, consented to the designation of a different primary beneficiary. [1]

Page 287

For purposes of the summary judgment motions submitted to the district court, Anthony Cotini admitted that his signature on the forms was authentic. However, he argues that the forms are invalid because his signature was not witnessed by a plan representative or a notary public as required by ERISA. A notary public's signature appears on the documents, but Cotini contends that he was never physically present before the notary and, therefore, the notary did not actually witness him signing the documents. He further asserted that he did not read the forms carefully when he signed them.

The notary, Louise Joslyn, stated that she does not know Anthony Cotini and had no recollection as to whether he had personally appeared before her to sign the documents. Joslyn stated that her general practice is to see the person actually sign a document before she will notarize it. However, she stated that she sometimes notarized documents without the signing party being present, particularly when an employee asked her to notarize a document that the employee claimed was signed by the employee's spouse.

After Celia Cotini's death, Encyclopedia Brittanica paid the Savings Plan benefits to Nicolette Butler based upon the beneficiary designation form for that plan. However, the company determined that Butler was not entitled to benefits under the Pension Plan. The company stated that because Celia Cotini had died before she retired, the Pension Plan provided a "preretirement spouse's death benefit" rather than a retirement benefit. Under the terms of the plan, Encyclopedia Brittanica determined that only Anthony Cotini, as the surviving spouse, was eligible for the spouse's death benefit.

Butler filed a complaint seeking a declaratory judgment of her rights under the pension and savings plans and an injunction to prevent Encyclopedia Brittanica from paying any of the benefits under either plan to Anthony Cotini. Cotini filed a counterclaim against Butler and a cross-claim against Encyclopedia Brittanica for the Savings Plan benefits.

On cross-motions for summary judgment, the district court held in favor of Butler under both plans. Butler v. Encyclopaedia Brittanica, Inc., 843 F.Supp. 387 (N.D.Ill.1994). Brittanica and Cotini have appealed the district court's decision with respect to the Pension Plan. Cotini also appeals the adverse ruling on the Savings Plan. [2]

## II. ANALYSIS

A district court's review of a denial of benefits under an ERISA plan is de novo

Page 288

unless the plan gives the administrator discretion to interpret plan terms or determine benefits eligibility. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80 (1989). There is no dispute that Encyclopedia Brittanica had such discretion in this case. Thus, the administrator's decision is reviewed under an arbitrary and capricious standard. Loyola Univ. of Chicago v. Humana Ins. Co., 996 F.2d 895, 898 (7th Cir.1993) ("In the event that the administrator's discretion is unrestrained or limited only by the requirement of good faith, the arbitrary and capricious standard of review is proper."). We review the district court's order granting a motion for summary judgment under a de novo standard. Kreutzer v. A.O. Smith Corp., 951 F.2d 739, 743 (7th Cir.1991).

## A. Butler's Entitlement to Pension Plan Benefits

Encyclopedia Brittanica's Pension Plan provides three basic types of benefits: Article VI provides the "Normal Retirement Benefit" for employees who terminate their employment on or after attaining normal retirement age; Article VII provides an "Early Retirement Benefit" for employees who terminate their employment on or after attaining early retirement age but before attaining the normal retirement age; and Article X provides "Pre-Retirement Death Benefits" in the case where an employee dies before he or she begins receiving retirement benefits. Celia Cotini died at age 65 while still employed by Encyclopedia Brittanica. Therefore, Article X provides the applicable benefit.

In denying Butler's claim, Encyclopedia Brittanica found that the preretirement death benefit in section 10.2 of the pension plan is available only to a surviving spouse, and the plan did not allow an employee or spouse to waive this benefit in favor of another beneficiary. The district court rejected this interpretation, finding that waiver was clearly allowed under Article XI of the plan. We find that the district court's construction was certainly plausible. However, a review of the Pension Plan as a whole shows that Encyclopedia Brittanica's interpretation is equally permissible and, therefore, not arbitrary and capricious.

Article X provides, in pertinent part, as follows:

10.1. General. If a Member dies before a Benefit Commencement Date ..., there shall be no death benefits payable except those specified in this Article X.

10.2. Pre-Retirement 100% Spouse's Death Benefit.

(a) Entitlement. A Pre-Retirement 100% Spouse's Death Benefit will be payable if a Member dies before a Benefit Commencement Date, is survived by his Eligible Spouse, and--

. . . . .

