UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>WILLIAM S. PATRICK,<br><br>Debtor. | Case No. SV 07-10312-GM<br><br>Chapter 7<br><br>**MEMORANDUM OF OPINION OVERRULING OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION**<br><br>DATE: AUGUST 27, 2008<br>TIME: 10:00 a.m.<br>PLACE: COURTROOM 303<br>21041 BURBANK BLVD.<br>WOODLAND HILLS, CA 91367 |

    This case presents an issue of first impression under the 2005 amendments to the Bankruptcy Code: under what conditions may a debtor exempt an individual retirement arrangement ("IRA") from the bankruptcy estate under the federal exemptions created by 11 U.S.C. §522(b)(3)(C) and (d)(12)?[1]

    Specifically, the issue is whether distributions from an IRA rolled over more than once during a one-year interval are exempt from the bankruptcy estate under 11 U.S.C. §522(b)(4)(D). To resolve this issue, the court must determine whether the Bankruptcy Code's requirements for exempting distributions rolled over from an IRA incorporate the requirements for exemption from taxation found in 26 U.S.C. §408(d)(3).

---

[1] The language contained in both subsections is identical.

# I. STATEMENT OF RELEVANT FACTS

On January 31, 2007, William S. Patrick ("Debtor") filed a voluntary Chapter 7 petition. In his original Schedule C, Debtor claimed the "whole" IRA as exempt in the amount of $175,000 under Cal. Civ. Proc. Code §703.140(b)(10)(E). In amended schedules filed on July 18, 2007 and then again on November 19, 2007, the Debtor claimed as exempt $172,870.95 in his First Bank IRA under both Cal. Civ. Proc. Code §703.140(b)(10)(E) and 11 U.S.C. §522(b)(3)(C). On June 18, 2007, Walter Prince ("Prince"), a judgment creditor owed approximately $2.4 million and the Debtor's former business partner, filed an objection to the Debtor's claim of exemptions.

Debtor opened the IRA in 1975 and claims to have contributed the maximum amount allowed every year since, except for 1995 when no contributions were made.[2]

On June 5, 2006, the IRA in question consisted of account number 001-805237 at First Private Bank & Trust in Granada Hills, CA ("First Bank IRA" or "IRA") with a balance of $172,685.05. Beginning on that date, three cashier's check were drawn on the First Bank IRA and each was subsequently redeposited into that same account within a four-month period:

1. June 5, 2006 - the Debtor obtained a cashier's check made payable to himself in the amount of $172,000. The check was labeled as "distribution 1-805237." On June 12, 2006, the Debtor deposited the same check back into his First Bank IRA.

2. July 14, 2006 - after making an additional $4,000 contribution to the First Bank IRA, the Debtor obtained another cashier's check made payable to himself in the amount of $176,000. The check was labeled "1805237." On July 24, 2006, the Debtor deposited the same check back into his First Bank IRA.

3. August 30, 2006 - the Debtor obtained another cashier's check made payable to himself in the amount of $176,000. The check was labeled "2006 distribution." On September 27, 2006, the Debtor deposited the same check back into his First Bank IRA.

The principal issue raised at the time that this objection was filed and for months thereafter

---

[2] Debtor initially declared that he made no contributions in 1988, 1990, 1999, and 2002; however, the account statements later turned over by Debtor show that he actually did make contributions in all of these years and those contributions are reflected in the charts used for the purpose of calculating the eligible amount of his exemption. Further, Debtor concedes that he was not allowed to make contributions after he reached age 70½ and therefore no amount is reflected in 2006.

1  was whether the Debtor had made the correct contributions so that the full amount of the funds held in
2  the First Bank IRA was tax deferred. Debtor asserted lack of records and the matter was continued
3  several times to allow him to gather evidence so that accountants for both parties could review the
4  records and ascertain whether all contributions qualified for tax deferred status. Eventually, the Debtor
5  produced substantially complete records of contributions and then, for the first time, the three 2006
6  transactions noted above came to light and Prince raised the issue of whether the IRA had lost its
7  exempt status because there had been more than one rollover in a single twelve-month period.