(2) dies while employed by an Employer or an Affiliate, provided he has attained Early Retirement Age or Normal Retirement Age, ...

. . . . .

There shall be no reduction in a Member's Accrued Benefit on account of death benefit coverage under this Section.

(b) Amount. The amount of the monthly benefit payable to the surviving Eligible Spouse is the amount of the hypothetical monthly early retirement benefit which would have been payable during the life of the Member if the Member had retired on the first day of the month following the month in which he died and his retirement benefit was payable in the form of the Five-Year Certain Joint and Survivor's Annuity described in subsection 11.5(c), with 100% of the amount payable to the Member continued to the Eligible Spouse....

(c) Commencement and Payment. Such death benefit shall be payable as of the first day of the calendar month following the month in which the Member died, and shall be payable monthly for the remainder of the Eligible Spouse's Life, but in no case shall fewer than 60 monthly payments be made. Notwithstanding the preceding sentence, if the lump sum Actuarial Equivalent of the Eligible Spouse's death benefit is $3,500 or less, the Plan Administration Committee shall pay such lump sum amount to the Eligible Spouse in

Page 289

lieu of the Pre-Retirement 100% Spouse's Death Benefit.

. . . . .

10.3 Pre-Retirement 50% Spouse's Death Benefit.

(a) Entitlement. A Pre-Retirement 50% Spouse's Death Benefit will be payable if a Member dies after he has completed five years of Vesting Service or has attained Normal Retirement Age and before his death qualifies his Eligible Spouse for a death benefit under Section 10.2, and if the Member is survived by his Eligible Spouse, regardless of whether the Member is employed by an Employer at the time of his death.

. . . . .

Fastcase
Case 1:07-bk-10312-GM   Doc 105-1   Filed 10/10/08   Entered 10/10/08 12:07:38   Desc
Appendix Authorities Relied Upon In Brief   Page 37 of 47

Page 5 of 15

10.4 Pre-Retirement Single Sum Death Benefit.

(a) Entitlement. A Pre-Retirement Single Sum Benefit shall be payable to the Beneficiary of a Member upon the Member's death unless either the Pre-Retirement Spouse's Death Benefit described in either Section 10.2 or Section 10.3 is payable or a single sum distribution was elected by a Member under subsection 8.3(b).

(b) Amount. The Pre-Retirement Single Sum Death Benefit shall be the Member's Accumulated Contributions on the date as of which the benefit is payable.

(c) Payment. The Pre-Retirement Single Sum Death Benefit shall be paid to the Beneficiary as soon as administratively practicable following the Plan Administration Committee's receipt of proof of the Member's death.

Section 10.2 obviously is the applicable provision here because Celia Cotini died after reaching normal retirement age but while still employed by Encyclopedia Brittanica. The clear language of this section provides that the death benefit is payable to the eligible spouse; there is no provision within this section that would allow the spouse to waive the benefit. The district court, however, found that waiver was allowed under section 11.7 of the plan, which provides:

11.7. Beneficiary. A Member, from time to time, by signing a form furnished by the Plan Administration Committee, may designate any legal or natural person or persons (who may be designated contingently or successively) to whom any benefits to which a Beneficiary may become entitled under the Plan are to be paid and the form in which such benefits are to be paid if the Member dies before he receives all of such benefits; provided, however, that if a Member is married on the date of his death, any designation of a form of benefits or of a person other than his Eligible Spouse as Beneficiary shall be effective only if consented to in writing by his Eligible Spouse, which consent may not be changed without spousal consent (unless the consent of the Eligible Spouse expressly permits designations by the Member without any requirement of further consent by the spouse). Such consent must be in writing filed with the Plan Administration Committee, must acknowledge the effect of such consent and must be witnessed by a notary public or a Plan representative appointed or approved by the Plan Administration Committee. A Beneficiary designation form will be effective only when the signed form is filed with the Plan Administration Committee while the Member is alive and will cancel all Beneficiary designation forms signed earlier. Except as otherwise specifically provided in this Section, if a deceased Member failed to designate a Beneficiary as provided above, or if the designated Beneficiary of a deceased Member dies before him or before complete payment of the benefits to which a Beneficiary may otherwise become entitled, such benefits shall be paid to the Member's surviving spouse or, if there is no surviving spouse, to the Member's surviving children (per stirpes) or, if he has no children, to the legal representative or representatives of the estate of the last to die of the Member and his Beneficiary.