8       Since then, several issues have been put before the court: (1) whether obtaining the three
9  cashier's checks within the same twelve-month period removes $176,000 (and its accrued interest from
10 July 14, 2006) from tax deferred status as set forth in 28 U.S.C. §408; (2) if the First Bank IRA funds no
11 longer have tax deferred status under 28 U.S.C. §408, does that prevent the Debtor from claiming an
12 exemption under 11 U.S.C. §522(b)(3)(C); (3) whether some or all of the remaining First Bank IRA
13 funds can be exempted under 11 U.S.C. §522(b)(3)(C) and, if so, how much is exempt; (4) whether
14 some or all of the First Bank IRA funds can be exempted under Cal. Civ. Proc. Code
15 §703.140(b)(10)(E); and (5) assuming that some portion of the funds in the First Bank IRA can be
16 exempted, what is that amount.

17

18 **II. WHETHER DEBTOR CAN CLAIM THE FUNDS EXEMPT UNDER FEDERAL LAW**
19     **A. <u>Eligible amount of exemption in the First Bank IRA</u>**
20      The amounts and dates of the contributions are disputed, and the objection has been
21 continued over a period of months to allow the Debtor to obtain sufficient evidence to finalize the
22 calculation. On January 8, 2008, Prince filed a declaration by his expert Neil S. Harmon concluding that
23 "the total deposits reveal a total balance of $70,030.16 inclusive of accrued interest as of December 31,
24 2006" and therefore anything above that amount should be disallowed. Then, in a pleading dated
25 January 14, 2008, Prince argued that, based on a review of additional documents, the above amount
26 should be decreased by $4,000, which was deposited post-retirement, for a new total of $66,030.16.
27      In a declaration dated June 4, 2008, Prince's expert Neil Harmon discussed the interest on
28 $42,887.62 in disputed contributions which constitute the "beginning balance" as of 1/1/87 and for

3

1  which the Debtor provided no supporting documents. Harmon calculated that this amount plus interest
2  currently accounts for $119,271.80 of the claimed exemption. In response, the Debtor provided evidence
3  that he sought to obtain records from the financial institution but was unable to do so because the
4  deposits were made too many years ago. Because the Debtor has met his burden and satisfied Federal
5  Rule of Evidence 1004 by presenting adequate testimony to explain the lack of records, the disputed
6  funds will not be subtracted from the eligible amount.

   The parties also argued over a $2,000 IRA contribution on 3/5/97, a $4,000 contribution on
   7/17/06, and a $15,000 contribution on 6/21/06. However, the Debtor eventually conceded that these
   contributions and interest thereon should be excluded from the exempt amount (see Debtor's Response
   to Evidentiary Objections, etc. dated 6/11/08).[3]

   In sum, Prince argues that once the total disputed contributions of $140,899.79 are taken into
   account, the Debtor's exemption should be denied in full because the disputed contributions exceed
   what the Debtor has already withdrawn from the IRA and the balance on hand.

   Based on the evidence before the court at this time, I find that the contributions are as set
   forth in the charts entitled "Summary of Actual IRA Activity from 1987" (Exhibit 3) and "Projected
   IRA Analysis" (Exhibit 25) filed by Debtor on March 25, 2008 with the Declarations of Donald T. Fife,
   CPA and William S. Patrick.[4] In accordance with the figures reflected in those charts, the court
   concludes that the full $172,870.95 constitutes an eligible amount which would qualify as exempt
   deposits and proceeds in the First Bank IRA account.

   However, once monies are deposited in an IRA account, they can lose their exempt status
   through later acts of the Debtor.

---

[3] As to the $4,622.21 discrepancy relating to 1975-1986 deposits by debtor's deceased spouse (described on p.1 of the Debtor's Response to Evidentiary Objections, etc., dated 8/11/08), the court accepts Debtor's explanation as reasonable and will not subtract this amount from the eligible amount.