Under the district court's interpretation, section 11.7 "unambiguously provides that 'any benefits' due to a beneficiary may be designated to be paid to any person

provided the eligible spouse consents." Butler, 843 F.Supp. at 395. The key question is what is meant by the phrase "any benefits to which a

Page 290

Beneficiary may become entitled under the Plan." The district court concluded that Article X's preretirement death benefit was a benefit due to a beneficiary because section 2.1(g) of the Pension Plan defines a beneficiary as "any person, persons or entity described in Section 11.7 entitled to receive death benefits[ ]" and eligible spouses are among the persons described in section 11.7 as being entitled to death benefits. In other words, the district court found that eligible spouses could be considered beneficiaries under section 11.7. Therefore, any benefit payable to an eligible spouse is a benefit that can be waived and paid to another beneficiary.

Encyclopedia Brittanica argues that the district court read section 11.7 too broadly and out of its proper context. Under the company's interpretation, section 11.7 merely identifies the mechanism for designating a particular person or entity as a beneficiary; it was not intended to identify the types of benefits that may be paid to a beneficiary. The latter is accomplished through other provisions in the plan. Specifically, Article X itself states that benefits under sections 10.2 and 10.3 are payable to an "Eligible Spouse" while section 10.4 provides for payments to a "Beneficiary." See Pension Plan Sec. 10.2(b) ("The amount of the monthly benefit payable to the surviving Eligible Spouse...."); id. Sec. 10.3(b) (same); id. Sec. 10.4 (a) ("A Pre-Retirement Single Sum Benefit shall be payable to the Beneficiary of a Member...."). Thus, while eligible spouses may also be named as beneficiaries under section 11.7, that only means that the spouse will receive the benefits that the plan provides for a "beneficiary;" it does not mean that the benefits that have been expressly earmarked for an "eligible spouse" also must be considered as benefits that are due to a "beneficiary."

We find Encyclopedia Brittanica's construction reasonable given the overall structure of the Pension Plan. As the company points out, Articles VI through X of the plan are intended to establish the retirement benefits that are available and the persons who qualify for such benefits while Article XI, entitled "Retirement Settlement Forms," establishes the mechanisms or procedures for obtaining those benefits--i.e., how the benefits are to be paid out. For example, section 11.2 provides that an employee who is married to an eligible spouse on the benefit commencement date generally "shall receive his retirement benefit in the form of the Qualified Joint and 50% Spouse's Annuity...." However, sections 11.2 and 11.3 provide that an employee and his spouse may elect to receive their benefits in another form, such as a "Five Year Certain Life Annuity" or a "Five Year Certain Joint and Survivor's Annuity." Section 11.5 describes how benefits are paid under each form of annuity. Within the context of these provisions in Article XI, then, it makes sense to view section 11.7 as merely a procedural provision that establishes the mechanism for naming a person or entity as a beneficiary on the retirement settlement forms.

Encyclopedia Brittanica's construction is also consistent with ERISA's requirements and the applicable tax regulations. Every pension plan governed by

ERISA must provide that if a vested participant in the plan dies before receiving benefits, a "qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant." 29 U.S.C. Sec. 1055(a)(2); 26 C.F.R. Sec. 1.401(a)-20. [3] ERISA states, as a general rule, that every plan must provide that a participant and his spouse may elect to waive this benefit. 29 U.S.C. Sec. 1055(c)(1). ERISA further requires that

(2) Each plan shall provide that an election under [Sec. 1055(c)(1) ] shall not take effect unless--

(A)(i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits designations by the participant without

Page 291

any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public ...

Id. Sec. 1055(c)(2), and that every plan shall provide each participant with a written explanation of the terms and conditions of the qualified preretirement survivor annuity. Id. Sec. 1055(c)(3)(B). This writing must explain not only the terms and conditions of the qualified preretirement survivor annuity, but also the effect of an election to waive the benefit, the spouse's right's under Sec. 1055(c)(2), and the right to revoke the waiver. Id.