[4] I have accepted the projected deposit amounts for 1975-1986 made by both the Debtor and his deceased spouse as reflected in Exhibit 25 based on Debtor's uncontroverted evidence that (1) he commenced contributions when the retirement savings system first became available in 1975, (2) he sought to but was unable to obtain complete supporting documents for the years 1975-1986, (3) the figures are documented in part by past tax returns which comport with Debtor's testimony, and (4) Debtor's expert Mr. Fife used a reasonable method to calculate the contributions and interest thereon.

### B. Qualifying for exemption under §522(b)(3)(C) of the Bankruptcy Code

Under 11 U.S.C. §522, debtors may exempt certain property from the claims of creditors. Following the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub. L. No. 109-8, § 224, 119 Stat. 23 (2005), exempt property now includes "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code of 1986."[5] Although the language is identical, a debtor may elect to exempt property under either §522(b)(3)(C) or §522(d)(12); in this case, the Debtor made the §522(b)(3)(C) election, which can be used in opt-out states such as California.

There are two ways for a retirement fund to be exempt: (1) a retirement fund is presumed to be exempt under §522(b)(4)(A) if the fund has received a favorable determination under section 7805 of the Internal Revenue Code of 1986 and that determination is in effect when the petition is filed or (2) if the fund has not received a favorable determination, it may be exempt if the debtor demonstrates that (i) no prior determination to the contrary has been made by a court or the IRS and (ii) the retirement fund is in "substantial compliance" with the Internal Revenue Code ("IRC") or the retirement fund fails to be in "substantial compliance" with the IRC and the debtor is not materially responsible for that failure.[6]

The first question requiring resolution by this Court is whether the Debtor's IRA should be presumed exempt from the bankruptcy estate under §522(b)(4). Neither party contends that the IRA received any prior favorable or contrary determination by the IRS or a court of law. Therefore, pursuant to §522(b)(4)(B), the Court must determine whether the IRA is in "substantial compliance" with the applicable requirements of the IRC or, if not, whether the debtor is not materially responsible for the non-compliance.

To support his contention, the Debtor provided a declaration by Denise Wilson, Fiserv Trust Company's Compliance Officer, dated July 2007 and stating that the Debtor's IRA "is in substantial

---

[5] §522(b)(3)(C); §522(d)(12).

[6] §522(b)(4)(B)(i)-(ii).

compliance with the applicable requirements of the Internal Revenue Code."[7] Prince has not attempted to refute Ms. Wilson's declaration with evidence to the contrary but instead argues that the Debtor's multiple rollovers violate §408(d)(3)(B)[8] of the IRC, effectively disqualifying the IRA from exempt status. By so doing, Prince ignores the fact that a distribution can be taxed without having any effect on the tax exempt status of the account itself.[9] In other words, Prince fails to acknowledge the distinction made in the IRC and the Bankruptcy Code between a tax exempt account and a tax exempt distribution.[10]

While it is tempting to limit the inquiry to a determination of whether the Debtor's IRA is in substantial compliance with the IRC, that would render the rest of §522(b)(4) superfluous. It is a fundamental rule of statutory construction that every word, clause, and provision in a statute must be given effect so that no part would be rendered inoperative or superfluous.[11] Therefore, paragraphs (b)(4)(C) and (D) must be given equal force in analyzing §522(b). Those subsections address direct transfers and rollover distributions (sometimes referred to as "indirect transfers") from retirement accounts. Consistent with the tax treatment of direct transfers between trustees,[12] subsection (b)(4)(C) states that a direct transfer of retirement funds between tax exempt accounts does not affect the exemption under subsections (b)(3)(C) and (d)(12).[13] Similarly, a properly rolled-over distribution from a retirement account does not affect the exemption of the distribution under subsections (b)(3)(C) and

---

[7] Although Wilson's declaration does not attest to whether the IRA was in substantial compliance on the date of the bankruptcy petition, which is the operative date for purposes of this analysis, the parties did not raise this as an issue.

[8] 26 U.S.C. §408(d) deals with the tax treatment of distributions and will be discussed in the next section.

[9] See Michel v. C.I.R., 58 T.C.M. (CCH) 1019 (T.C. 1989) (holding that the subsequent tax treatment of an IRA contribution does not affect the validity of the IRA).