Encyclopedia Brittanica argues that its plan fails to comply with all of the requirements in this section of ERISA. Although section 11.7 of the plan arguably could be interpreted as allowing a spouse to waive the preretirement death benefit, thus satisfying the requirements of Sec. 1055(c)(2), Encyclopedia Brittanica points out that its plan does not provide the written explanation required by Sec. 1055(c)(3) with respect to the preretirement death benefits. [4] Accordingly, the Pension Plan would be in violation of ERISA if, as the district court found, the plan allows for waiver of these benefits.

Significantly, ERISA provides that these requirements shall not apply if the qualified preretirement survivor annuity benefit "may not be waived (or another beneficiary selected) and if the plan fully subsidizes the costs of such benefit." Id. Sec. 1055(c)(5)(A). The parties do not dispute that this benefit is fully subsidized by Encyclopedia Brittanica. The company, therefore, argues that its interpretation of the plan would be in full compliance with Sec. 1055(c)(5) because its interpretation would not allow the preretirement death benefit to be waived. Accordingly, the company argues that its construction is preferable to the district court's interpretation, which could have adverse tax ramifications for the plan.

As a final policy matter, Encyclopedia Brittanica argues that the district court's

Fastcase
Case 1:07-bk-10312-GM    Doc 105-1    Filed 10/10/08    Entered 10/10/08 12:07:38    Desc
Appendix Authorities Relied Upon In Brief    Page 40 of 47

Page 8 of 15

interpretation would create a benefit disparity between married and unmarried employees. This disparity would result from the fact that the preretirement death benefit is available only when a plan participant has a surviving spouse. Under the district court's interpretation, the plan would allow married participants to waive this benefit in favor of their children, grandchildren or other beneficiary. However, unmarried participants would not have such a benefit that their beneficiaries could receive. Encyclopedia Brittanica's desire to avoid this inequity establishes an additional sound basis for interpreting its plan as prohibiting such a waiver.

Under the arbitrary and capricious standard, we will not upset Encyclopedia Brittanica's determination unless it is "downright unreasonable." Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 380 (7th Cir.1994) (quoting Fuller v. CBT Corp., 905 F.2d 1055, 1058 (7th Cir.1990)).

"[A] court will not set aside the denial of a claim if the denial is based on a reasonable interpretation of the relevant plan documents." Nor will it do so where the trustee has based its decision " 'on a consideration of the relevant factors' " that encompass the " 'important aspect[s] of the problem' " before it. If the trustee makes an informed judgment and articulates an explanation for it that is satisfactory in light of the relevant facts, i.e., one that makes a "rational connection" between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached, then the trustee's decision is final.

Cuddington v. Northern Indiana Pub. Serv. Co., 33 F.3d 813, 817 (7th Cir.1994) (quoting Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund, 900 F.2d 1138, 1141 (7th Cir.1990)). Based upon the foregoing analysis, Brittanica's denial of benefits was clearly based upon a reasonable interpretation of its plan. Therefore,

Page 292

while the district court's interpretation may have merit of its own, Brittanica's construction must prevail.

The language used on the beneficiary designation form and in an employee booklet describing the pension benefits do not compel a different result. The beneficiary designation form states that "I [the employee] designate the following person as my primary beneficiary to receive--in the event of my death--any amounts payable to my beneficiary under the terms and provisions of the Encyclopaedia Brittanica Pension Plan." (Emphasis added). The spouse's consent to the waiver acknowledges that "any amounts payable to my spouse [i.e., the covered employee] under the terms and provisions of the Encyclopaedia Brittanica Pension Plan will be paid--in the event of my spouse's death--to the designated primary beneficiary." (Emphasis added). This language is consistent with Encyclopedia Brittanica's interpretation that a beneficiary can be designated to receive only those benefits that are expressly earmarked for a "beneficiary" under the pension plan, such as the benefits in section 10.4 and 11.5(a) and (c).

The employee booklet's description of the plan also supports Encyclopedia Brittanica's interpretation. The booklet states that "[y]our eligible spouse will be entitled to a spouse's benefit if you die before your pension benefit starts...." After explaining how the amount of the benefit is calculated, the booklet states: "If you do not have an eligible spouse, or you don't meet the requirements for an eligible spouse's benefit when you die, your beneficiary will receive a single payment of any contributions you made before May 1, 1985, with interest." The booklet goes on to state:

How to Enroll

You do not have to sign an enrollment form to be a member of the EarningsPlus Pension Plan since you are automatically covered when eligible. However, you should sign a beneficiary designation form to ensure that any benefit due if you die before retirement is paid to the person of your choice.