[10] The distinction can be found in the IRC in that the tax-exempt status of distributions and the tax-exempt status of an IRA are discussed separately. Section 408(d)(3) deals specifically with the taxability of distributions, while §408(e) governs the disqualification and taxability of the fund itself.

[11] In re Catapult Entm't, Inc., 165 F.3d 747, 751 (9th Cir. 1999); see also 2A Singer, SUTHERLAND STATUTORY CONSTRUCTION § 46.6 (7th Ed. 2007).

[12] IRS Publication 590 (2007) states in part: "[a] transfer of funds in your traditional IRA from one trustee directly to another, either at your request or at the trustee's request, is not a rollover. Because there is no distribution to you, the transfer is tax free."

[13] §522(b)(4)(C).

(d)(12).[14] Therefore, retirement funds that are properly transferred via direct transfer or a tax-free rollover distribution do not cease to qualify for exemption by reason of such transfer or distribution. Conversely, this implies that if a direct transfer or rollover distribution does not comply with the applicable IRC provisions "to the extent allowed by law,"[15] the funds may cease to qualify for exemption from the bankruptcy estate. Thus, the court must determine whether the funds that Debtor distributed in the multiple rollovers ceased to qualify for exemption from the bankruptcy estate under subsection (b)(4)(D) by reason of such distribution.

### C. How can IRA funds qualify for exemption?

#### 1. Rollover distributions exempt from taxation under the IRC

Section 402(c) of the IRC contains the rules applicable to rollovers from exempt trusts,[16] and provides that distributions from such trusts that are transferred to "eligible retirement plans"[17] are exempt from taxation as long as such transfers are made within 60 days of the distribution.[18] If the transfer is not "rolled over" within 60 days, the distribution is taxable.[19] An individual will be treated as receiving a distribution if a check is made payable and received by the individual, as opposed to the funds being transferred directly from trustee of one IRA to trustee of another IRA.[20] This is because the "receipt of a check is tantamount to the receipt of cash, even if the check is not deposited or otherwise negotiated, provided that its receipt is not subject to 'substantial limitations' and there is no reason to suppose that it will be dishonored."[21]

Rollover distributions from an IRA are described in §408(d) of the IRC. Such distributions

---

[14] §522(b)(4)(D).

[15] §522(b)(4)(D)(ii)(II).

[16] Pursuant to §402(c)(8)(A), "exempt trust" means an employees' trust described in §401(a) that is tax-exempt under §501(a) of the IRC.

[17] An IRA, described in §408(a) of the IRC, is an example of an "eligible retirement plan."

[18] 26 U.S.C. §402(c)(3).

[19] §402(c)(3)(A).

[20] Martin v. C.I.R., 63 T.C.M. (CCH) 3122 (T.C. 1992), aff'd, 987 F.2d 770 (5th Cir. 1993).

[21] Id. n.5, citing Lavery v. Commissioner, 158 F.2d 859, 860 (7th Cir. 1946), affg. 5 T.C. 1283 (1945).

7

are exempt from taxation as long as they are "rolled over" into an IRA within 60 days.[22] However, such tax exempt rollovers may only occur once per year from the time of receipt of the distribution and any additional rollovers made during that year are taxable.[23] For purposes of §408(d)(3)(B), the fact that funds distributed from an IRA are withdrawn and redeposited on the same day is irrelevant, and such act constitutes a rollover.[24]

### 2. Rollover distributions exempt from the bankruptcy estate under §522(b)(4)(D)

In addition to the retirement accounts described above, §522(b)(4)(D) exempts from the bankruptcy estate two types of distributions:

> (i) [A]ny distribution that qualifies as an eligible rollover distribution within the meaning of section 402(c) of the Internal Revenue Code of 1986 or . . . (ii) . . . an amount that . . . has been distributed from a fund or account that is exempt from taxation under section . . . 408 of the Internal Revenue Code . . . and . . . to the extent allowed by law, is deposited in such a fund or account not later than 60 days after the distribution of such amount.[25]

Congress inserted subsection (b)(4) as a way of qualifying or limiting the types of actions a debtor may take with respect to his or her IRA. This is also evident by use of the phrase "[f]or purposes of paragraph (3)(C) and subsection (d)(12), the following shall apply,"[26] which resembles qualifying language. As long as a distribution complies with §402(c) (and qualifies for exemption from taxation under that subsection) or is "rolled over" into another retirement account within 60 days, it is exempt from the bankruptcy estate. In other words, to qualify for exemption from the bankruptcy estate, a rollover distribution must be exempt from taxation.