The latter statement, if taken alone, might suggest that a beneficiary could be designated to receive any benefits available under the plan. However, when read in its proper context, the provision does not establish such a right; it merely states the proper procedure to be followed to name the beneficiary who is to receive the single sum payment of an employee's contributions to the pension plan if the employee dies without an eligible spouse.

Moreover, as Encyclopedia Brittanica points out, this booklet was distributed in May 1985 as an initial announcement of the general terms of the new pension plan. The booklet expressly cautions that it "only summarizes the key features of the EarningsPlus Program, and is not a substitute for the appropriate plan documents, which will legally govern the Program." The booklet was superseded in July 1985 by an official Summary Plan Description that states with respect to naming a beneficiary: "You must name someone as your beneficiary to receive any benefits payable upon your death that are not paid automatically to your spouse." (Emphasis added). There is no indication whatsoever that the spouse's benefits can be waived in favor of another beneficiary.

For these reasons, we find that Encyclopedia Brittanica's decision to deny Butler's claim for the preretirement death benefits was not arbitrary and capricious. Accordingly, the district court's judgment in favor of Butler must be reversed and remanded to enter judgment in favor of Cotini, Encyclopedia Brittanica, and the Equitable Life Assurance Society of the United States with respect to the Pension Plan benefits.

B. Validity of the Spousal Consent Form

Anthony Cotini argues that Nicolette Butler is not entitled to the benefits under either the Pension Plan or the Savings Plan because the beneficiary designation forms submitted by Celia Cotini were invalid. Because we have already determined that Butler cannot receive the pension funds, we will address only the validity of the beneficiary form for the Savings Plan. [5]

Page 293

As set forth above, ERISA provides that if a pension plan allows a participant to waive a qualified joint and survivor annuity or a qualified preretirement survivor annuity, then the plan must provide that such a waiver shall not take effect unless the participant's spouse consents in writing to the waiver. 29 U.S.C. Sec. 1055(c)(2). The parties agree that this requirement also applies to the Savings Plan because ERISA Sec. 1055(b)(1)(C), which applies to individual account plans, incorporates the spousal consent rules in Sec. 1055(c)(2). Id. Sec. 1055(b)(1)(C)(i).

Section 1055(c)(2) further states that the waiver is not valid unless the spouse's written consent "acknowledges the effect of such election and is witnessed by a plan representative or a notary public...." Id. Sec. 1055(c)(2)(A)(iii). The Savings Plan incorporates this requirement in section 2.1(b), which states that the participant's "beneficiary" under the Savings Plan is the participant's spouse unless the spouse consents to the designation, which "shall be in writing, shall acknowledge the effect of such designation, shall be witnessed by a Plan representative or a notary public...."

Anthony Cotini does not dispute the fact that the form he signed acknowledged the effect of his waiver. However, he contends that the consent form is invalid because he did not sign the document in the physical presence of a plan representative or a notary public and, therefore, the document was not "witnessed" as required by Sec. 1055(c)(2).

Cotini's argument has considerable appeal, given the usual dictionary definition of the word "witness" as meaning "[t]o see or observe. To act as an observer for the purpose of attesting." Ballentine's Law Dictionary 1375 (3d ed. 1969). In fact, the district court appears to acknowledge that the literal terms of Sec. 1055(c)(2) would impose a physical presence requirement because if a consent form is not signed in the presence of the notary public or plan representative, "there is a risk that the signature is not genuine." Butler, 843 F.Supp. at 396. But the district court went on to state that there is no such risk in this case because Cotini acknowledged that he had signed the documents. Thus, the district court concluded that "[t]he purposes of the statute are satisfied where the spouse does not dispute his signature on the form, but signed it outside the presence of any notary public or plan representative." Id.

Cotini argues that the manifest purpose of the spousal consent requirement was to ensure that a spouse is "involved in making choices with respect to retirement income on which the spouse may also rely." S.Rep. No. 575, 98th Cong., 2d Sess. 12 (1984), reprinted in 1984 U.S.C.C.A.N. 2547, 2558; Pedro Enter., Inc. v. Perdue, 998 F.2d 491, 494 (7th Cir.1993) ("we understand the ERISA requirements of acknowledgment, writing and notarization to reflect the concern that any waiver be knowing and considered."). In his view, this purpose is served only by requiring that the spouse sign the document in the presence of a notary public or plan representative. We disagree.