### D. Applicability of IRC §408(d)(3)(B) to Bankruptcy Code §522(b)(4)(D)

The issue in contention here is whether the totality of the requirements and limitations for rolling over distributions from an IRA are listed in §522(b)(4)(D) or whether the IRC rules governing the taxability of such distributions must also be applied in the bankruptcy context. The Debtor contends that the requirements for rolling over distributions from an IRA are conclusively laid out in

---

[22] §408(d)(3)(A)(i). Failure to comply with the rollover requirements may result in an excess contribution and the imposition of a 6% excise tax. 26 U.S.C. §4973(a).

[23] §408(d)(3)(B).

[24] Martin, supra note 15.

[25] 11 U.S.C. §522(b)(4)(D).

[26] 11 U.S.C. §522(b)(4).

8

§522(b)(4)(D), and that if Congress wanted to incorporate the IRC's requirements, it would have expressly done so. Prince argues that there are multiple instances where §522(b) refers to IRC sections generally as a way of incorporating their respective requirements. The court agrees with Prince.

Each part or section of a statute should be construed in connection with other parts or sections of the statute in order to produce a uniform and harmonious result.[27] The general purpose and intent of the whole act controls, and all parts of the statute must be interpreted consistently with that purpose.[28] With this in mind, it is clear from the language of §522(b) that funds from an IRA are exempt from the bankruptcy estate under federal law to the extent that they are exempt from taxation under the applicable sections of the IRC. For example, paragraph (4)(C) states that a direct transfer of retirement funds from one tax exempt retirement account to another does not disqualify the funds from exemption from the bankruptcy estate. This is consistent with the fact that such direct transfers are tax free. A close reading of subsection (b)(4)(D) renders a similar conclusion regarding the exemption of distributions out of a retirement account: a distribution out of a tax exempt retirement account does "not cease to qualify for exemption" from the bankruptcy estate if (1) it is rolled over in accordance with §402(c) of the IRC or (2) to the extent allowed by law, is rolled over into a tax exempt retirement account within 60 days. In other words, if the distribution is exempt from taxation, it is exempt from the bankruptcy estate.

The IRC's rule that only one tax free rollover can be made in a one-year period applies in determining whether a rolled-over distribution is exempt from the bankruptcy estate under §522(b)(4)(D)(ii). This rule is incorporated by the phrase "to the extent allowed by law,"[29] which indicates intent to include any other requirements and limitations that may exist in the IRC. Because the IRC often contains long and complex provisions, Congress' use of the phrase "to the extent allowed by law" indicates an intent to incorporate these requirements for bankruptcy purposes without the hassle of reiterating them in the Bankruptcy Code. In fact, the language of §522(b)(4)(B) contains an additional

---

[27] Gustafson v. Alloyd Co., Inc., 513 U.S. 561 (1995).

[28] BFP v. Resolution Trust Corp., 511 U.S. 531 (1994).

[29] It should be noted that this phrase does not exist anywhere else in the Bankruptcy Code. The court disagrees with the Debtor's interpretation that this means "[t]ransactions which are legal but taxable are 'allowed by law'" because such interpretation omits the qualifying language "**to the extent** allowed by law" (emphasis added). And for purposes of tax exempt rollovers, the law does not allow distributions to take place more often than once a year.

9

provision to support this, namely that "the retirement fund is in substantial compliance with **the applicable requirements** of the Internal Revenue Code...."[30]

In addition, the conclusion that Congress intended to incorporate the IRC requirements for rolling over distributions into the Bankruptcy Code is supported by the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[31] Viewing §522(b)(4)(D)(ii) in context and in its place in the overall statutory scheme, it is apparent that under federal law, Congress intended to exempt retirement accounts and/or distributions from the bankruptcy estate only to the extent that the accounts and/or distributions are exempt from taxation under the applicable sections of the IRC.