If the intent of Congress was to ensure that spouses participate in the waiver

decision, that purpose is served by the fact that the consent form contains language acknowledging the effect of such election. When a spouse ascribes his or her signature beneath such an acknowledgment, the spouse has affirmatively participated in the decision to waive the applicable benefits. Contrary to Cotini's view, physical presence before a notary would not ensure that the spouse had read and understood the legal ramifications of that acknowledgment. A notary's function is simply to certify the validity of the signature; the notary does not attest to the validity of the statements made in the document itself. Commonwealth v. Frey, 258 Pa.Super. 288, 292, 392 A.2d 798, 800 (1978) ("notarization certifies the fact of execution by a person who purports to be the signer but not any fact beyond that...."); Uniform Laws on Notarial Acts Sec. 2 comment. (1982) (in witnessing or attesting a signature, "only the fact of the signature, not the intent to execute the instrument, is certified by the notarial officer."); cf. 58 Am.Jur.2d Notaries Public Sec. 75 (1989) ("the notary's certificate is not deemed to certify or guarantee the facts stated in the instrument to which it is attached,

Page 294

and to hold otherwise would make the surety on the notary's bond an insurer of all statements contained in the instrument notarized.").

There is nothing in ERISA's statutory language that would suggest that anything more than the usual notarization procedures are required to "witness" the consent form. Thus, we find that ERISA would not require the notary or plan representative to question whether a spouse fully understands the effect of what he or she is signing or otherwise attempt to ensure that a spouse has made an informed and knowing consent.

Cotini argues that the district court's decision circumvents ERISA's literal language and, in effect, upholds Encyclopedia Brittanica's decision under a substantial compliance theory. He argues that this court rejected a substantial compliance argument in an analogous ERISA case. Production and Maintenance Employees' Local 504 v. Roadmaster Corp., 954 F.2d 1397 (7th Cir.1992).

At issue in Roadmaster was whether the company had complied with ERISA Sec. 204(h), which requires "a written notice ... to each participant" whenever an ERISA plan is amended. The company argued that it fulfilled this requirement when it sent a letter to the union and posted a notice on company bulletin boards. In rejecting this argument, this court noted that the clear language of ERISA mandated individual notice to each participant. Id. at 1403. However, the opinion does not rest on that decision alone; it goes on to state that even if Sec. 204(h) were construed to allow a general posted notice, that notice must still be designed to reach "each participant." When Roadmaster posted its notice, many employees were on vacation and the company admitted that not all of its employees could have seen the notices. Thus, the posted notice did not fulfill the statutory purpose of ensuring that every participant received notice of the amendment. In view of these alternative holdings, Roadmaster strongly suggests that compliance with ERISA's literal terms is required but the decision does not necessarily foreclose the possibility that the substantial

compliance doctrine may be invoked in a proper case.

Butler and Encyclopedia Brittanica, on the other hand, have failed to cite any authority that has applied the substantial compliance doctrine to an unambiguous ERISA requirement. We are aware of a recent Fourth Circuit case which adopted the substantial compliance doctrine. Phoenix Mut. Life Ins. Co. v. Adams, 30 F.3d 554, 562-65 (4th Cir.1994). However, the court did so as a matter of federal common law based upon the fact that ERISA was silent on the particular issue before the court. As this court and others have held, "[c]ourts may develop ... a federal common law only where ERISA itself 'does not expressly address the issue before the court.' " Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 647 (7th Cir.1993) (quoting Nachwalter v. Christie, 805 F.2d 956, 959 (11th Cir.1986)). Thus, we cannot adopt a substantial compliance doctrine as a matter of federal common law in this case if it would conflict with ERISA's literal requirement that a spousal consent be "witnessed."