In sum, this Court concludes that the language of §522(b) indicates that the IRC's requirements and procedures for rolling over distributions from an IRA apply in determining whether any improperly rolled over distributions cease to qualify for exemption from the bankruptcy estate.

### E. The Debtor's multiple rollovers are not exempt from the bankruptcy estate because they would not qualify for exemption from taxation under IRC §408(d)(3)(B)

It is undisputed that the Debtor's withdrawals and subsequent deposits of the money from his IRA in 2006 constitute rollovers. As required by law, all three rollovers were reported as distributions by First Private Bank & Trust on a 2006 Form 1099-R in the total sum of $362,019.72. Although the Debtor's first rollover on June 12, 2006 was proper, the second and third rollovers occurred within one year of the first, in violation of the limitation set out in §408(d)(3)(B). Consequently, the $176,000 distributions involved in the second and third rollovers within the same year cannot be exempt from the bankruptcy estate under §522(b)(4)(D) because they did not occur "to the extent allowed by law."

Without providing any case law in support, the Debtor argues that the §408(d)(3)(B) limitation does not apply because the language of the section refers to receipt by the taxpayer of "any other amount" within the same year, and here the Debtor withdrew and redeposited exactly the same funds three times. Whether "amount" means an identical sum or a prior distribution is irrelevant because in this case there was a prior distribution and it was for a lesser sum ($172,000 was first

---

[30] 11 U.S.C. §522(b)(4)(B)(ii)(I) (emphasis added).

[31] FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (quoting Davis v. Mich. Dept. of Treasury, 489 U.S. 803, 809 (1989)).

received and the second distribution was for $176,000). For all the above reasons, Prince's objection to the Debtor's exemption under federal law must be sustained.[32]

### III. WHETHER DEBTOR CAN CLAIM THE FUNDS EXEMPT UNDER CALIFORNIA LAW

However, the Debtor may still pursue the exemption as claimed under state law pursuant to Cal. Civ. Proc. Code §703.140(b)(10)(E). For purposes of meeting the exemption under California law, the issue is to what extent the funds in Debtor's IRA are "reasonably necessary" for his support (debtor claims no dependants), given that he is a widower, 73 years old, and has no future employment prospects. In the Ninth Circuit, the "reasonably necessary" standard of §704.115(b) has been applied to cases in which a §703.140(b)(10)(E) exemption has been claimed.[33] Although the court has wide discretion in determining the amount necessary to support the debtor,[34] it is instructed to consider the Moffat factors when making findings on support: (1) the debtor's present and anticipated living expenses and income; (2) the age and health of the debtor; (3) the debtor's ability to work and make a living, including his/her training, skills and education; (4) the debtor's other assets and their liquidity; (5) the debtor's ability to save for retirement; and (6) any special needs of the debtor and his/her dependants.[35] Under Fed. R. Bankr. P. 4003(c), the objecting party has the burden of proving that the exemptions are not properly claimed, but there is no requirement that evidence must be provided on

---

[32] In their supplemental briefs filed after this matter was submitted, the parties did an excellent job briefing the legislative history which has confirmed the court's result in this case, with the following additional noteworthy comments not contained in the discussion above: (1) although waivers of the 60-day rule can be granted by the IRS under specific conditions including natural disasters and other unusual situations (which do not exist in this case), no such waivers appear to be allowed for the one-year rule; (2) any such waiver authority would have to be exercised by the IRS, not the courts; (3) both the 2006 Form 1099-R and 2006 tax return Form 1040 show distributions of $362,000; (4) Private Letter Ruling 9010007 cited by Prince confirms that temporarily withdrawn funds which are redeposited into same account within 60 days can qualify for tax-free treatment, but the taxpayer is limited to only one such tax-free event per year; (5) it appears that Debtor was aware of the one-year rule because he checked the box reflecting this limitation each time he took out the funds; and (6) the public policy reason clearly implicated in this case is the legislature's intent to prevent shifting of investments more than once a year (previously more than once every three years). As to Prince's evidentiary objection to Debtor's declaration dated 10/6/08 (filed in support of the Debtor's Brief Re Legislative History), that objection is sustained. In the brief dated 10/10/08, debtor blames First Private for not providing him with correct information regarding the effect of his withdrawals. However, assuming this is true, it would not absolve the Debtor from being materially responsible for compliance and would not change the court's analysis.