The Supreme Court has recognized that courts, in interpreting a statute, "[u]nquestionably ... have some 'scope for adopting a restricted rather than a literal or usual meaning of its words where acceptance of that meaning would lead to absurd results ... or would thwart the obvious purpose of the statute.' " Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965) (quoting Helvering v. Hammel, 311 U.S. 504, 510-11, 61 S.Ct. 368, 371, 85 L.Ed. 303 (1941)). Arguably, compliance with ERISA's literal language in this case would lead to the absurd result of invalidating a spousal consent form that Anthony Cotini admits that he signed but now attempts to disavow on the technicality that he did not sign it in the physical presence of the notary. We need not resolve this issue, however, because even if we were to apply a strict construction of the witnessing requirement, we find that Cotini lacks sufficient evidence to prove that the consent form he signed was not properly witnessed.

A notary public's certificate of acknowledgment, regular on its face, carries a strong presumption of validity. 1 Am.Jur.2d

Page 295

Acknowledgments Sec. 83 (1994) ("If a certificate of acknowledgment is complete and regular on its face, the facts stated in the certificate are presumed to be true [;] ... it is also presumed ... that the legal duties incumbent upon the officer in doing so have been properly performed."). Accordingly, the courts have held that in order to overcome this presumption, clear and convincing evidence is required. See, e.g., id. Sec. 84; Witt v. Panek, 408 Ill. 328, 333, 97 N.E.2d 283, 285 (1951) ("the rule is that the record of conveyance and the certificate of acknowledgment can be overcome only by proof which is clear, convincing and satisfactory, and by disinterested witnesses."). [6]

The notary's certificate in this case unambiguously states that Anthony Cotini appeared personally before the notary on August 27, 1990, and executed the spousal consent form. Cotini's evidence attacking the certificate falls far short of the clear and convincing standard. Although he states that he was never physically present before

Fastcase
Case 1:07-bk-10312-GM    Doc 105-1    Filed 10/10/08    Entered 10/10/08 12:07:38    Desc
Appendix Authorities Relied Upon In Brief    Page 45 of 47

Page 13 of 15

the notary, his statement is entitled to little weight because of his obvious self interest in the case. He further points to the fact that the notary stated that she does not know Anthony Cotini and had no recollection as to whether he had personally appeared before her to sign the documents. However, only a rare individual can remember every person with whom the individual has a brief encounter. Indeed, that is the basic reason for recognizing a presumption of validity for a notary's certificate in the first place. If a notary's certificate were vulnerable to attack every time an interested witness contradicted the certificate and the notary did not have a personal recollection of the event, "it would shock the moral sense of the community, deny justice, and create chaos in land titles[ ]" and every other type of document requiring notarization. Koepke v. Schumacher, 406 Ill. 93, 98, 92 N.E.2d 152, 155 (1950).

Somewhat troubling is the notary's concession that while her general practice is to see a person actually sign a document before she will notarize it, she sometimes notarized documents without the signing party being present. However, while this statement suggests that her certificate may be invalid in some cases, her testimony does not provide the clear and convincing evidence required to prove that the certificate was false in this particular case. In other words, although Louise Joslyn may have notarized some documents for employees who claimed that the document was signed by the employee's spouse, there is no competent evidence that Joslyn did so for Celia Cotini.

Based upon this record, we find that the spousal consent form signed by Anthony Cotini was valid and, as a result, Encyclopedia Brittanica properly paid Celia Cotini's Savings Plan benefits to Nicolette Butler.

III. CONCLUSION

For the foregoing reasons, the district court's judgment in favor of Nicolette Butler's

Page 296

right to the Savings Plan benefits is hereby AFFIRMED. However, that portion of the judgment declaring Butler's right to the spouse's death benefits under the Pension Plan is REVERSED AND REMANDED with directions to enter judgment in favor of Anthony Cotini, Encyclopedia Brittanica and the Equitable Life Assurance Society of the United States.

---------------

* Judge Easterbrook did not participate in the consideration or decision of this case.

** Hon. James L. Foreman, of the Southern District of Illinois, is sitting by designation.

1 The beneficiary designation form for the Savings Plan provides, in pertinent part:

Savings Plan Beneficiary Designation Form

Complete Section 2 to designate your beneficiaries under the Encyclopaedia Brittanica Savings Plan

Section 2--Savings Plan Beneficiary Designations

You can name anyone you want as your primary and contingent Savings Plan beneficiaries. However, if you are married and designate a primary Savings Plan beneficiary other than your spouse, your spouse must provide his/her written consent by completing Section 3 below. Your spouse must sign and date this form in the space provided and your spouse's signature must be witnessed by a notary public.