[33] See In re Davis, 323 B.R. 732, 736 (9th Cir. BAP 2005).

[34] See In re Spenler, M.D., 212 B.R. 625, 631 (9th Cir. BAP 1997).

[35] Davis, 323 B.R. at 736, quoting In re Moffat, 119 B.R. 201, 206 (9th Cir. BAP 1990), aff'd, 959 F.2d 740 (9th Cir. 1992).

11

1  each element "if there is other evidence from which it can be determined that the retirement funds at
2  issue are not necessary for debtor's support upon retirement."[36]
3  The factors most relevant in this case are the Debtor's age, lack of future employment
4  prospects and limited income potential. Debtor is 73 years old and there is no dispute that he will not be
5  meaningfully employed and able to add to his savings for retirement. In addition, due to his age, he's not
6  allowed to make any more IRA contributions. In a declaration filed on July 19, 2008 as part of his
7  opposition to the motion objecting to his claim of exemption, the Debtor disclosed his only sources of
8  income as social security ($928 per month) and a U.S. Army pension ($1,392.83 per month), totaling
9  $2,320.83 in monthly income.  This amount is also reflected on Debtor's most current amended
10 schedules filed on November 19, 2007, which also show that Debtor requires $3,256.69 in monthly
11 living expenses. Since Debtor's expenses are not met with his regular monthly income from social
12 security and pension (the difference being $935.86), he has been supplementing his income with
13 distributions from his IRA. To wit, in 2005 Debtor received $21,000 in net IRA distributions and in
14 2006, Debtor received $14,020. Based on his most recently filed schedules, Debtor has been
15 withdrawing $1,000/month from his IRA, for a 2007 estimated total of $12,000.
16 As discussed above, the court finds that on the date of bankruptcy the account contained
17 $172,870.95, which would be subject to Cal. Civ. Proc. §703.140(b)(10)(E).  Debtor's expenses do not
18 appear extravagant and Prince does not question their validity. Aside from increasing living expenses
19 (due to inflation) which are discussed in Donald T. Fife's declaration dated June 11, 2008, the Debtor
20 estimates an additional $18,450 in attorney's fees if this case goes to trial, and perhaps $25,000-30,000
21 if additional discovery and appeals are taken into account. As a starting point, Debtor's current expenses
22 amount to $39,080.28 a year.
23 It is difficult to ascertain what standard should be used to determine reasonable expenses.
24 Although Prince alludes to the poverty level, that is not a proper guide.  But neither is it appropriate to
25 merely rubberstamp the lifestyle that the Debtor has been used to.  The IRS Standards have become the
26 darlings of Congress in recent years, so that might be a good place to start, keeping in mind that the
27 Debtor is on a fixed income, but can expect an increase in health-related costs as he ages such as the

---

28  [36] Davis, 323 B.R. at 736, 739. Interestingly, in Davis, the trustee/objecting party presented the declaration and testimony of Donald Fife, the Debtor's expert in this case.

12

need for a companion, a driver, and/or nursing care. And as far as income goes, it might be worthwhile to look at median income for this geographic area.[37]

The January 31, 2007 median family income for California for a single earner was $3,592.25 per month, which is well in excess of that received by Patrick exclusive of his IRA. To meet the median, he would have to draw about $1,200 per month from the IRA. The IRS standards for a single person living in Los Angeles County for 2008 allow $3,149 per month in expenses.[38] The expenses set forth by Debtor on Schedule J are very close to these totals. Assuming that he is allowed $3,149 per month to live on, he would be required to draw $828 per month from his IRA. Next, the court should look at how much must be in that IRA account to assure that it will last for Patrick's life expectancy.[39]