Primary Savings Plan Beneficiary: I designate the following person as my primary beneficiary to receive--in the event of my death--any amounts payable to my beneficiary under the terms and provisions of the Encyclopaedia Brittanica Savings Plan.

Section 3--Spouse's Waiver of Primary Beneficiary Designation

I ___, spouse of ___, hereby consent to the primary beneficiary designation made in Section 2 by my spouse, a participant in the Encyclopaedia Brittanica Savings Plan. The designation provides that any amounts payable to my spouse under the terms and provisions of the Encyclopaedia Brittanica Savings Plan will be paid--in the event of my spouse's death--to the designated primary beneficiary. I understand that the effect of this designation is to cause my spouse's account balance to be paid to someone other than myself, that this beneficiary designation is not valid unless I consent to it and that my consent is irrevocable unless my spouse revokes this beneficiary designation.

_____

Spouse's Signature

_____

Date

On this _ day of __, 19__, before me personally came _____ to me known to be the individual described above and who executed the same as his/her free and voluntary act for the uses and purposes stated herein.

_____

Notary Public's Signature

_____

Date Commission Expires

The beneficiary designation form for the Pension Plan is virtually identical in all relevant aspects, except that the instructions for completing Section 2 state:

If you are married to an eligible spouse (as defined by the plan), your spouse is your primary Pension Plan beneficiary automatically.

If you are not married (or if you are married but not to an eligible spouse, as defined by the plan) you may designate any person as your primary Pension Plan beneficiary. However, if you are married and designate a primary Pension Plan beneficiary other than your spouse, your spouse must provide his/her written consent by completing Section 3 below. Your spouse must then sign and date this form in the space provided and your spouse's signature must be witnessed by a notary public.

2 Butler filed a cross-appeal from the district court's failure to award her attorney fees. Appeal No. 94-1431. However she subsequently filed a motion to dismiss that appeal pursuant to Rule 42(b) of the Federal Rules of Appellate Procedure. The motion was granted prior to oral argument on the remaining appeals.

3 ERISA-governed plans also must provide that if a vested participant does not die before the annuity starting date, "the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity...." 29 U.S.C. Sec. 1055(a)(1). Both of these provisions were enacted as a means of providing financial security to the surviving spouse of a plan participant.

4 ERISA provides similar requirements for waiving a qualified joint and survivor annuity (QJSA). 29 U.S.C. Sec. 1055(c)(1), (2), & (3)(A). Encyclopedia Brittanica's plan clearly satisfies these requirements for the QJSA in section 11.3. However, there are no comparable provisions in the plan for the preretirement death benefit.

5 The same general analysis would apply to the Pension Plan's form, however, inasmuch as it is virtually identical to the Savings Plan form in all relevant respects.

6 Cotini argues that this rule is a matter of state law and that ERISA preempts the application of state law. However, reference to state law is proper because ERISA has provided for spousal consents to be witnessed by a notary public, an office which, by definition, is a creature of state law. Therefore, it would be logical to consult state law to determine the effect of a notary's certification.

Secondly, and perhaps more importantly, ERISA preemption "does not mean that all common law concepts are automatically inapplicable in the ERISA context." Thomason, 9 F.3d at 647. Because ERISA is silent as to the precise effect of a notarial certificate, the courts "must construct a federal common law rule to effectuate the policies underlying ERISA." Id. "In so doing, they may use state common law as a basis for new federal common law, but only to the extent that state law is not inconsistent with congressional policy concerns." Id. We find that the presumption of validity accorded to a notary's certificate is not inconsistent with the policies underlying ERISA. Therefore, we would adopt this rule as a matter of federal common law to fill the interstices of ERISA. Moreover, several longstanding Supreme Court cases suggest that this rule is already part of the federal common law. See, e.g., Young v. Duvall, 109 U.S. 573, 577, 3 S.Ct. 414, 416, 27 L.Ed. 1036 (1883) (stating that if an acknowledgment can be contradicted, "the proof to that end must be of such a character as will clearly and fully show the certificate to be false or fraudulent.... The mischiefs that would result from a different rule could not well be overstated."); Northwestern Mut. Life Ins. Co. v. Nelson, 103 U.S. 544, 549, 26 L.Ed. 436 (1880) ("The acknowledgment of a deed can only be impeached for fraud, and the evidence of fraud must be clear and convincing.").