The experts disagree over which life expectancy table to use: Debtor's expert Mr. Fife is using a 2003 expectancy table, while Prince's expert Mr. Ahuja is relying on 1983 Group Annuity Mortality Tables. Since it is almost the end of 2008, the court believes that the 2003 table reflects a more accurate picture of today's mortality rates and thus adopts Mr. Fife's analysis as more convincing. Under Mr. Fife's analysis, the Debtor requires a minimum of $197,199 of current funds to pay his expenses over the next **12 years**. Under Mr. Ahuja's analysis which uses the 2008 HHS Poverty Guidelines, the Debtor would require the maximum sum of $120,158 to survive over the next **14 years**. As noted above, the HHS poverty guidelines are not the correct standard to use.

Assuming that income and expenses both rise at the inflation rate, the court can easily calculate the drawdown of the IRA account. If the debtor were to withdraw $828 per month from the IRA account for the 14 years of Patrick's life expectancy, this would require $139,104 in the account as of this time. However, it is very likely that, given the current technological advances in the health

---

[37] All figures come from the websites of the U.S. Census Bureau and Internal Revenue Standards for 2008. Because the national IRS standards for food and clothing in effect when debtor filed were based on income, I am using the current standards, which no longer include this variable. In ascertaining the debtor's "income," the court notes that at the time of filing it included an IRA withdrawal of $1,000 per month. This is deducted for purposes of these calculations. Therefore the gross income as of the date of filing (January 31, 2007) would be $2,320.83 per month (Social Security of $928 and pension of $1,392.83). Because of the short time frame from filing to the present, "mixing apples and oranges" by using income in 2007 and charts from 2008 should not have a meaningful impact on the outcome of this analysis.

[38] Food, clothing, etc. = $507; transportation of one car = $750; housing = $1,748; and health care for age 65+ = $144.

[39] Given the fluctuations of the stock market, it is extremely difficult to know how much will be in the account at any given time unless it is in cash. For this analysis, it is assumed that the money is in cash and will remain that way, drawing interest at about the inflation rate.

13

industry, Debtor may outlive his life expectancy, but not without having to meet an unknown higher cost of health care. In addition, Debtor presented uncontroverted evidence that he will likely incur a total of $18,450 of legal expenses in the next two years and will be liable for a total of $18,000 in taxes in the next two years and $2,500 per year thereafter (or $30,000 over the remaining years),[40] amounting to an additional $66,450 needed in the next 14 years. This would require over $200,000 in the account as of this time, which exceeds the $172,870.95 exemption.

Thus, the court concludes that the whole amount of the exemption is reasonably necessary for Debtor's support and should be allowed as claimed under California law.

DATED: 10/31/08

GERALDINE MUND, BANKRUPTCY JUDGE

---

[40] See p.3 of Mr. Fife's declaration dated June 11, 2008 filed in support of Debtor's reply re the June 18, 2008 hearing. The court is not taking into account the $100,000 projected cushion referred to in Mr. Fife's declaration in case Debtor exceeds the 12 year life expectancy used by Mr. Fife.

14

# CERTIFICATE OF MAILING

I, _____CECILIA ESPINO_____, a regularly appointed and qualified clerk of the United States Bankruptcy Court for the Central District of California, do hereby certify that in the performance of my duties as such clerk, I personally mailed to each of the parties listed below, at the addresses set opposite their respective names, a copy of the MEMORANDUM OF OPINION OVERRULING OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION in the within matter. That said envelope containing said copy was deposited by me in a regular United States mailbox in the City of Los Angeles, in said District, on _____NOV - 3 2008_____.

Mark M. Sharf
Sharf Law Firm
15821 Venture Blvd., Suite 245
Encino, CA 91436

Allan D. Sarver
16633 Ventura Blvd., Suite 800
Encino, CA 91436

David Seror
2029 Century Park East, 21st Floor
Los Angeles, CA 90067

Daniel Gill
Ezra Brutzkus Gubner
21650 Oxnard Str., Suite 500
Woodland Hills, CA 91367

Office of the United States Trustee

_____
(Clerk)

15